**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
         -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC,<br><br>               Plaintiffs,<br><br>     v.<br><br>LETITIA JAMES, in her official capacity as Attorney General for the State of New York,<br><br>          Defendant. | Civil Action No.: 1:21-cv-01352-BKS-CFH |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

Alina Habba, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
         -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ...................................................................................1

STATEMENT OF FACTS .............................................................................................2

LEGAL STANDARD.....................................................................................................4

ARGUMENT .................................................................................................................5

   I.   Plaintiffs Are Suffering Irreparable Harm Due to the Ongoing Deprivation of Their Constitutional Rights .................................................................................................5

   II.   Plaintiffs Have a Likelihood of Success on the Merits.......................................................7

      A.  Plaintiffs' Right to Freedom of Speech under the First Amendment is Being Impermissibly Infringed........................................................................................7

      B.  Defendant Has Violated Plaintiffs' Fourth Amendment Right to be Free from Unreasonable Searches and Seizures ....................................................................10

      C.  Defendant's Actions Violate Plaintiffs' Constitutional Right to Due Process Under the Fourteenth Amendment....................................................................................13

          i.   Defendant is an Interested Prosecutor........................................................14

          ii.   Defendant's Participation in a Contemporaneous Criminal Action Exceeds its Statutory Authority...............................................................................16

      D.  Defendant's Actions Constitute an Abuse of Process...........................................20

          i.   The Balance of the Hardships Tips in Plaintiffs' Favor ............................23

          ii.   A Preliminary Injunction is in the Public Interest ...................................24

CONCLUSION..............................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

*A'Hearn v. Comm. on Unlawful Practice of Law of N.Y. Cty. Lawyers' Ass'n*,

23 N.Y.2d 916, 919 (1969) ...................................................................................12

*Airbnb, Inc. v. Schneiderman*,

44 Misc. 3d 351, 356 (Sup. Ct. Albany Cnty. 2014) .............................................12

*Am. Civil Liberties Union v. Clapper*,

804 F.3d 617, 622 (2d Cir. 2015) .........................................................................4, 5

*Ass'n of Jewish Camp Operators v. Cuomo*,

470 F.Supp.3d 197, 227 (N.D.N.Y July 6, 2020) ..................................................6

*Berger v. United States*,

295 U.S. 78, 88 (1935) ......................................................................................14, 24

*Bisnews AFE (Thailand) Ltd. v. Aspen Research Grp. Ltd.*,

437 Fed. App'x 57, 58 (2d Cir. 2011) .....................................................................6

*Board of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers
Assn., Inc.*,

38 N.Y.2d 397 (1975) ............................................................................................20

*Brock v Tolkow*,

109 F.R.D. 116, 119 (E.D.N.Y 1985) ....................................................................19

*Buckley v. Valeo*,

424 U.S. 1, 15, 96 S. Ct. 612, 632 (1976) .............................................................7, 8

*Cf. Screws v. United States*,

325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) ...............................................14

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*,

598 F.3d 30, 35 (2d Cir. 2010) ..............................................................................23

*Citizens United v. Fed. Election Comm'n*,

    558 U.S. 310, 340 (2010)..................................................................................7, 8

*Cook v. Sheldon*,

    41 F.3d 73, 80 (2d Cir. 1994) ..................................................................................20

*Covino v. Patrissi*,

    967 F.2d 73, 77 (2d Cir. 1992) ..................................................................................6

*Curiano v. Suozzi*,

    63 NY2d 113, 116 (1984).........................................................................................20

*D'Amico v. Correctional Med. Care, Inc.*,

    120 A.D.3d 956, 960 (4th Dept 2014) .....................................................................22

*DaCosta v. City of New York*,

    296 F. Supp. 3d 569, 600 (E.D.N.Y. 2017) .............................................................24

*Elrod v. Burns*,

    427 U.S. 347, 373 (1976).....................................................................................6, 23

*Faiveley Tansport Malmo AB v. Wabtec Corp*,

    559 F.3d 110, 118 (2d Cir. 2009) ..............................................................................6

*Fed. Election Com'n v. Larouche Campaign*,

    817 F.2d 233, 234 (2d Cir. 1987) .......................................................................10, 11

*Fed. Trade Comm'n v. Am. Tobacco Co.*,

    264 U.S. 298, 306 (1924)...................................................................................10, 12

*Ginsberg v. Ginsberg*,

    84 A.D.2d 573, 573 (2d Dep't 1981)........................................................................21

*Hartman v. Moore*,

    547 U.S. 250, 256 (2006)..........................................................................................10

*Heffernan v. City of Paterson, N.J.*,

    578 U.S. 266, 270, 136 S.Ct. 1412, 1417, 194 L Ed 2d 508 (2016)........................8

*Hill v. Colorado*,

    530 U.S. 703, 719 (2000)................................................................................7

*Horn Const. Co. v. Fraiman*,

    34 A.D.2d 131, 133 (1st Dep't 1970) ...........................................................12, 13

*In re Horowitz*,

    482 F.2d 72, 78 (2d Cir. 1973)  ....................................................................11

*Jolly v. Coughlin*,

    76 F.3d 468, 482 (2d Cir. 1996) ...............................................................6, 7, 23

*Liss v. Forte*,

    96 A.D.3d 1592, 947 N.Y.S.2d 270 (4th Dep't 2012) .........................................20

*Lore v. City of Syracuse*,

    No. 00-CV-1833-HGM-DEP, 2001 WL 263051 at *6 (N.D.N.Y. 2001) ...........................23

*Lynch v. City of New York*,

    589 F.3d 94, 98 (2d Cir. 2009) .......................................................................4

*Marshall v. Jericho, Inc.*,

    446 U.S. 238, 249-250 (1980) ....................................................................5, 14

*Matter of Haggerty v. Himelein*,

    89 N.Y.2d 431, 436 (1997)..........................................................................19

*Matter of Harlem Teams for Self-Help v. Department of Investigation of City of N.Y.*,

    122 Misc.2d 1066, 1074, 472 N.Y.S.2d 967 (N.Y. Co. 1984) ..............................16

*Mitchell v. Cuomo*,

    748 F.2d 804, 806 (2d Cir. 1984) ................................................................6, 23

*Morrison v. Lefevre*,

    592 F Supp 1052, 1077 (SDNY 1984) ...................................................................14

*Myerson v. Lentini Bros. Moving & Storage Co.*,

    33 N.Y.2d 250, 258 (1973)...................................................................................12

*N.Y. State Dept. of Fin. Servs.*,

    769 F.3d at 110 ......................................................................................................7

*Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Servs.*,

    769 F.3d 105, 110 (2d Cir. 2014)  .........................................................................4

*Palko v. Connecticut*,

    302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937)...................................13

*Parkin v. Cornell Univ., Inc.*,

    78 N.Y.2d 523, 530 (1991)...................................................................................22

*People v. Gilmour*,

    98 N.Y.2d 126, 132 (2002)...................................................................................16

*People v. Cuttita*,

    7 N.Y.3d 500, 507 (2006).....................................................................................16

*People v. Fox*,

    253 A.D.2d 192, 195 (1999).................................................................................17

*People v. Fuller*,

    282 N.Y.S. 28, 49 (Gen. Sess. 1935)....................................................................24

*People v. Romero*,

    91 N.Y.2d 750, 758 (1998)...................................................................................17

*Police Dep't of Chi. v. Mosley*,

    408 U.S. 92, 96 (1972)...........................................................................................8

*Reilly v. Natwest Markets Group, Inc.*,

    178 F.Supp.2d 420, 430 (S.D.N.Y. December 28, 2001) ....................................................20

*Rochin v. California*,

    342 U.S. 165, 169 (1952) .............................................................................................13, 19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,

    515 U.S. 819, 828 (1995) ..................................................................................................8

*See v. City of Seattle*,

    387 U.S. 541, 544 (1967) ................................................................................................11

*Statharos v. New York City Taxi and Limousine Commission*,

    198 F.3d 317, 322 (2d Cir.) .............................................................................................6

*Sterling Bank v. A-I Hotels Int's Inc*,

    175 F.Supp.2d 573, 579 (S.D.N.Y. 2001) .......................................................................20

*Trump v. Vance*,

    140 S. Ct. 2412, 2428 (2020) ......................................................................................1, 10

*Tunick v. Safir*,

    209 F.3d 67, 87 (2d Cir. 2000) .........................................................................................6

*U.S. Serviceman's Fund v. Eastland*,

    488 F.2d 1252, 1256-57 (D.C. Cir. 1973) .......................................................................24

*United States v. Bowen*,

    799 F.3d 336, 353-354 (5th Cir. 2015) ...........................................................................15

*United States v. Silver*,

    103 F. Supp. 3d 370, 378-79 (S.D.N.Y. 2015) ...............................................................15

*Wandering Dago, Inc. v. Destito*,

    879 F.3d 20, 30–31 (2d Cir. 2018) ...................................................................................8

*Wayte v. United States*,

    470 U.S. 598, 608 (1985)........................................................................................10

*Young v. U.S. ex re. Vuitton et Fils S.A.*,

    481 U.S. 787, 807 (1987)............................................................................14, 15, 25

*Berger v. United States*,

    295 U.S. 78, 88 (1935)......................................................................................14, 24

**Statutes and Rules**

42 U.S.C. § 1983............................................................................................................5

ABA M.R.P.C. Rule 3.8................................................................................................22

Executive Law § 63......................................................................................................16

Executive Law § 63(2)..............................................................................16, 17, 18, 19

McKinney's Executive Law § 63(12)..........................................................................16

McKinney's Executive Law § 63(2)............................................................................16

Southern District of New York Local Rule 23.1(b)....................................................21

## PRELIMINARY STATEMENT

This application is made in the face of an unprecedented, politically-motivated attack orchestrated by the state's highest ranking law enforcement official—the Attorney General—against a private citizen, Donald J. Trump ("Trump"), and his business, the Trump Organization LLC (the "Trump Organization") (collectively, "Plaintiffs"), in a calculated attempt to circumvent the United States Constitution and deprive him of his fundamental civil liberties.

As outlined in Plaintiffs' Complaint, the defendant, Letitia James ("Defendant"), has displayed a shocking irreverence for her prosecutorial ethics and has routinely exploited her position to malign the former president by turning an unfounded investigation into a public spectacle.  In doing so, she has exposed the vindictive and self-serving nature of her actions – she is not serving any legitimate law enforcement interests but is merely seizing on an opportunity to harass, threaten, and retaliate against Trump, his family and his associates.  Her actions are consistent with her self-proclaimed mission statement: to be a "real pain in the ass"[1] by "us[ing] every area of the law to investigate President Trump…his business transactions…his family…[and] anyone in his orbit."[2]

Defendant's weaponization of the Office of the New York State Attorney General is an affront to this nation's democracy and flies in the face of the United States Constitution.  First, her targeted attack against a political adversary is an impermissible attempt to silence speech protected under the First Amendment.  Second, her pretextual investigation into Plaintiffs' business activities is nothing more than an "arbitrary fishing expedition" which constitutes an unreasonable search and seizure in violation of the Fourth Amendment. *Trump v. Vance*, 140 S. Ct. 2412, 2428 (2020).

---

[1] *See* Ex. A ¶ 55.
[2] *See* Ex. A ¶ 56.

Finally, her biased and overzealous handling of Plaintiffs' investigation has unduly deprived them of their right to due process as guaranteed by the Fourteenth Amendment.

By virtue of the pervasive effect of Defendant's misconduct, Plaintiffs have suffered and will continue to suffer serious and irreparable harm. Therefore, Plaintiffs come before this Court to seek injunctive relief in the form of an order requiring Defendant's civil investigation to be stayed for the duration of this action or, in the alternative, requiring that Defendant recuse herself from being involved in any capacity in the investigation.

## STATEMENT OF FACTS

In the interest of brevity and judicial economy, Plaintiffs will rely upon the recitation of facts set forth in their Complaint, recently filed on December 20, 2021, which is annexed as **Exhibit A** to the Declaration of Alina Habba, Esq. For the Court's convenience, however, a brief summary of the factual history is provided below.

Defendant exhibited a clear and profound hatred for the Plaintiff well before serving as the Attorney General of New York. During her tenure as New York City Public Advocate, she was leading "die in" protests against Trump because of her stated belief that "we are all being killed by this administration." *See* Ex. A ¶ 19. She continued to publicly voice her disdain for Trump during his first term in an effort to make him and his supporters "uncomfortable and not able to rest well." *Id*. at ¶ 20.

In May of 2018, Defendant declared her candidacy for Attorney General of the State of New York. Defendant's campaign was centered on "taking on Donald Trump." *Id*. at ¶ 26. The following statements are illustrative of the attacks she levied upon the Plaintiff:

- She referred to Trump as an "illegitimate president" and vowed to "fight against Donald Trump and his harmful administration." *Id*. at ¶ 34.
- She pledged to use the law as a "sword" against Trump and proclaimed that "no one is above the law, including this illegitimate president…and so I look forward to going into

the office of Attorney General every day, suing him, defending your rights, and then going home!" *Id.* at ¶ 36.

- In her victory speech, she vowed to "shin[e] a bright light into every dark corner of [Trump's] real estate holdings. *Id.* at ¶ 52.

- Defendant promised to "use every area of the law to investigate President Trump and his business transactions and "anyone in [Trump's] orbit. *Id.* at ¶ 56.

Upon swearing in as Attorney General, Defendant swiftly acted upon her campaign promises and employed the authority and array of her office's resources to formally open an investigation of the Trump Organization and issued subpoenas to Deutsche Bank and Investors Bank "for records relating to the financing of four major Trump Organization projects." *Id.* at ¶ 67.

On April 23, 2019, Defendant continued to repeat her baseless accusation that Plaintiffs actively participated in criminal activity: "We need to focus on Donald Trump and his abuses…we need to follow his money…we need to find out where he's laundered money…all of those transactions have happened here in New York City." *Id.* at ¶ 74.  On December 10, 2019, Defendant accused Trump of "abuse of power." *Id.* at ¶ 80.  Notwithstanding the never-ending tirade of biased and inflammatory statements made by Defendant, and the unconstitutional nature and scope of the civil investigation, Plaintiffs produced over eight million pages of documents in response to Defendant's subpoenas. *Id.* at ¶ 88.

Defendant made it abundantly clear that this investigation was little more than a pollical maneuver when she declared her candidacy for Governor of New York State.  In her announcement video, she proudly proclaimed that she "sued the Trump Administration 76 times, but who is counting?" *Id.* at ¶ 92. With this statement, Defendant signaled that she would once again center her forthcoming campaign upon 'taking on Trump.'  However, when her campaign no longer became viable, she suspended her campaign for Governor of New York and instead announced that she would run for re-election as Attorney General.  In a statement that accompanied her

withdrawal, she stated "I must continue my work as attorney general…[t]here are a number of important investigations and cases that are underway, and I intend to finish the job." *Id.* at ¶ 94. It is clear that the "job" she alluded to was to continue maliciously prosecuting Trump, his family, his business, and anyone that was associated with him.

The flagrant abuse committed by Defendant's office has not gone unnoticed. The Editorial Board of the Wall Street Journal duly noted that it would take "significant findings of fraud by her office to justify the damage to the legal system inflicted by an apparently political probe against an opposition party leader" and that "her investigation looks like more evidence of the decline of America's rule of law."[3]  Similarly, CNN senior legal analyst Elie Honig commented on the instant matter, stating that "the crux of [Trump's] argument is, we have been politically targeted by this attorney general, Letitia James…that's not a matter of opinion or speculation…She said, essentially, the main plank of her platform was vote for me, and I'll nail the Trumps."[4]

## LEGAL STANDARD

A district court may grant a preliminary injunction "where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.'" *Otoe-Missouria Tribe of Indians v. N.Y. State Dept. of Fin. Servs.,* 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of New York,* 589 F.3d 94, 98 (2d Cir. 2009). Courts will also consider whether the injunction is in the "public interest." *Am. Civil Liberties Union v. Clapper*,

---

[3] The Wall Street Journal, *New York's Trump* Inquisition, January 4, 2022, https://www.wsj.com/articles/new-yorks-trump-inquisition-letitia-james-ivanka-eric-donald-11641336578
[4] Newsbusters, *CNN Analyst Admits: New York AG 'Politically Targeted' Trump Family*, January 4th, 2022, https://www.newsbusters.org/blogs/nb/mark-finkelstein/2022/01/04/cnn-analyst-admits-new-york-ag-politically-targeted-trump

804 F.3d 617, 622 (2d Cir. 2015) ("A party seeking a preliminary injunction must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest.").

## ARGUMENT

Although a prosecutor is afforded a wide latitude of discretion in performing her duties, the Supreme Court has "made clear that traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249 (1980).

In this action, Plaintiffs have asserted numerous causes of action arising from Defendant's gross departure from the widely accepted standards of prosecutorial ethics, which has resulted in numerous violations of the United States Constitution[5] and New York state law. Plaintiffs are entitled to the requested injunctive relief because they have suffered, and will continue to suffer, irreparable harm as a direct result of Defendant's actions; have put forth meritorious claims under the First, Fourth, and Fourteenth Amendments of the United States Constitution as well as New York state law; have demonstrated that the balancing of equities weighs in Plaintiffs' favor; and have shown that the granting of the preliminary injunction is in the public interest.

### I.   Plaintiffs Are Suffering Irreparable Harm Due to the Ongoing Deprivation of Their Constitutional Rights

To warrant the issuance of a preliminary injunction, a movant must first demonstrate that he is likely to suffer irreparable harm in the absence of the requested relief. In fact, the "showing

---

[5] Plaintiffs' constitutional claims are brought pursuant to 42 U.S.C. § 1983, which states "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen…to the deprivation of any rights, privileges, or immunities secured by the Constitution…shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Bisnews AFE (Thailand) Ltd. v. Aspen Research Grp. Ltd.,* 437 Fed. App'x 57, 58 (2d Cir. 2011) (quoting *Faiveley Tansport Malmo AB v. Wabtec Corp*, 559 F.3d 110, 118 (2d Cir. 2009). To satisfy this requirement, the movant must demonstrate that absent a preliminary injunction he will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.*

It is well-established that irreparable harm is presumed when a plaintiff has alleged that his constitutional rights are being violated. *See Jolly v. Coughlin,* 76 F.3d 468, 482 (2d Cir. 1996) ("Generally an alleged violation of a constitutional right creates a presumption of irreparable harm."); *see also Statharos v. New York City Taxi and Limousine Commission*, 198 F.3d 317, 322 (2d Cir.) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary.")*.* This holds true whether the alleged violation arises from the First Amendment, *see Tunick v. Safir*, 209 F.3d 67, 87 (2d Cir. 2000)) ("[v]iolations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction.") (citation omitted); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("the loss of First Amendment freedoms…unquestionably constitutes irreparable injury."), the Fourth Amendment, *see Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992) ("given the fundamental right involved, namely, the right to be free from unreasonable searches—[movant] has sufficiently demonstrated for preliminary injunction purposes that he may suffer irreparable harm arising from a possible deprivation of his constitutional rights.") (citing *Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984)), or the Fourteenth Amendment, *see Ass'n of Jewish Camp Operators v. Cuomo*, 470 F.Supp.3d 197, 227 (N.D.N.Y July 6, 2020) (holding that it is the alleged violation of a constitutional right that triggers a finding of irreparable harm, for purposes of determining whether a preliminary injunction is warranted).

Here, Plaintiffs have alleged—and will ultimately prove—that Defendant's improper, politically-motivated investigations have violated their constitutional rights under the First, Fourth and Fourteenth Amendments and, absent judicial intervention, their rights will continue to be violated.  Given the breadth and gravity of Plaintiffs' allegations, coupled with the ongoing nature of the deprivation of rights, irreparable harm must be presumed by law.  Therefore, for the purposes of the instant motion, this prong is satisfied without need for further factual inquiry. *See Coughlin*, *supra*, at 482 ("The district court therefore properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights … it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm.").

## II.    Plaintiffs Have a Likelihood of Success on the Merits

The second prong Plaintiffs must satisfy is to establish that their claims have either "a likelihood of success on the merits, or sufficiently serious questions going to the merits of its claims to make them fair ground for litigation." *N.Y. State Dept. of Fin. Servs.,* 769 F.3d at 110. Although making this showing as to a single claim will suffice, Plaintiffs are able to do so for all of the claims set forth in their Complaint.

### A.    Plaintiffs' Right to Freedom of Speech under the First Amendment is Being Impermissibly Infringed

The First Amendment forbids the government from "abridging the freedom of speech," U.S. Const. amend. I, and is designed to protect against "the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas." *Hill v. Colorado*, 530 U.S. 703, 719 (2000).  This protection extends to political speech, which includes, among other things, an individual's[6] political association, expression and ideology, *Buckley v.*

---

[6] The First Amendment applies equally to corporations. *See Citizens United v. Fed. Election Com'n*, 558 U.S. 310, 342 (2010) ("Political speech does not lose First Amendment protection simply because its source is a corporation.")

*Valeo*, 424 U.S. 1, 15 (1976), and affords the "freedom to associate with others for the common advancement of political beliefs and ideas, a freedom that encompasses (t)he right to associate with the political party of one's choice." *Id.*   In fact, the First Amendment "affords the broadest protection to such political expression 'to assure (the) unfettered interchange of ideas for the bringing about of political and social changes desired by the people,'" *Id.* (quotation omitted), and is rooted in a "hostility to government action that "prescribe[s] what shall be orthodox in politics," *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 270 (2016) (citation omitted).  In this regard, "it can hardly be doubted" that the First Amendment has its "fullest and most urgent application precisely to the conduct of…political office." *Id.*

Among the types of conduct proscribed by the First Amendment are viewpoint discrimination and retaliatory action. As described herein, Defendant has plainly engaged in both forms of prohibited conduct.

Viewpoint discrimination occurs when the government "disfavors certain speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30–31 (2d Cir. 2018) (citation omitted); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints."). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (citing *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 96 (1972)).  Indeed, "[g]overnment 'discrimination against speech because of its message is presumed to be unconstitutional.'" *Wandering Dago, Inc.*, 87 F.3d 20 at 31 (citing *Rosenberger, supra*).

Turning to the instant matter, Defendant's actions plainly manifest the elements of viewpoint discrimination.  There is no question that Defendant vehemently disfavors Trump's political ideology, which is diametrically opposed to her own.  This much can be gleaned from Defendant's own public statements, which are outlined at length in Plaintiff's Complaint.  *See* Habba Decl., Ex. A.  For example, Defendant has, among other things: frequently referred to Trump as an "illegitimate president," *see Id.* ¶¶ 32, 36, 46, 48, 50, 66; led "die-in" protests against Trump while claiming that "we are all being killed by [the Trump] administration," *Id.* ¶ 19; pledged to "fight" against "Donald Trump and his harmful administration," *Id.* ¶ 34;  accused Trump of showing a "blatant disregard for human lives," *Id.* ¶ 22, engaging in "public corruption," *Id.* ¶ 27, and "defrauding Americans," *Id.* ¶ 51; declared that Trump is waging a "cruel crusade against…invaluable members of our society," *Id.* ¶ 79, and that he "doesn't believe in the rights and liberties of marginalized and vulnerable populations, *Id.* ¶ 83; claimed that he "doesn't believe in the rights and liberties of marginalized and vulnerable populations," *Id.* ¶ 83; and, displaying an utter lack of self-awareness, accused him of "abus[ing] [the] power" of his presidency, *Id.* ¶ 80.

Further, Defendant makes no attempt to conceal the fact that her actions are motivated by political bias.  Her entire campaign for New York Attorney General was premised on the idea that she was the political antithesis to Trump and that she would "take [him] on" if elected.  *See* Habba Decl., Ex. A ¶ 33.  She bluntly promised to employ her power as Attorney General as a "sword" against Trump and even went so far as proclaiming that she "looked forward to going into the office of Attorney General every day, suing him…and then going home." *Id.* ¶ 36.  Her stated objective was to be a "real pain in the ass" to Trump, *Id.* ¶ 66, by "us[ing] every area of the law to investigate" him and "anyone in his orbit," *Id.* ¶ 56.  In her own words, this bitter crusade to harass a private citizen, and those closest to him, "fuels [her] soul." *Id.* ¶ 66.

Defendant's conduct—abusing her investigatory power to silence a political opponent—not only constitutes viewpoint discrimination, but it also falls squarely within the type of retaliatory conduct that is prohibited under the First Amendment. *See Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("The law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions" for exercising their First Amendment rights."); *see also Wayte v. United States*, 470 U.S. 598, 608 (1985) ("To establish a retaliation claim, a plaintiff must show that: (1) his conduct was protected by the First Amendment, and (2) such conduct prompted or substantially caused defendant's [retaliatory] action.").

Accordingly, Defendant's actions qualify as viewpoint discrimination and retaliatory action and, therefore, impermissibly infringe his rights under the First Amendment.

### B. Defendant Has Violated Plaintiffs' Fourth Amendment Right to be Free from Unreasonable Searches and Seizures

The Fourth Amendment guarantees individuals and corporations the right to be secure in their "papers[] and effects against unreasonable searches and seizures." U.S. Const. amend. IV.

One such protection afforded pursuant to the Fourth Amendment is the prohibition against "fishing expeditions into private papers on the possibility that they may disclose evidence of crime." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924). This procedural safeguard rests on the belief that it is "contrary to the first principles of justice to allow a search through all the [movant's] records, relevant or irrelevant, in the hope that something will turn up." *Id.*; *see also Trump v. Vance*, 140 S. Ct. 2412, 2428 (2020) (noting the prohibition against "engaging in arbitrary fishing expeditions" and "initiating investigations out of malice or an intent to harass.") (citations and quotations omitted). In that vein, a subpoena may only be issued for a "proper purpose" and the information sought must be "relevant to that purpose." *Fed. Election*

*Com'n v. Larouche Campaign*, 817 F.2d 233, 234 (2d Cir. 1987). Further, "when an administrative agency subpoenas corporate books or records, the Fourth Amendment requires that the subpoena be sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *In re Horowitz*, 482 F.2d 72, 78 (2d Cir. 1973) (quoting *See v. City of Seattle*, 387 U.S. 541, 544 (1967)).

In the instant scenario, Defendant's pretextual investigation blatantly constitutes an unreasonable search and seizure in violation of Plaintiffs' Fourth Amendment rights. At the outset, Plaintiffs have demonstrated that the investigation lacks a "proper purpose" as evidenced by the exhaustive list of statements made by Defendant which show that she commenced the investigation out of political animus and for the purpose of harassing, threatening, intimidating and retaliating against Plaintiffs. Consequently, the investigation is unconstitutional by design.

Further, Defendant's investigation lacks an evidentiary basis and is nothing more than an impermissible "fishing expedition" which runs afoul of the Fourth Amendment. As described in the Complaint, in furtherance of her campaign efforts, Defendant effusively promised to investigate Plaintiffs if she were to be elected as Attorney General. Her commitment to 'taking down' Trump was the primary focus of her campaign. Among other things, Defendant pledged that, if elected as Attorney General, she would: "take on Donald Trump," Habba Decl., Ex. A. ¶ 33; go "into the office…every day" to "su[e] him, *Id.* ¶ 36; "ask him some questions – under oath," *Id.* ¶ 40; immediately investigate him and his "cronies," *Id.* ¶ 41; "challenge this illegitimate president," *Id.* ¶ 46; and "join with law enforcement and other attorney generals across the nation in removing this President from office," *Id.* ¶ 47.

Critically, these statements were made *prior* to Defendant being elected Attorney General, at a time when she possessed no information or insight into Plaintiffs' activities other than what

11

was publicly available.  In making these statements *without any evidentiary basis whatsoever*, Defendant made her intentions perfectly clear – once elected, she planned to employ the resources and authority of her government position to investigate Plaintiffs "in the hope that something will turn up." *Am. Tobacco Co.*, *supra*.  That is exactly what she has done since taking office.  Her baseless investigation into Plaintiffs' business activities is merely the realization of her pre-election promise to search far and wide for any possible evidence of wrongdoing.  As such, it fits the hornbook definition of a "fishing expedition." *Am. Tobacco Co.*, *supra*, at 306.

Moreover, in furtherance of these efforts, Defendant has served countless subpoenas that are unconstitutional in their own right since they are overly broad, irrelevant and unduly burdensome to Plaintiffs.  In reviewing the exercise of the Attorney General's subpoena power, New York courts "weigh[] the scope and basis for the issuance of the subpoena against the factual predicate for the investigation 'lest the powers of investigation, especially in local agencies, become potentially instruments of abuse and harassment.'" *Airbnb, Inc. v. Schneiderman*, 44 Misc. 3d 351, 356 (Sup. Ct. Albany Cnty. 2014) (quoting *Myerson v. Lentini Bros. Moving & Storage Co.,* 33 N.Y.2d 250, 258 (1973)).  When the investigation has extended past its initial stage, the Attorney General "may not rest alone on [the] inference" that some wrongdoing may have occurred. *A'Hearn v. Comm. on Unlawful Practice of Law of N.Y. Cty. Lawyers' Ass'n*, 23 N.Y.2d 916, 919 (1969).  To justify the substantial widening of a long-running investigation, the Attorney General must demonstrate that continued investigative "efforts would or reasonably might prove fruitful." *Horn Const. Co. v. Fraiman*, 34 A.D.2d 131, 133 (1st Dep't 1970).

Defendant's formal investigation into Plaintiffs' business activities has been active for nearly three years and, despite millions of dollars and countless hours expended, Defendant has yet to uncover any evidence sufficient to justify heightened action against Plaintiffs.  Yet, the

barrage of subpoenas continues.  The most recent subpoenas served by Defendant in December 2021 request both testimony and documents from Trump along with testimony from two of children, Donald Trump, Jr. and Ivanka Trump.  The all too familiar subject areas identified in the document subpoenas include requests for information about valuations and appraisals of properties and assets of Plaintiffs.  These matters have long been the subject of Defendant's joint criminal investigation with the Manhattan District Attorney's Office and Defendant's civil investigation dating back to 2019.  Thus, her repetitious onslaught of subpoenas, which have failed to produce any fruitful evidence, demonstrate that the subpoenas lack a legitimate basis and are merely "instruments of abuse and harassment." *Fraiman*, 34 A.D.2d at 131.

Based on the foregoing, Defendant's investigation exceeds the bounds of the Fourth Amendment since it is an "arbitrary fishing expedition" that was commenced for an improper purpose and without a justifiable basis.

## C. Defendant's Actions Violate Plaintiffs' Constitutional Right to Due Process Under the Fourteenth Amendment

The Fourteenth Amendment, also known as the Due Process Clause, guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.   In deciding whether due process concerns are implicated by a particular state act, a court must consider whether that act "'offend[s] those canons of decency and fairness which express the notions of justice of English speaking peoples'.... [and is] 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Rochin v. California,* 342 U.S. 165, 169 (1952) (citations omitted).  It is "implicit in the concept of ordered liberty" exemplified by the Fourteenth Amendment, *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), that the processes by which a person is deprived of her liberty not be tainted by

the intentional and malicious acts of state officials. *Cf. Screws v. United States,* 325 U.S. 91, 65

(1945); *see also Morrison v. Lefevre*, 592 F.Supp 1052, 1077 (S.D.N.Y. 1984).

Due process concerns are particularly relevant in a prosecutorial context, since prosecutors

"have available a terrible array of coercive methods to obtain information," including "civil

investigatory demands, [and] enhanced subpoena power," the misuse of which "would unfairly

harass citizens, give unfair advantage to [the prosecutor's personal interests], and impair public

willingness to accept the legitimate use of those powers." *Young v. U.S. ex re. Vuitton et Fils S.A.*,

481 U.S. 787, 807 (1987).  For example, "if a prosecutor uses the expansive prosecutorial powers

to gather information for private purposes, the prosecutorial function has been seriously abused

even if, in the process, sufficient evidence is obtained to convict a defendant." *Id.* at 811.

Defendant's actions offend at least two aspects of constitutional due process. First, her

unabashed political bias contravenes Plaintiffs' entitlement to a disinterested prosecutor.  Second,

her unauthorized participation in the Manhattan District Attorney's criminal proceedings exceeds

the clearly delineated statutory authority of the Office of the Attorney General.  Taken together,

these actions result in an unfair application of the law and a significant deprivation of Plaintiffs'

rights under the Fourteenth Amendment.

### i.  <u>Defendant is an Interested Prosecutor</u>

The Fourteenth Amendment prohibits a prosecutor from "injecting a personal interest,

financial or otherwise, into the enforcement process." *Marshall v. Jericho, Inc.*, 446 U.S. 238, 249-

250 (1980).  Indeed, a "disinterested prosecutor"—one who is not "influenced by improper

motives"—is required by due process. *Vuitton*, 481 U.S. at 788; *see also Berger v. United States*,

295 U.S. 78, 88 (1935) ("It is as much [the prosecutor's] duty to refrain from improper methods

calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a

just one.").  In fact, the presence of an interested prosecutor is a "fundamental and pervasive" error – an injustice so severe that it warrants the reversal of any conviction resulting therefrom without consideration for the facts or circumstances of the particular case. *Vuitton, 481 U.S.* at 815.

Given the vast array of statements that Defendant has made demonstrating her overt political agenda, coupled with her well-documented disdain for Plaintiffs, she cannot possibly be construed as a disinterested prosecutor in her investigation of Plaintiffs.  Among the vast array of prejudicial statements outlined in Plaintiff's Complaint, Defendant's pernicious bias is perhaps best exemplified in her callous disregard for the presumption of innocence, a hallmark of prosecutorial ethics which requires a prosecutor to "refrain from speaking in public about pending and impending cases except in very limited circumstances." *United States v. Bowen*, 799 F.3d 336, 353-354 (5th Cir. 2015).  Despite her well-founded obligation to not taint the public's perception of an ongoing investigation, Defendant seemingly jumps at every opportunity to offer public comment about her investigation of Plaintiffs.  Even worse, her comments prejudge Plaintiffs' guilt by presuming they have committed the crimes being investigated. *See e.g.*, Habba Decl., Ex. A. ¶¶ 41, 47, 50, 56, 61, 62, 68, 100 and 109.

Most astonishing, Defendant's statements were not only made without a conviction, but without so much as an *indictment*.  New York federal courts have rebuked precisely these types of remarks which "bundle together unproven allegations regarding [a] [d]efendant with broader commentary on corruption and a lack of transparency in certain aspects of . . . politics." *United States v. Silver*, 103 F. Supp. 3d 370, 378-79 (S.D.N.Y. 2015).  Statements of this nature are inherently prejudicial because "it would not be unreasonable for members of the media or the public to interpret" them "as a commentary on the character or guilt of" the individual or entity under investigation. *Id.* at 379.  "Remarks that associate the accused with a broader pattern [of

15

government or corporate conduct] or recognized wrongdoing…are of concern specifically because they tend to blur the distinction between legitimate public commentary and improper opinion." *Id.*

### ii.   Defendant's Participation in a Contemporaneous Criminal Action Exceeds its Statutory Authority

In New York, the Office of the Attorney General ("OAG") has the authority to conduct a civil investigation into whether any person has engaged in "repeated fraudulent illegal acts or otherwise demonstrate[d] persistent fraud or illegality in the carrying on, conducting or transaction of business." McKinney's Executive Law § 63(12).  In the usual course, "the attorney general is authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules.  Such authorization shall not abate or terminate by reason of any action or proceeding brought by the attorney general under this section." *Id.; see Matter of Harlem Teams for Self-Help v. Department of Investigation of City of N.Y.,* 122 Misc.2d 1066, 1074, 472 N.Y.S.2d 967 (N.Y. Co. 1984).

However, the OAG's investigatory powers are strictly limited by New York law. Specifically, the OAG does not have the power to commence criminal investigations unless expressly permitted to do so, as this authority has over time been transferred to county district attorneys pursuant to Executive Law § 63(2). McKinney's Executive Law § 63(2); *see also People v. Cuttita*, 7 N.Y.3d 500, 507 (2006).  The evolution of Executive Law § 63(2) and its related provisions makes clear that the Legislature has sought to delineate meticulously the prosecutorial powers of the OAG. *People v. Gilmour*, 98 N.Y.2d 126, 132 (2002).

To obtain authority to commence a criminal investigation or prosecution, the OAG must receive express permission from the Governor in the form of an Executive Order with a grant of superseding authority. Executive Law § 63(2).  Notably, the OAG bears the burden in showing that the Governor asked for the prosecutorial participation of the OAG in a particular matter. *Id.*

at 135.  In the absence of such an order, the OAG lacks power to criminally investigate a defendant, to such an extent that any subsequent indictment must be dismissed. *Id.* (citing *People v. Romero,* 91 N.Y.2d 750, 758 (1998); *People v. Fox,* 253 A.D.2d 192, 195 (1999) ("Hence, because this investigation was not activated 'by the request of a proper State officer pursuant to [Executive Law § 63] the indictment must be dismissed.'").

The mandates of Executive Law § 63(2) are relevant here because Defendant is exceeding her statutory authority by improperly heading a *criminal* investigation of Plaintiffs in addition to her ongoing civil investigation. On May 18, 2021, Defendant formally Defendant formally announced that her Office had launched a criminal investigation.[7]  During a press conference held on May 21, 2021, Defendant publicly stated that her office was not only conducting its own criminal investigation but was also actively working with the Manhattan District Attorney in a joint criminal investigation, including cross-designating OAG staff attorneys as "Special ADAs" as part of the joint investigation:

> Our civil investigation continues, but we are now actively investigating the Trump Organization in a ***criminal capacity*** and we are working alongside, cooperating with the Manhattan District Attorney, Cy Vance. […] [T]wo of our assistant attorneys general have been cross designated as district attorneys.[8]

Numerous press reports, including some in recent weeks, make clear that the joint OAG/Manhattan DA investigation is focused on valuations and appraisals of Plaintiffs' properties as reflected in financial statements and as presented to taxing authorities and financial institutions

---

[7] *See* S. Chamberlain, May 18, 2021 "New York AG reveals Trump Organization probe is now 'criminal,'" N.Y. Post, *available at* https://nypost.com/2021/05/18/new-york-ag-reveals-trump-organization-probe-is-now-criminal.

[8] *See* ABC online article, "New York AG has 2 lawyers working with DA on Trump probe" – ABC News (go.com); *See* Danny Hakim *et al.*, "New York's Attorney General Joins Criminal Inquiry Into Trump Organization," N.Y. TIMES (May 18, 2021), *available at* https://nyti.ms/3nf9t8Jd; *see also* Habba Decl., Ex. A at ¶87.

– the very same subject matter as the Attorney General's investigation.[9]  Press reports further indicated that the joint OAG/DANY investigation has targeted the very same properties and transactions that are the subject of the Attorney General's investigation.[10]

Recently, on December 14, 2021, during an appearance on *The View*, a nationally televised daytime talk show, Defendant was about whether her office was "trying to depose Trump under oath next month." Defendant replied:

> "**We** indicted the Chief Financial Officer of the Trump Organization and the Trump Organization itself. So, **I have two parallel investigations, one civil, one criminal** … **We** indicted Mr. Weisselberg, the CFO, and the Trump Organization – that investigation is ongoing."

(Letitia James on "*The View*," December 14, 2021) (Emphasis added).

By Defendant's own admission, she is not only conducting a civil investigation into Plaintiffs – she is also conducting a contemporaneous *criminal* investigation of them as well.  Yet, Defendant has not proffered an Executive Order or other directive which granted her the authority to do so.  In such a scenario, the Court of Appeals has noted:

> When the Attorney General "'exercise[s] all the powers and perform all the duties ... which the district attorney would otherwise be authorized or required to exercise or perform," the absence of an Executive Order [under Executive Order § 63(2)] would have rendered the intervention jurisdictionally defective, even if requested and agreed to by the District Attorney. As we explained in *Matter of Schumer v. Holtzman* (*supra*), the essence of a District Attorney's constitutional, statutory and common-law prosecutorial authority is the "discretionary power to determine whom, whether and how to prosecute [a criminal] matter" (60 NY2d, at 52), the

---

*See, e.g.,* David A. Fahrenthold, *Trump's longtime accountant testifies to N.Y. grand jury in criminal probe*, WASHINGTON POST (December 14, 2021) ("Prosecutors are investigating whether Trump's company broke the law by giving widely different values for the same property at the same time. In some cases, for instance, the Trump Organization provided low valuations to property-tax officials, while telling lenders that the same property was worth much more."); William K. Rashbaum, Ben Protess and Jonah E. Bromwich, *Trump Fraud Inquiry's Focus: Did He Mislead His Own Accountants?*, N.Y. Times (Dec. 14, 2021) (reporting that "the prosecutors, working with the Office of the New York State attorney general, Letitia James, have examined the possibility that Mr. Trump and his deputies at the company cherry-picked favorable information — and ignored data that ran counter to it — to essentially mislead the accountants into presenting an overly rosy picture of his finances").

[10] *See id.; see also, e.g.,* Jonah E. Bromwich, Ben Protess and William K. Rashbaum, *New York A.G. to Subpoena Trump to Testify in Fraud Investigation*, N.Y. TIMES (Dec. 9, 2021);

responsibility and accountability for which is not freely transferable to anyone else, and that includes the Attorney-General."

*Matter of Haggerty v. Himelein*, 89 N.Y.2d 431, 436 (1997).

Defendant's admitted "criminal investigation" of Plaintiffs, which is being done without the necessary authorization required under Executive Law § 63(2), is clearly outside the bounds of the OAG's statutory authority.

Moreover, even if Defendant did have the requisite authority to proceed with a criminal investigation, the co-mingling of joint criminal and civil investigations – being handled by the *same* office – is highly prejudicial to Plaintiffs and "clearly offends those canons of decency and fairness which express the notions of justice." *California,* 342 U.S. at 169.  Indeed, New York courts have recognized that, in the context of parallel criminal and civil investigations, a stay of the civil proceedings is appropriate "where the civil and criminal actions involve the same subject matter … and is even more appropriate when both actions are brought by the government." *Brock v Tolkow*, 109 F.R.D. 116, 119 (E.D.N.Y 1985). In such a scenario, a stay is warranted to guard against the "special danger that the government can effectively undermine rights that would exist in a criminal investigation by conducting a de facto criminal investigation using nominally civil means," *Sterling Bank v. A-I Hotels Int's Inc.*, 175 F.Supp.2d 573, 579 (S.D.N.Y. 2001), a maneuver which "undercuts" a defendant's constitutional rights. *Id.* at 120.

Here, Defendant's dual role as civil *and* criminal investigator is highly prejudicial to Plaintiffs.  As evidenced by her own public statements, Defendant is intimately involved in concurrent civil and criminal investigations against Plaintiffs and is therefore in position to use her civil investigation to improperly advance her criminal investigation.  By playing both sides, she is able to cherry pick her investigatory methods – civil or criminal – in a calculated manner to, for example, leverage a Fifth Amendment assertion and obtain an adverse inference. In other words,

19

she is taking full advantage of her "opportunity to escalate the pressure on [Plaintiffs] by manipulating simultaneous civil and criminal proceedings, both of which [she] controls." *A-I Hotels Int's Inc.*, 175 F.Supp.2d at 579. Naturally, it is not appropriate for any state actor – let alone the highest-ranking law enforcement official in the state – to endeavor into this type of intentional circumvention of the procedural safeguards of the judicial system.

Accordingly, Defendant's handling of parallel criminal and civil investigations is *per se* improper and an infringement of Plaintiffs' due process rights under the Fourteenth Amendment.

### D.  Defendant's Actions Constitute an Abuse of Process

Under New York state law, an action for abuse of process arises from the misuse of regularly issued legal process, civil or criminal, to accomplish a purpose not justified by the nature of the process. *Board of Educ. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Assn., Inc.*, 38 N.Y.2d 397 (1975); *Liss v. Forte*, 96 A.D.3d 1592, 947 N.Y.S.2d 270 (4th Dep't 2012).  Indeed, as the Second Circuit has explained, "procedural due process forbids the use of legal process for a wrongful purpose." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994).

Abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (1984) (citing *Farmingdale*, *supra*, at 403).  A plaintiff asserting an abuse of process claim must also plead special damages.  *See Reilly v. Natwest Markets Group, Inc.*, 178 F.Supp.2d 420, 430 (S.D.N.Y. December 28, 2001).

The facts set forth in Plaintiffs' Complaint plainly satisfy these elements.  Initially, it is well established that civil subpoenas are a "regularly issued process" which may give rise to an abuse of process claim.  *See Farmingdale*, 38 N.Y.2d at 404 (noting that subpoenas are "regularly

issued process" in the context of an abuse of process claim); *see also Ginsberg v. Ginsberg*, 84 A.D.2d 573, 573 (2d Dep't 1981) (finding valid claim for abuse of process when party "repeatedly and improperly used the subpoena power…to harass defendant and exhaust her resources.").

Next, in issuing the subpoenas, Defendant's intent is to do harm to Plaintiffs without excuse or justification. Defendant herself admitted that her goal was to be a "real pain in the ass," *see* Habba Decl., Ex. A. ¶ 55, to Plaintiffs and that she wanted to "vigorously fight" against them, *Id.* ¶ 78. In addition, considering that she frequently pledged to "take on [Trump] and his business," *Id. ¶* 43, even *before* she was in office, it is overwhelmingly apparent that her investigation is not based in substance or fact and is rooted in her desire to harm Plaintiffs. Indeed, Defendant's intention in bombarding Plaintiffs with overreaching and overly burdensome subpoenas is simply to harass, intimidate, embarrass and/or injure them. James's conduct Plaintiffs also constitutes a jarring departure from New York's Rules of Professional Conduct, which prohibit "[a] lawyer who is participating in a criminal or civil matter" from "mak[ing] extrajudicial statement[s] that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the mater. N.Y.R.P.C. 3.5. *See also* Rule 23.1(b) of SDNY Local Rules (mandating that "government lawyers…shall refrain from making any extrajudicial statement which a reasonable person would expect to be disseminated by means of public communication that goes beyond the public record or that is not necessary to inform the public that the investigation is underway, to describe the general scope of the investigation, to obtain assistance in the apprehension of a suspect, to warn the public of any dangers or otherwise to aid in the investigation, if there is a substantial likelihood that such dissemination will interfere with a fair trial or otherwise prejudice the administration of

justice."); ABA M.R.P.C. Rule 3.8 ("[A] [p]rosecutor shall…refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused").

Further, Defendant utilized the subpoenas in a perverted manner to obtain a collateral objective. First, Defendant sought to obtain a collateral detriment to Plaintiffs inasmuch as she sought to compel Trump to discontinue his political career by launching unfounded attacks against him and his business. This much is evidenced by Defendant's promise that she would "join with law enforcement and other attorney generals across the nation in *removing this President from office*" as well as her ominous warning that "the days of Donald Trump are coming to an end." *See* Habba Decl., Ex. A. ¶ 47. Second, not only were Defendant's actions fueled by her political animus towards Plaintiffs, but she was equally driven by a desire to obtain a collateral advantage for herself inasmuch as she hoped to increase her public profile and advance her own career at Plaintiffs' expense. Her self-serving motive may be gleaned from the pompous, self-aggrandizing nature of her statements, such as proclaiming herself the "fighter" who "will take on Donald Trump," *Id.* ¶ 33, or boasting that she "sued the Trump Administration 76 times, but who is counting?" *Id.* ¶ 92.

Finally, Plaintiffs have made a sufficient showing of special damages, as they have alleged to have suffered "special damages in the form of costs of defense and attorney's fees incurred in defending against Defendant's baseless investigations." *See* Habba Decl., Ex. A. ¶ 155; *see also Parkin v. Cornell Univ., Inc.*, 78 N.Y.2d 523, 530 (1991) (finding that legal expenses incurred in connection with defense constitute special damages); *see also D'Amico v. Correctional Med. Care, Inc.*, 120 A.D.3d 956, 960 (4th Dept 2014) (finding that "legal fees incurred in defending against" abuse of process is "sufficient") (citation omitted).

Based on the foregoing, Defendant's conduct constitutes an abuse of process on its face.

### i.    The Balance of the Hardships Tips in Plaintiffs' Favor

The balance of hardships also favors granting the requested injunction.  As demonstrated above, Plaintiffs will continue to suffer irreparable harm in the absence of injunctive relief and it is well-established that violations of constitutional rights, especially claims involving First, Fourth and Fourteenth Amendment violations such as here, are *per se* irreparable harm for purposes of a court's consideration of an applicant's request for injunctive relief.  *See, e.g.*, *Lore v. City of Syracuse*, No. 00-CV-1833-HGM-DEP, 2001 WL 263051 at *6 (N.D.N.Y. 2001) ("[I]t is clear that violations of First Amendment rights are commonly considered *per se* irreparable injuries"); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (the loss of First Amendment freedoms unquestionably constitutes irreparable injury); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (finding that the district court properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights to issue a preliminary injunction); *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary").

In contrast, Defendant will suffer no meaningful harm if the Court issues the injunction. In fact, any claim by Defendant that she would suffer any such harm personally would only serve to support Plaintiffs' position that Defendant has exploited her state office to target Plaintiffs and further her retaliatory motives.  Indeed, injunctive relief would be for a limited duration.  It would ensure the status quo is preserved while this Court considers the merits of the parties' claims, and there would be no irreparable harm to the Defendants or the public.  At the very least, Plaintiffs' claims raise "sufficiently serious questions going to the merits to make them a fair ground for litigation" and the "balance of the hardships tip [] decidedly toward . . . preliminary relief." *Citigroup Glob. Markets, Inc. V. VCG Special Opportunities Master Fund Ltd.,* 598 F.3d 30, 35 (2d Cir. 2010).  Federal courts have held that preliminary injunctive relief is warranted where a

case, such as the case at bar, raises "serious constitutional questions that require more time" and issues that are "of such significance that they require" further "consideration and deliberation." *U.S. Serviceman's Fund v. Eastland*, 488 F.2d 1252, 1256-57 (D.C. Cir. 1973).

Therefore, the balancing test results in the scale tipping decidedly in Plaintiffs' favor and thus, injunctive relief is warranted.

### iii.   A Preliminary Injunction is in the Public Interest

The final consideration is whether the preliminary injunction sought by Plaintiffs is in the public interest. Given the paramount public interests at stake—namely, securing the public's trust and faith in the judicial system—it assuredly is.

This action deals with blatant abuses of power by the New York Attorney General, the state's "chief law officer." *People v. Fuller*, 282 N.Y.S. 28, 49 (Gen. Sess. 1935).  In this role, Defendant is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). She is entrusted with a great deal of power to "strike hard blows" on behalf of the rule of law, but she is not permitted to "strike foul ones." *Id.*[11]

Given the seriousness of the constitutional violations involved in this action, monumental public policy concerns are implicated. The conduct alleged herein—that Defendant is utilizing her office to impermissibly target a private citizen and his company in furtherance of her own political agenda—represents an outrageous abuse of the state's policing power.  Left unchecked, Defendant's continuing misconduct not only poses an imminent threat to Plaintiffs, but also to the integrity of the institution of law as a whole.

---

[11] This obligation "applies equally to attorneys [general] who represent the government in civil disputes." *DaCosta v. City of New York*, 296 F. Supp. 3d 569, 600 (E.D.N.Y. 2017).

The Supreme Court has noted that "[p]rosecutors "have available a terrible array of coercive methods to obtain information," such as "police investigation and interrogation, warrants, informers and agents whose activities are immunized, authorized wiretapping, civil investigatory demands, [and] enhanced subpoena power" and that the "misuse of those methods would unfairly harass citizens, give unfair advantage to [prosecutor's personal interests], and impair public willingness to accept the legitimate use of those powers." *Vuitton,* 481 U.S. at 807. For this reason, it is vital that the public "have assurance that those who would wield this power will be guided solely by their sense of public responsibility for the attainment of justice." *Id.* at 814.

These public policy considerations are all the more significant in the instant matter where the target of the government speech and action is a political figure, a former President of the United States, and the government actor is a state Attorney General who vehemently opposes him. Given the significant public attention that the subject investigation has received, and sure will continue to receive, there is a substantial risk that the ongoing presence of a biased prosecutor, such as Defendant, will "create an appearance of impropriety" which will ultimately "diminish [] faith in the fairness" of the judicial system. *Id.* at 812.

Thus, Plaintiffs' request for a preliminary injunction is firmly within the public interest.

## CONCLUSION

For the foregoing reasons, Plaintiffs, Donald J. Trump and Trump Organization LLC, respectfully requests this Court grant its motion.

Dated: January 10, 2021.          Respectfully submitted,
New York, New York

_____
Alina Habba, Esq.
**HABBA MADAIO & ASSOCIATES LLP**