# EXHIBIT I

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No. 451685/2020 |
| Petitioner, | **SUPPLEMENTAL VERIFIED PETITION** |
| -against- | |
| THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS & BOCKIUS, LLP; SHERI DILLON; DONALD J. TRUMP; IVANKA TRUMP; and DONALD TRUMP, JR., | |
| Respondents. | |

INDEX NO. 451685/2020

RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 3 of 116

Petitioner, the People of the State of New York, by Letitia James, Attorney General of the State of New York, as and for her Supplemental Verified Petition, respectfully alleges:

## PRELIMINARY STATEMENT

1.      The Office of the Attorney General ("OAG") is currently investigating whether the Trump Organization and Donald J. Trump ("Mr. Trump") misstated the value of Mr. Trump's assets on annual financial statements, tax submissions, and other documents and made other material misrepresentations provided to third parties in order to secure loans and insurance coverage and obtain other economic and tax benefits.

2.      This investigation is being conducted pursuant to the New York Executive Law and other applicable laws. OAG has identified facts and evidence indicating that the annual financial statements, tax submissions, and other documents under investigation contain material misstatements and omissions. It intends to make a final determination about who is responsible for those misstatements and omissions. OAG requires the testimony and evidence sought herein to determine which Trump Organization employees and affiliates—and which other entities and individuals—may have assisted the Trump Organization and Mr. Trump in making, or may have relevant knowledge about, the misstatements and omissions at issue.

3.      The factual basis for OAG's investigation is set out below and in OAG's previous filings in this proceeding, which are incorporated herein, including the Second Affirmation of Matthew Colangelo dated August 21, 2020 ("Second Aff."), filed *in camera* to protect the confidentiality of this ongoing investigation. *See Michaelis v. Graziano*, 5 N.Y.3d 317, 323 (2005); *American Dental Coop., Inc. v. Attorney-General*, 127 A.D.2d 274, 280 (1st Dep't 1987).

1

INDEX NO. 451685/2020

RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 4 of 116

4.      Upon this Supplemental Verified Petition; the Affirmation of Colleen Faherty, dated January 18, 2022; and its attachments (incorporated herein), OAG moves to compel the testimony of Donald J. Trump, Donald Trump, Jr., and Ivanka Trump, and to compel the production of documents in the possession, custody, or control of Donald J. Trump.

5.      As alleged in detail below, OAG has obtained documents and testimony from numerous witnesses that were involved in creating and disseminating the misleading statements and omissions at issue in this investigation. However, witnesses closest to the top of the Trump Organization have asserted their Fifth Amendment rights against self-incrimination. Certain others have professed faulty memories or asserted that they were following instruction from more senior employees. And as the Court is well aware, other testimony and documents have been withheld under assertions of privilege, including assertions on behalf of Mr. Trump himself: for instance, Sheri Dillon, a respondent in OAG's motion that began this proceeding, was Mr. Trump's personal tax counsel.

6.      The knowledge and actions of Mr. Trump's agents and attorneys can be imputed to Mr. Trump himself. *See, e.g.*, *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465-66 (2010). But Mr. Trump's actual knowledge of—and intention to make—the numerous misstatements and omissions made by him or on his behalf are essential components to resolving OAG's investigation in an appropriate and just manner. Likewise, Donald Trump, Jr. and Ivanka Trump worked as agents of Mr. Trump, acted on their own behalves, and supervised others in connection with the transactions at issue here; their testimony is necessary for appropriate resolution of OAG's investigation as well.

7.      For all these reasons, there is a heightened need for testimony from these respondents. Specifically:

2

8.    <u>Respondent Donald J. Trump.</u> Mr. Trump is the beneficial owner of the Trump

Organization. He had ultimate authority over a wide swath of conduct by the Trump

Organization involving misstatements to counterparties, including financial institutions, and the

Internal Revenue Service. The Trump Organization has responded to OAG's document and

testimonial subpoenas, producing more than 930,000 documents. Although approximately a

dozen current and former Trump Organization employees have testified before OAG, and Mr.

Trump personally authorized the production of federal income tax information to OAG, Mr.

Trump himself has declined to comply with OAG subpoenas for documents and testimony,

moving to quash the subpoenas in this proceeding and (along with the Trump Organization)

seeking to enjoin this investigation in its entirety in a recently-filed action in the United States

District Court for the Northern District of New York. Mr. Trump should be compelled by this

Court to testify before OAG and produce to OAG relevant documents in his possession, custody,

or control.

9.    <u>Respondent Donald Trump, Jr.</u> Donald Trump, Jr. manages the Trump

Organization with Eric Trump. He is also the trustee of the Donald Trump Revocable Trust and

is responsible for issuing annual financial statements regarding the assets the Trust holds for his

father. Since 2017, Donald Trump, Jr. has had authority over numerous financial statements

containing misleading asset valuations. Donald Trump, Jr. should be compelled to testify before

OAG.

10.    <u>Respondent Ivanka Trump.</u> Respondent Ivanka Trump was an Executive Vice

President for Development and Acquisitions of the Trump Organization through at least 2016.

Among other responsibilities, Ms. Trump negotiated and secured financing for Trump

Organization properties. Until January 2017, Ms. Trump was a primary contact for the Trump

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 6 of 116

Organization's largest lender, Deutsche Bank. In connection with this work, Ms. Trump caused

misleading financial statements to be submitted to Deutsche Bank and the federal government.

Ivanka Trump should be compelled to testify before OAG.

11.     Petitioner seeks an order pursuant to C.P.L.R. 2308(b) to enforce its subpoenas

without further delay and therefore respectfully requests that the Court grant OAG's motion in its

entirety and reject the motions by the moving respondents. Exs. 301-303.[1]

## THE PARTIES

12.     The Attorney General is responsible for overseeing the activities of New York

corporations and the conduct of their officers and directors, in accordance with the New York

Executive Law and other applicable laws. She is expressly tasked by the Legislature with

policing fraud and illegal conduct in business. *See, e.g.*, Executive Law § 63(12).

13.     Respondent Donald J. Trump is the beneficial owner of the collection of entities

he styles the "Trump Organization." As previously alleged, according to required disclosures,

from May 1, 1981 to January 19, 2017, Mr. Trump was Director, President, and Chairman of the

Trump Organization, Inc. From at least July 15, 2015 until May 16, 2016, Mr. Trump was the

sole owner of the Trump Organization, Inc. As of 2017, the Trump Organization, Inc. was

wholly owned by DJT Holdings Managing Member LLC. On information and belief, Mr. Trump

is the sole beneficiary of The Donald J. Trump Revocable Trust, a trust created and operating

under the laws of New York that is the legal owner of the above entities.

---

[1] Citations to "Ex. __" are to true copies of the referenced documents as annexed to the
Affirmation of Colleen Faherty, dated January 18, 2022, and filed with this petition. Certain
exhibits to this Affirmation have been excerpted in order to avoid presenting the Court with
extraneous material. As the parties requested, the Court has granted OAG leave to file exhibits
under seal where they contain investigatory information. Docket No. 356.

4

14.     Respondent Donald Trump, Jr. is an Executive Vice President of the Trump Organization. According to the Trump Organization, Donald Trump, Jr. and Respondent Eric Trump took over management of the Trump Organization from Mr. Trump in 2017. Donald Trump, Jr. oversees the Trump Organization's property portfolio and is involved in all aspects of the company's property development. Donald Trump, Jr. and former Trump Organization Chief Financial Officer Allen Weisselberg were trustees of the Donald J. Trump Revocable Trust until Mr. Weisselberg resigned in June 2021. As of October 29, 2021, Donald Trump, Jr. was the sole Trustee of the Donald J. Trump Revocable Trust.

15.     Respondent Ivanka Trump was an Executive Vice President for Development and Acquisitions of the Trump Organization through at least 2016. Among other responsibilities, Ms. Trump negotiated and secured financing for Trump Organization properties. While at the Trump Organization she "direct[ed] all areas of the company's real estate and hotel management platforms." Ex. 330. This included active participation in all aspects of projects, "including deal evaluation, pre-development planning, financing, design, construction, sales and marketing" as well as "involve[ment] in all decisions—large and small." *Id*. Among other duties, she negotiated the ground lease with the federal government related to the Old Post Office property as well as financing related to that property.

## JURISDICTION, APPLICABLE LAW, AND VENUE

16.     The Attorney General commenced this special proceeding on behalf of the People of the State of New York pursuant to the New York Executive Law and C.P.L.R. Article 4.

17.     Executive Law § 63(12) allows the Attorney General to bring a proceeding "[w]henever any person shall engage in repeated fraudulent or illegal acts or otherwise

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 8 of 116

demonstrate persistent fraud or illegality in the carrying on, conducting or transaction of business."

18.  Fraudulent conduct as used in § 63(12) has been defined as "whether the targeted act has the capacity or tendency to deceive, or creates an atmosphere conducive to fraud." *People v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 107 (3d Dep't 2005), *aff'd on other grounds*, 11 N.Y.3d 105 (2008).

19.  A violation of any federal, state, or local law or regulation constitutes "illegality" within the meaning of § 63(12). *See, e.g.*, *Applied Card Sys.*, 27 A.D.3d at 104; *Oncor Commc'ns, Inc. v. State,* 165 Misc. 2d 262, 267 (Sup. Ct. Albany Cty. 1995), *aff'd*, 218 A.D.2d 60 (3d Dep't 1996); *People v. Am. Motor Club, Inc.*, 179 A.D.2d 277 (1st Dep't 1992), *appeal dismissed*, 80 N.Y.2d 893; *State v. Winter*, 121 A.D.2d 287 (1st Dep't 1986).

20.  The requirement to show "persistent" or "repeated" acts is met by, among other things, a showing of "separate and distinct fraudulent or illegal acts which affected more than one individual." *People v. 21st Century Leisure Spa Int'l Ltd.*, 153 Misc. 2d 938, 944 (Sup. Ct. N.Y. Cty. 1991); *see also State of New York v. Wolowitz*, 96 A.D.2d 47, 61 (2d Dep't 1983) (recognizing that § 63(12) allows "the Attorney-General to bring a proceeding when the respondent was guilty of only one act of alleged misconduct, providing it affected more than one person"); Exec. Law. § 63(12) (defining "persistent" and "repeated").

21.  The Attorney General has broad authority to issue subpoenas and take sworn testimony to determine whether a proceeding should be brought. The Attorney General is "authorized to take proof and make a determination of the relevant facts and to issue subpoenas in accordance with the civil practice law and rules." Exec. Law § 63(12).

INDEX NO. 451685/2020
RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 9 of 116

22.     A sufficient factual basis for a subpoena under § 63(12) exists as long as there is a "reasonable relation to the subject-matter under investigation and to the public purpose to be achieved." *Matter of La Belle Creole Int'l, S.A. v. Attorney-General of the State of N.Y.*, 10 N.Y.2d 192, 196 (1961).

23.     Because the Attorney General is presumed to be acting in good faith when issuing a subpoena, *Am. Dental Coop.*, 127 A.D.2d at 280, a § 63(12) subpoena will not be quashed unless it seeks material "utterly irrelevant to any proper inquiry" or where the futility of the process "to uncover anything legitimate is inevitable or obvious." *La Belle Creole*, 10 N.Y.2d at 196.

24.     Venue is properly set in New York County pursuant to C.P.L.R. 503, 505, and 509, because Petitioner is resident in New York County and has selected New York County, and because Petitioner is a public authority whose facilities involved in the action are located in New York County.

## PRELIMINARY FACTUAL FINDINGS

### I.     Misleading Statements of Financial Condition of Donald J. Trump

25.     Since no later than 2004, Mr. Trump and the Trump Organization have prepared an annual "Statement of Financial Condition of Donald J. Trump" (the "Statements" or "Statements of Financial Condition"). Since 2017, commencing with the Statement for the year ending June 30, 2016, the Statements have been issued by the Trustees of the Donald J. Trump Revocable Trust. These Statements contain Mr. Trump's or the Trustees' assertions of net worth, based principally on asserted values of particular assets minus outstanding debt.

26.     From 2004 until 2020, Mr. Trump's Statements of Financial Condition were compiled by accounting firm Mazars USA LLP ("Mazars"). Mazars ceased work on the Statements after the Statement reflecting Mr. Trump's financial condition as of June 30, 2020.

7

Another firm, Whitley Penn LLP, compiled the June 30, 2021 statement. The relevant Statements of Financial Condition obtained by OAG from 2004 to 2021 are attached to the Affirmation as exhibits 304-319.

27.    The Statements relied upon a supporting data spreadsheet and backup material prepared by the Trump Organization; Mazars compiled that information into financial-statement format. *E.g.*, Ex. 313 at MAZARS-NYAG-00000689. The relevant supporting data spreadsheets obtained by OAG from 2011 to 2020 are attached to the Affirmation as exhibits 320-329.

28.    The Trump Organization and its affiliates, including Mr. Trump, Donald Trump, Jr., and Ivanka Trump, submitted the Statements or arranged for their submission to counterparties, including financial institutions, other lenders, and insurers. The Trump Organization and its affiliates made these submissions to induce counterparties' consent to transactions or comply with the terms of transactions in which the parties were already engaged. The counterparties relied on the Statements and additional information provided by the Trump Organization in evaluating Mr. Trump's financial condition.

**A.    Misleading asset valuations in Trump financial statements**

29.    The Statements described Mr. Trump's (or the Trustees of the Revocable Trust's) valuation process in broad terms and in ways which are often inaccurate or misleading to a reader when compared with the supporting data and documentation that the Trump Organization submitted to Mazars. Among other things, the Statements or the backup material:

    a.    Misstated objective facts, like the size of Mr. Trump's Trump Tower penthouse;

    b.    Miscategorized assets outside Mr. Trump's or the Trump Organization's control as "cash," thereby overstating his liquidity;

    c.    Misstated the process by which Mr. Trump or his associates reached valuations.

    d.   Failed to use fundamental techniques of valuation, like discounting future revenues and expenses to their present value;

    e.   Misstated the purported involvement of "outside professionals" in reaching the valuations; and

    f.   Failed to advise that certain valuation amounts were inflated by an undisclosed flat percentage for brand value, despite express language on the Statements asserting that the value of Mr. Trump's brand was not reflected the Statements pursuant to generally accepted accounting principles ("GAAP").

30.    Since 2019, OAG has taken testimony from Trump Organization employees and others involved in these and other valuations. As detailed below, those involved have not been able to provide plausible justification for the valuation decisions at issue, their description of the Statements, or representations about the Statements made to counterparties. In light of the pervasive and repeated nature of the misstatements and omissions, it appears that the valuations in the Statements were generally inflated as part of a pattern to suggest that Mr. Trump's net worth was higher than it otherwise would have appeared.

31.    OAG is investigating a number of issues with the Statements. Other than appearing in New York Supreme Court beginning in August 2020 in this proceeding to compel production of necessary documents, and to seek the Court's intervention regarding the Trump Organization's documentary subpoena-compliance failures, OAG has largely maintained its investigation out of the public eye. However, because the Respondents have questioned whether OAG is pursuing in good faith a civil inquiry that may lead to civil remedial action within OAG's statutory power, OAG now presents to the Court a showing that reflects the progress of that inquiry. Below are seven issues that OAG believes are appropriate for disclosure to the

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 12 of 116

RECEIVED NYSCEF: 01/24/2022

Court now. The disclosure of these examples will not impede OAG's investigation; OAG is also investigating other conduct not discussed here.

### 1. "Other assets": Seven Springs and the Mr. Trump's Trump Tower Triplex

32.    The Seven Springs Estate ("Seven Springs") is a parcel of real property that consists of approximately 212 acres within the towns of Bedford, New Castle, and North Castle in Westchester County. Seven Springs LLC, a Trump Organization subsidiary, purchased the property in December 1995 for $7.5 million.[2]

33.    A 2000 appraisal prepared for the Royal Bank of Pennsylvania and sent to the Trump Organization estimated that Seven Springs had an "as-is" market value of $25 million for residential development. Ex. 335 at C&W_0048781, -88-91.

34.    The same bank's records further indicate that a 2006 appraisal showed an "as-is" market value of $30 million. Ex. 336 at 00046009.12.2019.

---

[2] From December 1995 to January 19, 2017, Mr. Trump was President of Seven Springs LLC. Seven Springs LLC is 99.9% owned by DJT Holdings LLC, an entity wholly owned by Mr. Trump until approximately 2016, when ownership was transferred to the Donald J. Trump Revocable Trust. Seven Springs LLC is 0.1% owned by Bedford Hills Corp., which was wholly owned by Mr. Trump until at least May 16, 2016, and is now wholly owned by DJT Holdings LLC. Ex. 331 at A4; Ex.332 at A2, A4; Ex. 333 at 4, A2; Ex. 334 at 00027709.12.2019.

10

| Year | Stated Value | Citation |
|------|--------------|----------|
| 2004 | $80 million | Ex. 304 at 12. |
| 2007 | $200 million | Ex. 305 at 17. |
| 2008 | $200 million | Ex. 306 at 17. |
| 2009 | $251 million | Ex. 307 at 15. |
| 2010 | $251 million | Ex. 308 at 00165209.12.2019. |
| 2011 | $261 million | Ex. 309 at MAZARS-NYAG-00003148. |
| 2012 | $291 million | Ex. 310 at MAZARS-NYAG-00006325. |
| 2013 | $291 million | Ex. 311 at MAZARS-NYAG-00000052. |
| 2014 | $291 million | Ex. 312 at MAZARS-NYAG-00000733. |

35.    The Statements of Financial Condition listed the above valuations of Seven Springs for the indicated year.[3]

36.    The 2012, 2013, and 2014 Statements of Financial Condition reported a value for Seven Springs of $291 million and asserted that "[t]his property is zoned for 9 luxurious homes." Ex. 310 at MAZARS-NYAG-00006325; Ex. 311 at MAZARS-NYAG-00000052; Ex. 312 at MAZARS-NYAG-00000733. Each financial statement asserted that the valuation was "based on an assessment made by Mr. Trump in conjunction with his associates of the projected net cash flow which he would derive as those units are constructed and sold, and the estimated fair value of the existing mansion and other buildings." *Id.*

37.    As depicted below, supporting data that the Trump Organization provided to Mazars for the purpose of compiling the 2012 financial statement recorded a "telephone

---

[3] Mr. Trump's Statements of Financial Condition represent that valuations of Seven Springs were "based on an assessment made by Mr. Trump in conjunction with his associates . . . ." *See, e.g.*, Ex. 312 (2012 Statement at 16).

conversation with Eric Trump (9/24/2012)" as one basis of this valuation, and also noted that

portions of the Seven Springs property were "land to be donated." *See* Ex. 321 at rows 679-680.

The supporting data for 2013 and 2014 reflected similar conversations with Eric Trump. Ex. 322

at cell B640; Ex. 323 at cell B660.

| PROPERTIES UNDER DEVELOPMENT | | 6/30/2011 | 6/30/2012 |
|---|---|---|---|
| Westchester, NY - Seven Springs | | | |
| Valuation is based on the sale of luxury homes | | | |
| net of cost. | | | |
| 6/30/2011-Per telephone conversation with Hal Goldman (9/16/2011) | | | |
| New Castle - 2 mansions - still in application process | | | |
| North Castle - 5 mansions - still in application process | | | |
| 6/30/2012-Per telephone conversation with Eric Trump (9/24/2012) | | | |
| New Castle-land to be donated | | | |
| North Castle-land to be used as part of Main Mansion | | | |
| Bedford - 7 mansions approved | | | |
| Selling Price | | 35,000,000 | 35,000,000 |
| Cost | | 12,000,000 | 12,000,000 |
| Profit | | 23,000,000 | 23,000,000 |
| Number of homes | | 7 | 7 |
| Value | | 161,000,000 | 161,000,000 |
| Current selling price of existing structures | | | |
| Main mansion | | 70,000,000 | |
| Main mansion + North Castle land (150 acres) | | | 100,000,000 |
| None Such Mansion | | 30,000,000 | 30,000,000 |
| Total value | | 261,000,000 | 291,000,000 |
| 809 NORTH CANNON DRIVE MOVE TO OTHER ASSETS-6/30/2011 "Per financials" amounts not adjusted for removal of 809 N Cannon Drive) | | | |
| Per financials | | 273,200,000 | 291,000,000 |

38.     Mr. McConney, Senior Vice President and Controller of the Trump Organization,

testified that this valuation includes the full amount that would be generated from the sale of the

non-existent homes without taking into account the years it would take to construct

infrastructure, build homes, obtain necessary approvals, and sell the number of homes identified

in the supporting data. Ex. 337 at 230:10-231:11. He provided similar testimony with regard to

the 2013 and 2014 valuations. *Id.* at 240:6-20; also 242:22-243:20.

12

INDEX NO. 451685/2020

RECEIVED NYSCEF: 01/24/2022

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 15 of 116

39.    Asked to explain various aspects of the 2012 and 2013 valuations, Eric Trump repeatedly invoked his Fifth Amendment privilege. Ex. 338 at 262:5-266:7; 271:19-272:3. And asked whether he discussed the valuation of Seven Springs with Mr. McConney on September 12, 2014, Eric Trump invoked his Fifth Amendment privilege. *Id*. at 274:10-16.

40.    Notably, the September 12, 2014 conversation described by Mr. McConney occurred after the completion of a valuation of the development potential for Seven Springs by a Cushman & Wakefield, Inc. ("Cushman") appraiser. In July 2014, the law firm Vinson & Elkins LLP (by an attorney, Sheri Dillon), had engaged Cushman to "provide consulting services related to an analysis of the estimated value of a potential conservation easement on all or part of the Seven Springs Estate." Ex. 339 at C&W_0016742. Vinson & Elkins acted "in its capacity as legal counsel for Seven Springs, LLC, the owner of the Seven Springs Estate." *Id.*

41.    David McArdle, an appraiser at Cushman, performed this engagement. Mr. McArdle testified that this engagement was to provide, verbally, a "range of value" of the Seven Springs property. Ex. 340 at 50:06-51:08, 96:19-98:09.

42.    Mr. McArdle valued the sale of eight lots in the Town of Bedford, six lots in New Castle, and ten lots in North Castle. Spreadsheets he prepared reflecting his opinion on the range of values show that McArdle used two different techniques to reach this range of values.

43.    In one spreadsheet, which he called "a sellout analysis," McArdle reached an average per-lot sales value of $2 million for the New Castle and North Castle lots, and $2.25 million for the Bedford lots. Ex. 341 at 458:6-459:8; Ex. 342 at C&W_0048563. After preparing a cashflow anticipating the sale of the lots and 10% rounded costs over five years, McArdle reached a rounded present value for all 24 lots of $29,950,000. In other words, Mr. McArdle—

13

accounting for the time it would take to develop the property and discounting revenues and expenses to their present value—computed a value.

44.     Using another valuation technique, Mr. McArdle also sought to establish a value "Before" and "After" an easement donation. He assumed the eight Bedford lots were presently worth $1.5 million to $2.5 million each, for a range of $12 million to $18 million. He assumed six lots in New Castle at an estimated range of $1.5 million to $2 million for a total of $9 million to $12 million. Likewise, he assumed ten lots in North Castle at an estimated range of $1.5 million to $2 million, for totals of $15 million to $20 million, respectively. Ex. 343 at C&W_0048562. McArdle testified that he provided these individual ranges of value per lot to the client. Ex. 341 at 454:2-21. These ranges put the current value of the lots at a range of $36 million to a maximum of $50 million.

45.     McArdle testified that he conveyed his estimated range of value to the Trump Organization in late August or September 2014. Ex. 341 at 506:5-15. In an email he wrote on September 8, 2014, Mr. McArdle stated that he had "completed the research and all verbal consulting." Ex. 344.

46.     The Trump Organization was thus in possession of McArdle's "range of value" of $29,500,000 to a maximum of $50,000,000 for the developable lots at Seven Springs before Mr. McConney's September 12, 2014 telephone conversation with Eric Trump, and well before the finalization of the 2014 Statement of Financial Condition on November 7, 2014.

47.     Despite the Trump Organization's receipt of a valuation of twenty-four lots across three Westchester townships reflecting a value between $29.5 million and $50 million, the 2014 Statement of Financial Condition valued seven non-existent mansions in Bedford at $161

million—without factoring in the valuation the Trump Organization commissioned or the time it would take to build and sell such homes. Those failures are objectively misleading.

48.     As described in previous submissions and alleged in detail below, in March 2016, two Cushman appraisers completed an appraisal of Seven Springs and concluded that the entire property (including undeveloped land and existing buildings) as of December 1, 2015 was worth $56.5 million. *See* 345 at MLB_EM00009124 (the "March 2016 Appraisal"). Like Mr. McArdle's verbal consultation, this March 2016 Appraisal—reporting less than one-fifth of the value that Mr. Trump had most recently asserted on his financial statements and certified as accurate to financial institutions—substantially undermines the assertions in Mr. Trump's Statements of Financial Condition: from 2008 through 2014, the Statements assigned valuations for Seven Springs that range from $200 million to $291 million. Ex. 312 at MAZARS-NYAG-00000733; Ex. 346. And as noted below, OAG has identified evidence that the March 2016 Appraisal itself relied on questionable assumptions indicating misrepresentations and significant omissions—such that even the $56.5 million valuation in that appraisal was improperly inflated.

49.     Further, after receiving the March 2016 Appraisal, Mr. Trump's subsequent Statement of Financial Condition was changed in a manner that disguised what would otherwise have appeared as a more than 80% drop in the value of Seven Springs, which had been reported to be worth $291 million for the three preceding years.

50.     In prior years, the asserted value for Seven Springs was listed individually on the summary page or property description for each financial statement. *See* Ex. 305 at 17; Ex. 306 at 17; Ex. 307 at 15; Ex. 308 at 16; Ex. 309 at MAZARS-NYAG-00003148; Ex. 310 at MAZARS-NYAG-00006325; Ex. 311 at MAZARS-NYAG-00000052; Ex. 312 at MAZARS-NYAG-00000733.

51.     Mr. Trump's financial statement as of June 30, 2015 (which was not issued until March 2016), does not identify any value for the Seven Springs property. Ex. 313 at MAZARS-NYAG-00000691-92.

52.     The property was instead moved into a catch-all category entitled "other assets," where its value was part of that category's total but not separately itemized. *See* Ex. 313 at MAZARS-NYAG-00000710-12.

53.     Between the 2014 and 2015 financial statements, the "other assets" category was reported to have increased in value by $219.6 million, with the Seven Springs property representing a significant asset transferred to this category. *Compare* Ex. 312 at MAZARS-NYAG-00000717 (reporting "other assets" worth $338 million), *and id.* at MAZARS-NYAG-00000736-37 (listing assets included in this category); *with* Ex. 313 at MAZARS-NYAG-00000691 (reporting "other assets" worth $557.6 million), *and id.* at MAZARS-NYAG-00000710-12 (listing assets included in this category).

54.     In that same "other assets" category in 2015, the data supporting the financial statement reflects that there was a $127 million increase in the reported value of Mr. Trump's triplex apartment in Trump Tower from $200 million to $327 million, a 64 percent increase in reported value in a single year. Ex. 324 at rows 819-904.

55.     Because none of the assets in the "other assets" category were given individual line-item values on the Statement of Financial Condition, the $127 million increase in asserted value for Mr. Trump's triplex apartment helped disguise a substantial drop in the value of Seven Springs, which had been transferred to the same "other assets" category.

56.     With respect to Mr. Trump's triplex apartment in Trump Tower, OAG has discovered that the valuations of this asset as incorporated into the Statements of Financial

16

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 19 of 116

Condition since at least 2012 were based on the assertion that the triplex apartment was 30,000

square feet in size. Evidence indicates that Mr. Weisselberg and Mr. McConney both participated

in such valuations. *See, e.g.*, Ex. 347 at MAZARS-NYAG-00003611.

57.     Further, there is evidence that documents demonstrating that the actual size of Mr.

Trump's triplex apartment was only 10,996 square feet (namely the condominium offering plan

and associated amendments for Trump Tower) were easily accessible inside the Trump

Organization, were signed by Mr. Trump, and were sent to Mr. Weisselberg in 2012. *See* Ex.

348; Ex. 349 at LC00132530, -37.

58.     The supporting data for Mr. Trump's 2015 financial statement reported the value

of Mr. Trump's triplex apartment as $327 million, based on the apartment having 30,000 square

feet of space multiplied by a certain price per square foot. Ex. 324 at rows 882-883. This

assertion was repeated in the supporting data for Mr. Trump's 2016 financial statement. Ex. 325

at row 913.

59.     Without mention in the financial statement, the supporting data for Mr. Trump's

2017 financial statement presented yet another change in the valuation, stating the value of Mr.

Trump's triplex apartment as $116.8 million. Ex. 326. But for the first time in 2017, the

supporting data states that the triplex apartment had only 10,996.39 square feet. Ex. 326.

Because these valuations were performed by multiplying the number of square feet times a price

per square foot, the reduction in the apartment's square footage in the valuation from 30,000 to

10,996 indicates that the valuations of Mr. Trump's triplex in the 2015 and 2016 were overstated

almost by a factor of three, as Mr. Weisselberg conceded in his testimony. Mr. Weisselberg

admitted that this amounted to an overstatement of "give or take" $200 million. Ex. 351 at

507:05-22 ("Q: In fact, overstated by a factor of 3, is that correct? A: I didn't do the math, but it

should be one third, yes, I would agree with that. Q: So, it's on the order of a $200 million overstatement, give or take? A: Give or take.").

60.     A Trump Organization employee who assisted in these valuations testified that he had prepared the spreadsheets. He accepted that there was "a fairly large discrepancy in the square footage listed for this asset in the two spreadsheets [he] prepared." He stated that he had "probably" discussed the discrepancy with "either Jeff McConney or Allen Weisselberg." Ex. 352 at 267:17-271:12

61.     Publicly available information indicates that Mr. Trump himself has stated his triplex apartment in Trump Tower was approximately 30,000 square feet in size or larger. For example, a 2017 article in *Forbes* magazine states: "During the presidential race, Donald Trump left the campaign trail to give Forbes a guided tour of his three-story Trump Tower penthouse— part of his decades-long crusade for a higher spot on our billionaire rankings. . . . [Mr. Trump] bragged that people have called his Manhattan aerie the 'best apartment ever built' and emphasized its immense size (33,000 square feet) and value (at least $200 million). 'I own the top three floors—the whole floor, times three!'" Ex. 353. The article evaluated whether the apartment was actually 30,000 square feet or more in size, and referred to a review of records, "[t]he end result [of which was] 10,996 square feet of prime Manhattan real estate—a massive residence, no doubt, but much smaller than what Trump claims to own." Ex. 353.

### 2.     Trump International Golf Club Scotland – Aberdeen

62.     Trump International Golf Club Scotland ("Trump Aberdeen") is a parcel of land containing a golf course, a country club, and undeveloped land in Aberdeen, Scotland. The entire property was purchased in 2006 for $12.6 million by the Trump Organization. Ex. 354 at 2.

18

63.    Trump Aberdeen has been included as an asset on Mr. Trump's Statements of Financial Condition each year from 2011 to 2019. Ex. 309 at MAZARS-NYAG-00003144; Ex. 310 at MAZARS-NYAG-00006321; Ex. 311 at MAZARS-NYAG-00000046; Ex. 312 at MAZARS-NYAG-00000729; Ex. 313 at MAZARS-NYAG-00000703; Ex. 314 at MAZARS-NYAG-00001995; Ex. 315 at MAZARS-NYAG-00001854; Ex. 316 at MAZARS-NYAG-00002737; Ex. 317 at DB-NYAG-230542.

64.    The Statements of Financial Condition do not list an individual value for the property. Instead, the value of Trump Aberdeen, as recorded in the supporting data for the respective financial statements, is grouped together with a series of other properties in a category called "Club Facilities and Related Real Estate." Ex. 309 at MAZARS-NYAG-00003140; Ex. 310 at MAZARS-NYAG-00006317; Ex. 311 at MAZARS-NYAG-00000043; Ex. 312 at MAZARS-NYAG-00000723; Ex. 313 at MAZARS-NYAG-00000697; Ex. 314 at MAZARS-NYAG-00001989; Ex. 315 at MAZARS-NYAG-00001848; Ex. 316 at MAZARS-NYAG-00002731; Ex. 317 at DB-NYAG-230536. The result is that a recipient of the financial statement receives a bottom-line figure for all of those clubs and related properties—but is kept from learning, from the statement, the value assigned to any particular club in that category.[4]

65.    In 2011, the valuation for Trump Aberdeen in the supporting data that the Trump Organization provided to Mazars was based on capital contributions from inception and an estimate of value for the undeveloped land on the property of £75,000,000 "per George Sorial email 9/6/2011." Ex. 321 at row 533.

---

[4] The Statements of Financial Condition claim, among other things, that the valuations of the category "Club Facilities and Related Real Estate" were reached in an "assessment [that] was prepared by Mr. Trump working in conjunction with his associates and outside professionals." Ex. 312 (2014 Statement at 8). *See also* Ex. 309 at MAZARS_NYAG_00003140; Ex. 307 at 8.

19

66.     The referenced email had the subject line "Forbes Magazine," and contained a quote Mr. Sorial provided to an accountant in Scotland who was then expected to pass the information on to *Forbes* Magazine. Ex. 355. The quote stated: "Although a formal appraisal has not been prepared at this point, after speaking with specialists in the field and having closely watched this development transform itself over the last five years, we are informed that the value for the residential/hotel land parcels could achieve a value in excess of 75 million [British pounds sterling]." Ex. 355 at TTO_008977.

67.     It thus appears that the valuation of Trump Aberdeen used for Mr. Trump's financial statement was prepared for purposes of providing information to *Forbes* magazine in a quote. Ex. 355.

68.     Converted to U.S. dollars, the Trump Organization's asserted value of Trump Aberdeen in 2011 was $161 million. *See* Ex. 356 at rows 527-543.

69.     In April 2012, Donald Trump testified to the Scottish Government that he "cannot proceed with [the development] if the hotel is going to be looking at industrial turbines, and no one here would do so if they were in my position."[5]

70.     Mr. Sorial's "Forbes Magazine" email was a component of the Trump Organization's 2012 and 2013 valuations of Trump Aberdeen as well. *See* Ex. 356 at rows 527-543; Ex. 322 at rows 487-503.

71.     The Trump Organization valued Trump Aberdeen at $435.56 million for purposes of Mr. Trump's 2014 financial statement; that figure was more than double the 2013 valuation for the same property. Ex. 323 at cell H527. Of the asserted $435.563 million valuation in 2014,

---

[5] Donald Trump Testifies on Wind Turbines to the Scottish Parliament - April 25, 2012, at 01:47:31 - 01:47:58, https://www.youtube.com/watch?v=HX4J1a8gy6I&t=6465s. Transcript available at https://factba.se/transcript/donald-trump-testimony-wind-scotland-april-25-2017.

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 23 of 116

more than four-fifths of the value ($361.393 million) was derived from the Trump Organization's estimate of the residential development potential of the property. Ex. 323 at rows 519-526.

72.     The 2014 Statement of Financial Condition reports that the Trump Organization "received outline planning permission in December 2008 for . . . a residential village consisting of 950 holiday homes and 500 single family residences and 36 golf villas." Ex. 312 at MAZARS-NYAG-00000729. This is a total of 1,486 homes. But the supporting data for the 2014 valuation contained a residential parcel valuation based on the development potential of 2,500 homes. Ex. 323 at row 521. Mr. Weisselberg testified that he could not explain this discrepancy. Ex. 357 at 299:03-300:09, 302:06-17.

73.     In 2014, shortly before the Trump Organization finalized Mr. Trump's Statement of Financial Condition (including the $361.393 million asset valuation for the residential development potential at Aberdeen), the Trump Organization, consistent with Donald Trump's testimony to the Scottish government, represented in an audited financial statement that it did not intend any residential development on the property for the foreseeable future. Ex. 358 at TTO_009941. Specifically, in the "Director's report and financial statements for the year ended 31 December 2013," submitted to a UK regulator and signed on September 29, 2014, the Trump Organization wrote: "the hotel, second golf course, and future phases of the project have been postponed until such time that the Scottish Government and regional Councils have reversed their stance on supporting the wind farm development being considered for Aberdeen Bay." Ex. 358 at TTO_009941-42, -9947.

74.     Mr. Weisselberg signed the audited statement as an officer of Trump International Golf Club Scotland. Ex. 358 at TTO_009942, -9946, -9948.

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 24 of 116

75.     The valuation of Trump Aberdeen in the 2014 supporting data which was ultimately reflected on the 2014 Statement of Financial Condition did not account for this indefinite postponement of residential development. Ex. 351 at 357:09-15.

76.     As was the case with the valuation of the Seven Springs residential development (see *supra* at ¶¶ 37-38), the valuation for Trump Aberdeen did not account for the time it might take to secure any needed approvals, develop the property, and market the property. Ex. 351 at 398:24-399:24; Ex. 323 at rows 519-526. Supporting data for the Statements of Financial Condition for 2015 and 2016 do not reflect, in the valuation of Trump Aberdeen, any consideration of the time it might take to secure any needed approvals, develop the property, and market the property. Ex. 324 at rows 530-539; Ex. 325 at rows 563-571.

77.     OAG has learned of additional information that further calls into question the valuation of the Aberdeen property on the Statement of Financial Condition.

78.     For example, the Trump Aberdeen valuations described above—computing a valuation principally based on building 2,500 homes—assumes that 2500 homes would have the same characteristics (and the same value per home). This ignores that, as the Statements notes, of the 1,486 homes that were purportedly the recipient of some level of approval, 950 of the homes were to be "holiday homes" and 36 were to be "golf villas." OAG has obtained evidence indicating that such properties—under the terms governing Trump Aberdeen—would be rental properties and no individual could rent one for more than six weeks at a time. Ex. 359 at 5.

79.     In 2017 the Trump Organization commissioned an appraisal which suggested that if 557 private homes (which exceed the approved amount) were built that would result in a total net present valued profit of £16-19 million. Ex. 360 at TTO_242033. The Trump Organization

valued the undeveloped residential land at more than ten times that amount, £212,160,000, that year. Ex. 326 at G582.

### 3. The "Trump" brand

80.      The financial statements explicitly state that, according to GAAP, the statements do not incorporate any intangible brand value. In particular, the financial statements assert that, although Mr. Trump's name "enhances the value of the properties reflected in this statement," that value "has not been reflected in the preparation of this financial statement." Ex. 309 at MAZARS-NYAG-00003136. A similar proviso is included each year from 2012-2020. Ex. 310 at MAZARS-NYAG-00006313; Ex. 311 at MAZARS-NYAG-00000039; Ex. 312 at MAZARS-NYAG-00000719; Ex. 313 at MAZARS-NYAG-00000693; Ex. 314 at MAZARS-NYAG-00001986; Ex. 315 at MAZARS-NYAG-00001845; Ex. 316 at MAZARS-NYAG-00002731; Ex. 317 at MAZARS-NYAG-161792; Ex. 318 at MAZARS-NYAG-00162250.

81.      The language in the 2016 Statement is depicted below:

This financial statement does not reflect the value of Donald J. Trump's worldwide reputation; however, the brand value has afforded Mr. Trump the opportunity to participate in licensing deals around the globe as reflected on the statement of financial condition herein (see Note 5). Mr. Trump's name conveys a high degree of quality and profitability. This prestige significantly enhances the value of the properties reflected in this financial statement, as well as that of future projects. The brand along with the level of quality of Mr. Trump's residential developments has allowed the selling price per square foot in Trump properties to be amongst the highest among prominent real estate developers. The goodwill attached to the Trump name has significant financial value that has not been reflected in the preparation of this financial statement.

Ex. 314 at MAZARS-NYAG-00001986.

82.      Mr. Trump was personally aware of the fact that his Statement of Financial Condition represented that no brand value was included. In a letter to CSG Investments Inc., for example, Mr. Trump wrote:

23

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 26 of 116

I am also enclosing a letter that establishes my brand value, which is not included in my net worth statement, from Predictiv, the most respected branding valuation company in the country. Among the companies they represent are Major League Baseball, Southwest Airlines, Pfizer, Petrobras, General Motors, UPS, Visa, BASF, and United Technologies.

With best wishes,



Sincerely

Donald J. Trump

Ex. 534.

83.     The Statement's representation regarding the absence of brand value is false (or, at a minimum, misleading). As described below, the Statement of Financial Condition includes an added brand premium for most of the properties in the Club Facilities and Related Real Estate category.

84.     The Statements of Financial Condition include a category of assets called "Club Facilities and Related Real Estate." *See, e.g.*, Ex. 309 at MAZARS-NYAG-00003134. Values assigned to the assets in this category are summed together, with only the overall figure reported to recipients of the financial statement, who are kept from learning, from the statement, the value assigned to any particular club in that category.

85.     Beginning in the year 2013 nearly all properties in this category are valued based on, at least in part, a metric entitled "fixed assets." Ex. 322; Ex. 323; Ex 324; Ex. 325; Ex. 326 at MAZARS-NYAG-00002024; Ex. 327 at MAZARS-NYAG-00002772; Ex. 328 at MAZARS-NYAG-00161836; Ex. 329 at MAZARS-NYAG-00162291.

86.     According to the Trump Organization Controller Jeffrey McConney, when the Trump Organization was valuing golf clubs, the label "fixed assets" encompassed cash spent to build the clubhouse and any improvements. Ex. 337 at 64:06-11.

24

87.     For the 2013 and 2014 Statements, the Trump Organization added thirty percent to the "fixed assets" metric it had used for several clubs. The label associated with that 30% premium was, "fully operational branded facility." That premium was applied to the Trump Organization's golf clubs at Colts Neck, Washington D.C., Hudson Valley, Philadelphia, Jupiter (Florida), Charlotte, and Los Angeles. Ex. 322; Ex. 323.

88.     For each Statement from 2015 to 2020 the value of the Trump golf clubs at Colts Neck, Washington D.C., Hudson Valley, Philadelphia, Jupiter, Charlotte, and Los Angeles included a fifteen-percent premium in addition to fixed assets for a "fully operational branded facility." Ex. 324; Ex. 325; Ex. 326 at MAZARS-NYAG-00002024; Ex. 327 at MAZARS-NYAG-00002772; Ex. 328 at MAZARS-NYAG-00161836; Ex. 329 at MAZARS-NYAG-00162291.

89.     For the Statements from 2013 to 2018, the brand premiums for Colts Neck, Washington D.C., Hudson Valley, Philadelphia, Jupiter, Charlotte, and Los Angeles were all purportedly based on a 2013 phone call with an outside golf club professional. *See e.g.*, Ex. 324 at rows 383-386. The supporting data from the Trump Organization asserts, as a basis for the premium, that the Organization was told by the professional that "Trump branded clubs are more valuable than most golf courses." Ex. 322 at rows 306-307.

90.     That outside professional testified that it would never be his practice to value a golf course based on fixed assets or add a premium to fixed assets to value a golf course. Ex. 361 at 82:10-25.

91.     That outside golf club professional, who is the only outside professional listed on the Colts Neck, Washington D.C., Hudson Valley, Philadelphia, Jupiter, Charlotte, and Los Angeles golf club valuations for the Statements from 2013-2018, denied ever having provided a

valuation of, or a brand premium number for, any Trump golf courses during this time period. Ex. 361 at 70:19-21, 95:04-96:16.

92.     As discussed below at ¶¶ 160-190, Mr. Trump's Statements of Financial Condition were submitted to counterparties to seek or obtain credit and insurance, and to comply with covenants on existing loans that required periodic submission of financial statements. Ex. 362 at DB-NYAG-003049; Ex. 363 at DB-NYAG-059810-13.

93.     Mr. Trump personally guaranteed several of those loans and at least one insurance program, and those personal guarantees required that Mr. Trump certify that he accurately represented his financial condition. See, e.g., Ex. 363 at DB-NYAG-059810, -059813, -059821-22; Ex. 346 at DB-NYAG-060415.

94.     Donald Trump was required to submit his Statement of Financial Condition and maintain a certain minimum net worth in order to comply with covenants on loans that he personally guaranteed. See Exs. 356, 364, 365, 366.

95.     The agreed upon definition of net worth in the loan documentation of one bank excluded brand value. "For purposes hereof, the goodwill attached to the Trump name shall be excluded from the calculation of Guarantor's assets, as stated in Note 1 of the Notes to Statement of Financial Condition of Guarantor's Statement of Financial Condition, dated as of June 30, 2011." Ex. 356 at DB-NYAG-004173; Ex. 364 at DB-NYAG-038873 (relying on note 1 to the 2012 SOFC); Ex. 365 at DB-NYAG-003223 (relying on Note 1 to the 2012 SOFC); Ex. 366 at DB-NYAG-003279 (relying on Note 1 to the 2013 SOFC). Similarly, the underwriting guidelines of one insurer which provided coverage to the Trump Organization specify that intangible assets such as brand value be excluded from financial statements. Ex. 367 at 98:02-98:18.

26

96.     Accordingly, at least one financial institution who lends to, and at least one insurer of, the Trump Organization have policies which treats brand value as worthless in their analysis and requires they not consider it for purposes of determining net worth. Ex. 368 at DB-NYAG-001697, 1701; Ex. 369 at 184:20-185:18; Ex. 367 at 98:02-98:18.

97.     The originating credit risk manager for those loans stated that if brand value were included in Mr. Trump's reported net worth that it would constitute a breach of the net worth covenant. Ex. 369 at 202:20-203:11.

98.     As is discussed below, an underwriter for the Trump Organization's surety program stated that if she were aware brand value had been included in Donald Trump's Statement of Financial Condition, she would have been required to reduce reported net worth accordingly. Ex. 367 at 98:02-98:18.

**4.     Trump National Golf Club – Westchester**

99.     Mr. Trump purchased Trump National Golf Club Westchester ("Briarcliff") for $8,500,000. Ex. 311 at MAZARS-NYAG-0000044. The property has been included as an asset on Mr. Trump's Statements of Financial Condition from 2004 to present.

100.    As discussed supra at ¶¶ 84-85, the Statements of Financial Condition do not list an individual value for the Briarcliff property; instead, the value of the property, as recorded in the supporting data for the financial statement, is grouped together with a series of other properties in a category called "Club Facilities and Related Real Estate." The result is that a recipient of the financial statement receives a bottom-line figure for all items in that category together—but cannot identify the value assigned to any particular club in that category.

101.    In the 2011 supporting data document the property was valued at $68,703,300. Ex. 320 at G300. That valuation was broken down into multiple components. First was the value of the initiation fee for 67 unsold memberships totaling $12,775,000. Although the supporting

data spreadsheet states that the club was currently "getting $150,000" per membership, the Trump Organization derived $12,775,000 in value by computing a value with 47 of the 67 unsold memberships priced higher than that amount, in many instances by $100,000 each. Ex. 320 at G265-284. Next, the valuation included $28 million for the cost to construct the clubhouse and $2,828,300 in receivables from members. Ex. 320 at G288-293. Furthermore, the valuation included an estimate of $25,100,000 for the expected profit from the sale of 31 mid-rise units "put on hold." Ex. 320 at G295-298

102.    According to TTO membership records, even the representation that the club was "getting $150,000 per membership" in June 2011 was false: Records indicate that many members paid no deposit for their memberships in 2011. Ex. 370.

103.    In March 2012, the club sought to increase membership through a strategy that "has been discussed several times with Mr. Trump and will be implemented per his instructions." Ex. 371 at TTO_02360603. The goal was to bring in 75 new members in order to generate maximum revenue for the club and the instructions note that memberships should be sold dues only with no initiation fee in order to achieve that goal. Ex. 371 at TTO_02360603-04.

104.    According to TTO membership records no new members paid an initiation fee in 2012. Ex. 370.

105.    Increasing the number of new members and not collecting initiation fees would reduce the remaining number of unsold memberships available for sale and thereby the listed value of Briarcliff on the Statement of Financial Condition.

106.    However, after the strategy change directed by Mr. Trump, his Statement of Financial Condition stopped computing the value of the Briarcliff property using unsold memberships: The Briarcliff valuation was done using "fixed assets" instead of unsold

28

membership prices for the 2012 Statement of Financial Condition. As discussed *supra,* ¶ 86, "fixed assets" referred to the cost to build the clubhouse and any improvements to the property. The value of fixed assets was $71,200,000. Ex. 321 at H280. When added to the receivables from members of $3,207,000 and the estimate of $25,100,000 for the expected profit from the sale of 31 mid-rise units "put on hold" the total reported value of the property reached $99,507,000. Ex. 321 at H273-287.

107.    These valuations do not take into account the time value of money.

108.    The Briarcliff property increased in valuation on Mr. Trump's Statement of Financial Condition by at least over $30 million from 2011 to 2012, mostly because of this change in methods. The change in methods and the concomitant increase were concealed from a reader of the statement of financial condition. This is because a reader of the statement only sees a total value for the category "Club facilities and related real estate" rather than an individual valuation for each property.

109.    Although the statement discloses that "cash expenditures to improve certain facilities" is a method of valuation used in the club facilities and related real estate category, there is no way to ascertain that the methodology switched for Briarcliff in particular.

110.    In the supporting data for the financial statement issued on October 28, 2013, Briarcliff's "fixed assets" were $72,354,000, its receivables from members were $2,160,000, and the spreadsheet listed an additional value of $101,748,600 for the profit from a sellout of "71 Mid Rise units approved but put on hold," for a total of $176,262,600. The source of this valuation was a telephone conversation with Eric Trump. See Ex. 311 at Mazars-NYAG-0000036; Ex.322 at G253-273.

111. Without the supporting data document, a reader of the financial statement would be unaware that the value of Briarcliff increased by over $75 million from 2012 to 2013, and by over $100 million from 2011 to 2013. A reader of the statement would also be unaware that this increase in value came in part from adding 40 homes and over $75 million in additional profit to the forecast of a project that was "on hold."

112. Starting in 2013, the Trump Organization considered donating a conservation easement over the land where the 71 undeveloped mid-rise units would go. During that process the Trump Organization and outside tax counsel Ms. Dillon hired an appraiser, who reached several preliminary valuations. Yet, as illustrated in the below chart, the Statement of Financial Condition value ignored the preliminary valuations.

| Year | Trump Statement Values[6] | Preliminary Appraised Values[7] | Citation for Appraised Values |
|------|---------------------------|--------------------------------|-------------------------------|
| 2013 | $101,748,600 | $45,000,000 | Ex. 372 at VE_00008043 |
| 2014 | $101,748,600 | $43,300,000. | Ex. 373 at C&W_0056373 |
| 2014 | $73,130,987 in golf club fixed assets | $16,500,000 value of golf club using income approach | Ex. 373 at C&W_0056373 |
| 2015 | $101,748,600 | $45,200,000. | Ex. 374 at C&W_0052753-54 |
| 2016 | $101,748,600 | $45,200,000. | Ex. 374 at C&W_0052753-54 |
| 2016 | $177,697,732 entire property | $8,960,000 market value or $15,124,300 "full value based on [assessed value]" | Ex. 375 at PDF 5. |

---

[6] Values refer to the 71 mid-rise units as listed in the supporting data (Ex. 322 at rows 277-281; Ex.323 at rows 263-267; Ex. 324 at 265-269) unless otherwise noted.

[7] Values refer to the 71 mid-rise units unless otherwise noted.

30

113.    Each appraisal discussed in the table above appears to have been prepared using standard methodologies—such as reaching a market value for a business entity based on its income performance, and valuing proposed residential property based on comparable sales data and time factors. There was no apparent basis for the Trump Organization to disregard such professionally prepared information in favor of the "fixed assets" method that is an accounting of past expenditures or the method that Eric Trump used.

### 5.    Trump Park Avenue

114.    Mr. Trump's Statements of Financial Condition include a property called "Trump Park Avenue." *See, e.g.*, Ex. 311 at MAZARS-NYAG-00000034, 42-43. Trump Park Avenue is reflected on Mr. Trump's Statement of Financial Condition for the years 2011 through 2020. Ex. 311 at MAZARS-NYAG-00000037, -42-43; Ex. 310 at MAZARS-NYAG-00006311, 6316-17; Ex. 311 at MAZARS-NYAG-00000037, 0042-43; Ex. 312 at MAZARS-NYAG-00000717, 722-23; Ex. 313 at MAZARS-NYAG-0000691, 96-97; Ex. 314 at MAZARS-NYAG-00001983, 1988-89; Ex. 315 at MAZARS-NYAG-00001842, 47-48; Ex. 316 at MAZARS-NYAG-00002725, 30-31; Ex. 317 at MAZARS-NYAG-00161790, 95-96; Ex. 318 at MAZARS-NYAG-00162248, 58. In these years, the property was reported as representing between $135 and $350 million of Mr. Trump's total assets. *Id*. Evidence obtained by the Attorney General establishes that unsold residential condominium units represented the lion's share of reported value (in excess of 95% in some years). On the 2011 Statement of Financial Condition, the reported value of the asset was $311,600,000, with unsold residential units comprising $293,122,750 of that value. Ex. 320 at G163-178.

115.    Evidence obtained by OAG indicates both that the reported values of the unsold residential units of the Trump Park Avenue building and representations regarding those values were inaccurate or misleading.

116.    The earliest outside valuation of the property identified by OAG consists of an appraisal performed in 2010 by the Oxford Group in connection with a $23 million loan from Investors Bank. As the appraisal identified, the collateral consisted of twenty-three residential units (twelve of which were rent stabilized), two commercial spaces, and six storage spaces. Ex. 376 at TTO_233905; Ex. 377 at TTO_234022. The appraisal valued the collateral at $72.5 million. Ex. 376 at TTO_233905. Approximately $55.1 million of that was derived from the residential and storage units. Ex. 377 at TTO_234055-56.[89] The appraisal valued twelve rent-stabilized units at $750,000 total, noting that the rent-stabilized units "cannot be marketed as individual units" because the "current tenants cannot be forced to leave." Ex. 377 at TTO_234022.

117.    Mr. Trump's Statements of Financial Condition in 2010, 2011, and 2012 valued the unsold residential units in Trump Park Avenue at more than $292 million, or roughly six times the 2010 appraised value attributable to the residential and storage units. Ex. 320 at H163-178; Ex. 320 at G163; Ex. 321 at H166.

118.    Evidence indicates that the Trump Organization routinely prepared estimates of current market value for unsold residential units at Trump Park Avenue that conflicted with the much higher values reported on Mr. Trump's Statement of Financial Condition and failed to account for rent-stabilized units that could not be marketed.

---

[8] $55.1 million is a figure resulting from the percentage (76%) of a key valuation variable (effective gross revenue) attributable to income streams other than the building's commercial units. Ex. 377 at TTO_234044, 055.

[9] The appraisal also contained what is known as a "sum of gross sellout" of each unsold condominium unit using comparable properties totaling $164 million. Ex. 377 at TTO_234024-25, 56. The gross sellout figure determined the percentage of the loan collateral that was released if an unsold unit was sold to pay down the loan. Ex. 378 at TTO_03003564.

119.     In the Statements of Financial Condition for 2010, 2011, 2012, 2013, 2014, and

2015 (the last of which was finalized in March 2016), the Trump Organization used offering

plan[10] or selling prices to value unsold residential condominium units at Trump Park Avenue—

not estimates of current market value. *See* Ex. 379 at TTO_009309; Ex. 380 at MAZARS-

NYAG-00003290; Ex. 381 at MAZARS-NYAG-00003476; Ex. 382 at MAZARS-NYAG-

00000184; Ex. 383 at MAZARS-NYAG-00000445; Ex. 384 at MAZARS-NYAG-00000846; *see

also*, Ex. 352 at 398:15-399:15; 400:12-403:09.

120.     But the Trump Organization maintained its own internal estimates of current

market value that were considerably lower than the values employed for Mr. Trump's Statements

of Financial Condition. Evidence indicates that, as far back as 2012 (and perhaps earlier),[11] the

Trump Organization's in-house real estate brokerage (Trump International Realty) prepared

Sponsor Unit Inventory Valuation spreadsheets reflecting *both* offering plan prices and current

market values that included unsold units at Trump Park Avenue. Ex. 385 (2012); Ex. 386 (2013);

Ex. 387 (2014). These spreadsheets reflected market valuation information for multiple Trump

Organization condominium buildings.

121.     Evidence indicates that Trump Organization employees used these sponsor unit

valuation spreadsheets—reflecting internal estimates of market value and offering plan prices—

---

[10] Before the sponsor of a condominium may offer units for sale, it is required to file an
offering plan with the New York State Department of Law. GBL §352-e. The offering plan must,
at a minimum, contain in detail the terms of the transaction and be complete, current, and
accurate, and disclose all material facts relevant to a decision to purchase a unit, including the
maximum price, as determined by sponsor, for units that are offered for sale. A sponsor may not
offer units for sale at prices higher than those disclosed in the offering plan without first filing an
amendment to the offering plan changing the maximum offering prices.

[11] This practice may have occurred earlier. Jeff McConney testified that, when he was
responsible for preparing the Statement of Financial Condition, he asked Trump International
Realty for current market value figures on Trump Park Avenue. Ex. 388 at 745:04-17.

for day-to-day operations and business planning, but used offering plan prices rather than the company's actual estimates of current market value when reporting the current market value of those units for Mr. Trump's Statements of Financial Condition. *Compare* Ex. 381 at MAZARS-NYAG-3476 with Ex. 385 at TTO_01226369 Column C; Ex. 382 at MAZARS-NYAG-00000184] with Ex. 386 at Column F; Ex. 383 at MAZARS-NYAG-00000445 with Ex. 387 at Column F.

122.    The results were considerable differentials in reported value as shown in the following chart:

| Year | Total Offering Plan Price used for Statement of Financial Condition | Total Current Market Value Prepared by Trump | Difference in Value | Source |
|------|------|------|------|------|
| 2012 | $293,122,750 | $236,425,000 | $56,697,750 | Ex. 385 at TTO_01226369 |
| 2013 | $326,854,500 | $285,795,000 | $41,059,000 | Ex. 386 TTO_010644 |
| 2014 | $326,854,500 | $246,265,000 | $80,589,500 | Ex. 387 at TTO_010663 |

123.    The figures in the above charts, both offering plan prices and current market value prices, do not include any reductions to account for reduced marketability due to rent stabilization. If they had, information available to the Trump Organization indicates that the valuation of Trump Park Avenue would have significantly decreased. For instance, from 2010-2012 the twelve rent stabilized units were valued collectively at $49,596,000—a rate 98.5 percent higher than the $750,000 valuation for those units in the 2010 appraisal, which valued them based on their rent-stabilized status. Ex. 377 at TTO_234022; Ex. 379 at TTO_009309; Ex. 380 at MAZARS-NYAG-00003290; Ex. 381 at MAZARS-NYAG-3476.

124.    Valuations in future years also ignored the impact of rent stabilization on units owned by Mr. Trump or the Trump Organization. Unit 15A was rent stabilized and the subject of

litigation in which the Trump Organization intervened.[12] Yet the Trump Organization's internal sponsor unit valuation merely computed the value of that unit based on a price per square foot figure and the unit's square footage—without any consideration of the unit's rent-stabilized status. *See* Ex. 352 at 405:10-406:19; Ex. 389; Ex. 390; Ex. 391.

125.    The Trump Organization's own conduct beginning in late 2016 or early 2017 reflects an understanding that reporting offering plan prices as the estimated current values of unsold Trump Park Avenue units—rather than its own, lower assessment of these units' actual current market values—was incorrect and misleading. Beginning with the June 30, 2016 Statement of Financial Condition—finalized in March 2017—the Trump Organization changed its practice and began reporting its current market value estimates for purposes of that financial statement.[13] Ex. 315 at MAZARS-NYAG-00001982; Ex. 392 at MAZARS-NYAG-00001433; Ex. 326 at H182.

126.    Apart from those discrepancies, statements on Mr. Trump's Statements of Financial Condition reflecting the manner in which those valuations were reached appear to be inaccurate and misleading. In particular, the Statements of Financial Condition from at least 2011 through 2019 reflect, in sum and substance, that the reported values were "based upon an evaluation made by Mr. Trump in conjunction with his associates *and outside professionals*,"[14]

---

[12] *Blaise Cossalino v. The New York State Division of Housing and Community Renewal, Trump Park Avenue LLC, The Trump Corporation*, NYSCEF Doc. 33 INDEX NO. 161368/2020 (Sup. Ct. N.Y. Cty.).

[13] A Trump Organization Assistant Vice President, who evidence indicates had a substantial role in preparing the Statement of Financial Condition beginning with the June 30, 2016 statement, testified that he could "not recall a decision to change the practice to reporting current market value," but that he probably "would have been instructed" to do so by Jeff McConney or Allen Weisselberg. Ex. 352 at 404:06-25.

[14] In years from June 30, 2016 and later, "the Trustees" were referenced instead of "Mr. Trump," but the references to "outside professionals" remained.

35

thereby leading the reader to believe that the manner of valuation included consultation with outside professionals. Ex. 309 at MAZARS-NYAG-00003140; *see also* Ex. 310 at MAZARS-NYAG-00006317; Ex. 311 at MAZARS-NYAG-00000043; Ex. 312 at MAZARS-NYAG-00000724; Ex. 313 at MAZARS-NYAG-0000697; Ex. 314 at MAZARS-NYAG-00001989; Ex. 315 at MAZARS-NYAG-00001848; Ex. 316 at MAZARS-NYAG-00002731; Ex. 317 at MAZARS-NYAG-00161796.

127.    Despite review of considerable evidence, including backup material provided to the Mazars accounting firm, OAG has been unable to identify any evidence indicating that any consultation with any outside professional occurred in connection with reporting the value of unsold residential condominium units at Trump Park Avenue for the Statement of Financial Condition in those years.

128.    In 2020, Jeffrey McConney was questioned about various references to "outside professionals" on the Statements of Financial Condition. Ex. 337 at 272:22-273:13 (reference to outside professionals regarding Seven Springs); 277:25-279:10 (same); 320:05-321:12 (club facilities); Ex. 388 at 772:19-776:21 (Niketown).

129.    After Mr. McConney testified, the 2020 Statement of Financial Condition was issued. That Statement of Financial Condition, unlike those that came before it for many years, omitted any contention that any specific valuation was reached in consultation with any outside professional. Instead, the 2020 Statement references outside professionals as one factor that may have been included or "applicable" in preparing various unidentified valuations reflected on the statement. Ex. 318 at MAZARS-NYAG-00162251.

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 39 of 116

130.    That abrupt removal of specific references to outside-professional consultation appears, among other things, to acknowledge that references to such professionals in prior years was inaccurate and misleading.

131.    Evidence obtained by the Attorney General indicates that Ivanka Trump resided in two penthouse apartments in the Trump Park Avenue building and that Mr. Trump's Statement of Financial Condition reported values for one of those units much higher than the price at which Ivanka Trump had obtained an option to purchase.

132.    Ivanka Trump rented a penthouse unit in Trump Park Avenue starting in 2011. Ex. 380 at MAZARS-NYAG-00003293. Ms. Trump's rental agreement included an option to purchase the unit for $8,500,000. Ex. 394. For the 2011 and 2012 Statements of Financial Condition, this unit was valued at $20,820,000—approximately two and a half times as much as the option price, with no disclosure of the existence of the option. Ex. 380 at MAZARS-NYAG-00003292; Ex. 381 at MAZARS-NYAG-3476. For the 2013 Statement of Financial Condition, the unit was valued at $25,000,000—more than three times the option price, again, with no disclosure of the existence of the option. Ex. 382 at MAZARS-NYAG-00000184.

133.    The Trump Organization's own conduct acknowledges that reporting an offering plan price for a unit—instead of the price at which the Trump Organization already had agreed to sell the unit to Ms. Trump—was incorrect and misleading. In particular, in October 2015 Ivanka Trump acquired an option to purchase a different, larger penthouse unit at Trump Park Avenue for $14,264,000. Ex. 395 at TTO_02226839.

134.    After Ms. Trump acquired that option to purchase, the backup to the Statement of Financial Condition for Trump Park Avenue in 2015 used a value of $14,264,000 instead of the

offering plan price of $45,000,000 that had been used in 2014. See Ex. 385 at MAZARS-NYAG-00000846; Ex. 383 at MAZARS-NYAG-00000445.

### 6.   Liquidity

135.   As a general matter, when a financial statement reports "cash," it is referring to an amount of liquid currency or demand deposits. See Financial Accounting Standards Board ("FASB"), Master Glossary - Cash. Similarly, when a financial statement reports "cash equivalents," it is reporting "short-term, highly liquid investments" that both can be "readily converted to known amounts of cash" and is "so near their maturity that they present insignificant risk of changes in value because of changes in interest rates." See FASB, Master Glossary – Cash Equivalents. When a financial statement refers to "marketable securities," it refers to debt or equity securities for which market quotations are available, and such assets are valued at "their quoted market prices." See, e.g., FASB, Accounting Standards Codification ("ASC") 274-10-35-5.[15]

136.   Mr. Trump's Statements of Financial Condition for several years reported cash amounts in partnership entities Mr. Trump did not control as Mr. Trump's own liquidity. In some years these restricted funds accounted for almost one-third of all the cash reported by Mr. Trump (for example $24 million of the total $76 million in cash reported for 2018). For the sake of simplicity, these entities will be referred to here as the Vornado partnership entities.

---

[15] Such measures of liquidity can assist a bank in evaluating a borrower's ability to repay a loan, including if the property that is collateral for the loan does not generate sufficient income to cover loan payments. Misrepresentations regarding a person's liquidity may be actionable. *See, e.g., Nairobi Holdings Limited v. Brown Brothers Harriman & Co.*, No. 02 CIV. 1230, 2002 WL 31027550, at *4-*5 (S.D.N.Y. Sept. 10, 2002) (misrepresentation regarding whether short-term investment qualified as a "marketable security").

137.    The Vornado partnership entities are entities through which Mr. Trump has a thirty-percent limited partnership stake in certain partnership entities that own 1290 Avenue of the Americas in New York, NY and 555 California Street in San Francisco, CA. Vornado Realty Trust ("Vornado"), in which Mr. Trump has no ownership interest, holds the other seventy-percent stake in the Vornado partnership entities and functions as the General Partner.

138.    Under the pertinent partnership agreements, the General Partner has "full control over the management, operation and activities of, and dealings with, the Partnership Assets and the Partnership's properties, business and affairs," and "the Limited Partners shall not take part in the management of the business or affairs of the Partnership or control the Partnership business." E.g., Ex. 396 at TTO_02545363.[16] Moreover, "[t]he Limited Partners may under no circumstances sign for or bind the Partnership." Id. The partnership agreements provide for cash distributions in an amount, if any, that is "determined by the General Partner in its sole discretion." *Id*. at -338-339.

139.    Internal Trump Organization records reflect an understanding that cash residing in the Vornado partnership entities could be distributed at Vornado's discretion only.[17] The Trump Organization maintained internal spreadsheets reflecting its own cash position and cash flow. One cash flow spreadsheet states, with respect to the Vornado partnerships: "Although there

---

[16] This document is entitled "Agreement of Limited Partnership of Hudson Waterfront Associates I, L.P." The partnership agreements for other pertinent entities—Hudson Waterfront Associates III LP, Hudson Waterfront Associates IV LV, and Hudson Waterfront Associates V LP—contain similar provisions. Without fully delineating the ownership structure, OAG understands that Vornado's 70% stake in 1290 Avenue of the Americas and 555 California Street is owned directly or indirectly by means of these partnerships, and that Mr. Trump's 30% stake is as well.

[17] Donald J. Trump took part in extensive litigation regarding these partnerships in which control over partnership cash was addressed. *See, e.g.*, *Trump v. Cheng*, 9 Misc. 3d 1120(A), at *7 (Sup. Ct. N.Y. Cty. Sept. 14, 2005) (quoting definition of "Cash Available for Distribution").

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 42 of 116

could be operating profits, distributions are at the discretion of Vornado at a rate of 30% to Trump. At this point we do not have all of the data that goes into Vornado's decision making, thus we are attributing no distribution for these properties." Ex. 397 (tab that says "Notes"). Similarly, spreadsheet documents with "cash position" in their filename include cash in a range of Trump Organization entities—but not cash in the Vornado partnership entities. See, e.g., Ex. 398 (email with attached document named "121517 Cash Position.xls").

140.     Contrary to what is reflected in these internal records (which are consistent with the terms of the governing trust documents), Mr. Trump's Statement of Financial Condition from at least 2013 through 2020 included cash in the Vornado partnership entities as Mr. Trump's "cash and marketable securities" or similarly identified liquid asset, often comprising a considerable portion of Mr. Trump's reported liquidity.[18]

141.     For example, the June 30, 2016 Statement of Financial Condition reported $114.4 million in cash, marketable securities, and hedge funds. Ex. 400. Approximately $19.6 million (17.6%) of that figure appears to have been derived from cash in or associated with the Vornado entities. Ex. 400. The June 30, 2018 Statement of Financial Condition reported $76.2 million in cash and cash equivalents. Ex. 401. Approximately $24.4 million (32%) of that figure apparently was derived from cash in or associated with the Vornado entities. Ex. 401. See also Ex. 402 (in 2019, $24.65 million out of $87 million); Ex. 403 (in 2020, $28.25 million out of $92.7 million).

### 7.     40 Wall Street

142.     Mr. Trump's Statements of Financial Condition refer to a property identified as "40 Wall Street," an office building located on Wall Street in New York, NY. The Trump

---

[18] This practice appears to have begun in 2013. See Ex. 399 (2012 schedule not including cash in or associated with Vornado properties).

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 43 of 116

Organization owns a "ground lease" pertaining to the property; in other words, it holds a leasehold interest in the land and buildings on the land, but pays rent (known as ground rent) to the fee owner. By the terms of the ground lease, the rent on 40 Wall Street would gradually increase over a series of years, with a reset in 2032 based on the overall value of the building. Ex. 388 at 612:16-23, 613:16-19; Ex. 311 at MAZARS-NYAG-00000041-42.

143.    For several years, the supporting data for Mr. Trump's Statement of Financial Condition reported a valuation for 40 Wall Street that was calculated using the "income capitalization approach," a method for estimating the value of real property based on the net operating income the property generates. Under the valuation method used by the Trump Organization, a property's net operating income is divided by a capitalization rate to arrive at an estimate of market value.[19]

144.    Net operating income is typically defined as "[t]he actual or anticipated net income that remains after all operating expenses are deducted from the effective gross income but before mortgage debt service and book depreciation are deducted." Appraisal Institute, The Dictionary of Real Estate Appraisal 158 (6th ed. 2015).

145.    OAG has obtained evidence raising questions regarding the true value of the Trump Organization's leasehold interest in 40 Wall Street as reported on Mr. Trump's Statements of Financial Condition.

146.    For example, evidence obtained by OAG suggests that Capital One (which held a $160 million mortgage on the property at the time) raised substantial concerns about cash flow at the property in approximately August and September 2009, leading to in-person meetings with

---

[19] For example, using the income capitalization approach, a property with a net operating income of $100 and a capitalization rate of 5% would yield a value of $2,000 (100/0.05).

Mr. Trump, Mr. Weisselberg, and others. *See, e.g.*, Ex. 404 at CAPITALONE-00348244 (notes from August 2009 meeting); Ex. 405 at CAPITALONE-00348333 (notes from September 2009 meeting).

147.    Those discussions led to a loan modification executed in 2010 attaching the Trump Organization's own 2010 budget for the property. Ex. 406 at CAPITALONE-00349593-96. That budget reflected a net operating income (described in the budget as "cash flow before debt service") of $12.3 million, *see* Ex. 406 at CAPITALONE-00349595; a figure bank personnel described as "very optimistic." Ex. 407 at CAPITALONE-00348988.

148.    Other materials indicate the Trump Organization's own budget as submitted to Capital One for 40 Wall Street for 2011 projected a net operating income of just over $4.4 million. Ex. 408 at CAPITALONE-00350719, -23 (figure results from starting with $25,183,244 in "total income accounts" and subtracting "total expense accounts" figure of $20,722,238; debt service and depreciation are not listed in such expenses).

149.    In connection with the 2010 Capital One loan modification, an appraisal was performed by Cushman & Wakefield valuing the Trump Organization's interest at $200 million as of August 1, 2010. Ex. 409 at CAPITALONE-00350131. Similar appraisals were performed in 2011 and 2012 reaching a similar valuation conclusion. Ex. 410; Ex. 411. In the 2012 appraisal, in addition to reaching a valuation of $220 million as of November 1, 2012, the appraisers also calculated a valuation "upon stabilized occupancy" as of November 1, 2015 at $260 million. Ex. 411 at TTO_220765. A key component of the 2012 appraisal and in valuing the Trump Organization's interest in the building was the reset value of the ground lease in 2032. The 2012 appraisal reached a conclusion that the ground lease rent (a Trump Organization

expense) would reset from $2.8 million a year to more than $15.5 million a year beginning on

January 1, 2033. Ex. 411 at TTO_220826-846.

150.    A copy of the 2012 appraisal was contained in the files of the Trump

Organization.

151.    Mr. Weisselberg testified that he recalled having an appraisal of 40 Wall Street

from approximately 2011 or 2012 that valued the property in the $200 million range, but he

determined the property was worth a different amount and listed that amount on the Statement of

Financial Condition. Ex. 357 at 134:25-138:02.

152.    During the same period, Mr. Trump presented a value for 40 Wall Street on his

Statements of Financial Condition of $601.8 million in 2010, $524.7 million in 2011, $527.2

million in 2012, and $530.7 million in 2013.[20] Ex 308 at 3, 7; Ex. 309 at MAZARS-NYAG-

00003134, -3139; Ex. 310 at MAZARS-NYAG-00006311, -6316; Ex. 311 at MAZARS-NYAG-

00000037, -41-42. These values are between two and three times the value recorded in the three

consecutive appraisals noted above. They rested, in part, on the use of figures for net operating

income that differed markedly from the Trump Organization's own contemporaneous budgets

which also were known to Mr. McConney or Mr. Weisselberg.[21]

---

[20] The Statements of Financial Condition represent that the reported valuations of 40
Wall Street were based upon an evaluation by Mr. Trump working with others. *See, e.g.*, Ex. 309
(2011 Statement at 7 ("The estimated current value of $524,700,000 is based upon a successful
renegotiation of the ground lease *and an evaluation made by Mr. Trump in conjunction with his
associates and outside professionals* . . . .")); Ex. 310 (2012 Statement at 7 (similar)); Ex. 311
(2013 Statement at 7 (similar)).

[21] *Compare, e.g.*, Ex. 320 (2011 supporting data at row 118 (using $26.2 million net
operating income figure, based on years of future projections)), *with* Ex. 408 at CAPITALONE-
00350719, -23 (2011 budget submitted to Capital One with $4.4 million figure); Ex. 321 (2012
supporting data at row 121 (using $22.72 million net operating income figure)) *with* Ex. 412 at
CAPITALONE_00254432 (2013 projected budget sent to Capital One on December 13, 2012
subtracting expenses from receipts to arrive at "operating cash flow before debt service" of $14.3
million, accompanied by letter signed by Mr. McConney).

153.    An exchange between the Trump Organization and Capital One in 2015 establishes that Capital One harbored great skepticism regarding the Trump Organization's valuations. In 2014 the Trump Organization valued 40 Wall Street at $550 million. Ex. 312 at MAZARS-NYAG-00000714, -717. Mr. Weisselberg then brought that valuation to Capital One on January 12, 2015 in an effort to restructure the loan on the building and avoid a principal payment of $5 million due in November 2015. Ex. 413 at TTO_123039, -40. Touting his own assertion of a favorable loan to value ratio of 30%, Mr. Weisselberg wrote to Capital One:

> This investment along with a very successful rental program has turned the Trump Building at 40 Wall St. into one of the great success stories post 2008. Mr. Trump's latest financial statement dated June 30, 2014 shows a valuation of $550,000,000 for the building based upon NOI & CAP rates on that date. This would put your loan at a 30% loan to value.
>
> In light of the aforementioned valuation and considerable capital investment, along with a much improved cash flow (which will continue to grow as new tenant free rent continues to burn off) and an occupancy rate of 91%, which will be 96% after pending leases totaling 34,862 square feet are signed, we respectfully request that the required $5 million principal payment due in November 2015 be waived.
>
> We look forward to a favorable response from Capital One Bank.
>
> Very truly yours,
>
> Allen Weisselberg
> EVP/CFO

Ex. 413 at TTO_123040.

154.    Capital One had performed its own internal valuation analysis as of October 31, 2014, however, which reached a starkly different conclusion. That analysis valued 40 Wall Street at $257 million and estimated a much less favorable loan to value ratio of 62%. Ex. 414 at CAPITALONE-06262020-00000170.

155.    Based on its valuation and analysis, Capital One declined to restructure the loan. Ex. 413 at TTO_123039.

44

156.    Rebuffed by Capital One, Mr. Weisselberg then began working with his son, Jack

Weisselberg, a Director at Ladder Capital Finance LLC, in an effort to arrange financing on

more favorable terms using the valuation of 40 Wall Street from the 2014 Statement of Financial

Condition. Ladder Capital reached out to Cushman & Wakefield about preparing an appraisal for

40 Wall Street. Ex. 415.

157.    Cushman had prepared the 2012 appraisal valuing the property at $220 million

and the same team prepared the 2015 appraisal for Ladder Capital. *Compare* Ex. 411 at

TTO_220760 *with* Ex. 416 at C&W_0009325. But the 2015 appraisal more than doubled the

valuation of the building to $540 million.

158.    Evidence obtained by OAG suggests that the Cushman & Wakefield valuation in

the 2015 appraisal did not reflect a good faith assessment of value. The appraisal appears to have

used demonstrably incorrect facts and aggressive assumptions to arrive at this much higher

value.

159.    Still, even this increased valuation for 40 Wall Street was not sufficient for

purposes of Mr. Trump's Statement of Financial Condition for the year ending June 30, 2015

(also prepared at least in consultation with Mr. Weisselberg). That Statement tacked nearly $200

million in additional value onto the 2015 appraised value of the property, valuing the building at

$735.4 million. Ex. 313 at MAZARS-NYAG-00000691. Thereafter the valuation on Mr.

Trump's Statement of Financial Condition rose to $796.4 million in 2016 and settled at $702.1

million in 2017. Ex. 314 at MAZARS-NYAG-00001983; Ex. 315 at MAZARS-NYAG-

00001842.

### B.    Trump misrepresentations to counterparties

160.    Mr. Trump's financial statements were submitted to financial institutions to seek

or obtain credit and insurance, and to comply with covenants on existing loans that required

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 48 of 116

periodic submission of financial statements. *E.g.*, Ex. 362 at DB-NYAG-003049. Mr. Trump personally guaranteed certain financial obligations to these counterparties; and those personal guarantees required that Mr. Trump certify that his financial statements presented his financial condition fairly in all material respects. *E.g.*, Ex. 363 at DB-NYAG-059809-14; Ex. 346.

### 1.    Trump misrepresentations to banks

161.    OAG is investigating the Trump Organization's representations to banks and whether those institutions relied on Mr. Trump's financial statements. The evidence to date indicates that Mr. Trump's Statements of Financial Condition factored into banks' decisions and that banks relied on Mr. Trump's financial statements in granting Mr. Trump and the Trump Organization access to credit. Mr. Trump's Statements of Financial Condition were submitted to multiple banks to obtain credit and to comply with covenants on existing loans that required periodic submission of financial statements. Ex. 362 at DB-NYAG-003049; Ex. 363 at DB-NYAG-059810-13.

162.    One financial institution noted that it had "received CPA prepared financial statements by WeiserMazar LLP dated June 30, 2014 verifying Donald J. Trump's net worth of $5,777,540,000 and liquidity of $302,300,000." Ex. 417 at FSI-Investors-00000003_0005.

163.    That financial institution did not apply any adjustments to the reported net worth figure and treated it as a mitigant to potential weaknesses in the deal. Ex. 417 at FSI-Investors-00000003_0028. The loan officer on the deal testified that, if he had been aware of material misstatements in the Statement of Financial Condition, the loan officer would not have brought the deal to his financial institution's commercial lending committee. Ex. 418 at 100:10-101:04

164.    Another financial institution—Deutsche Bank—considered Mr. Trump's Statements of Financial Condition in the course of loan transactions related to three properties totaling more than $300 million. Ex. 368; Ex. 424; Ex. 419.

165.    In particular, in evaluating whether to extend or maintain credit, Deutsche Bank accepted Mr. Trump's personal guaranty and Mr. Trump's Statements of Financial Condition, and the valuations listed thereon were incorporated into internal bank memoranda. At origination, the truth of Mr. Trump's representations was a condition precedent to the bank's obligation to lend. Ex. 420 at DB-NYAG-005911 (Doral); Ex. 421 at DB-NYAG-005025 (Old Post Office); Ex. 422 at DB-NYAG-006020 (Chicago hotel); Ex. 423 at DB-NYAG-005307-08 (Chicago residential). In addition, an "event of default" would occur if "[a]ny representation or warranty of Borrower or Guarantor herein or in any other Loan Document" (including a compliance certificate) "shall prove to have been false or misleading in any material respect at the time made or intended to be effective." Ex. 420 at DB-NYAG-005916.[22]

166.    Deutsche Bank's assessments included the values asserted on the Statements of Financial Condition, and then apply that financial institution's "haircuts"—or percentage reductions in estimated value—for arriving at adjusted net worth values to evaluate whether to extend or maintain credit. See, e.g., Ex. 362 at DB-NYAG-003054-55.

167.    OAG has received evidence that those haircuts are standardized reductions based on the class of asset. Ex. 369 at 76:11-77:10. For instance, the haircut on cash is very small compared to residential or commercial real estate because cash is assumed to be liquid. Ex. 369 at 76:11-77:10, 78:08-17. If the bank is aware of potential restrictions on cash the bank would likely apply a steeper haircut. Ex. 369 at 153:03-156:05.

---

[22] The term "Loan Document" included Mr. Trump's guaranty and "any other document, agreement, consent, or instrument which has been or will be executed in connection with" the loan agreement and guaranty. *Id.* at 5865. The same conditions applied to the Chicago and OPO properties. Ex. 422 at DB-NYAG-006019, -6023; Ex. 423 at DB-NYAG-005307-12; Ex. 421 at DB-NYAG-005025, 5031.

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 50 of 116

168.     When applying a haircut, the assumption is that the client had accurately stated the asset value. Ex. 369 at 76:11-77:10. The haircut percentages applied during origination are carried forward to subsequent annual reviews. Ex. 369 at 90:19-25.

169.     Incorrect or misleading valuations in the statement of financial condition would impact the adjusted net worth reached by the Bank, the risk rating for the loan, and the decision of whether or not to extend financing at all. Ex. 369 at 193:04-25, 200:25-202:09.

170.     Internal bank memoranda emphasize the reported financial strength of Mr. Trump as a factor in lending. One loan from Deutsche Bank was issued to Trump Endeavor 12 LLC, an entity in the Trump Organization, and personally guaranteed by Mr. Trump. This loan relates to a property known as the Trump National Doral in Miami, Florida. This loan (initially comprised of one secured tranche and one unsecured tranche) was for a total of $125 million and closed in June 2012. Ex. 420; Ex. 356. An internal bank credit memorandum makes clear that the "Financial Strength of the Guarantor" (referring to Mr. Trump) and his personal guaranty were factors in favor of approving the loan. Ex. 368 at DB-NYAG-001693.

171.     Deutsche Bank issued a second such loan (or group of two loans) to 401 North Wabash Venture LLC, an entity in the Trump Organization. Mr. Trump personally guaranteed this loan. The loan was issued in connection with the Trump International Hotel and Tower Chicago for up to $107 million. Ex. 249. The loan was comprised of two components: a portion related to the condominium component of that property for up to $62 million, and a portion related to the hotel component of that property for up to $45 million. Ex. 424.

172.     The bank's internal credit memorandum, in recommending approval, noted the "unique nature" of the loans and stated that "the credit exposure is being recommended based on the financial profile of the Guarantor," who was Mr. Trump. Ex. 424 at DB-NYAG-068526.

173.    Deutsche Bank issued a third such loan to Trump Old Post Office LLC, an entity in the Trump Organization.[23] Mr. Trump personally guaranteed this loan. The loan was issued in connection with the Trump Organization's redevelopment of the Old Post Office building in Washington, D.C., and was for up to $170 million. Ex. 421 at DB-NYAG-005055.

174.    The internal bank approval memo for this loan stressed the unique nature of the loan and Mr. Trump's financial profile in recommending approval. Ex. 419. The memo also incorporated figures from Mr. Trump's 2011, 2012, and 2013 financial statements. Ex. 419.

175.    In furtherance of Mr. Trump's guaranty on the Doral loan, Mr. Trump provided certain prior financial statements (a Statement of Financial Condition), which he represented was "true and correct in all material respects" and "presents fairly Guarantor's financial condition."[24] Mr. Trump signed that guaranty.[25] Mr. Trump also provided a personal guaranty for a $170 million loan in connection with the Trump International Hotel, Washington, DC ("Old Post Office") property, and similarly provided his Statement of Financial Condition for the year ending June 30, 2013, which he represented was "true and correct in all material respects" and

---

[23] Donald J. Trump, Eric Trump, Ivanka Trump, and Donald Trump, Jr. were officers and owners (directly or indirectly) of Trump Old Post Office LLC in 2014 approximately when Deutsche Bank extended credit in connection with that entity. Ex. 425 (at DB-NYAG-004655, -656, -657, -678, -714.)

[24] *See* Ex. 356 (Guaranty dated as of June 11, 2012 (Doral Guaranty)) at DB-NYAG-004177-78; *id.* at 4173 (defining "Prior Financial Statements" to include Mr. Trump's "Statement of Financial Condition, dated as of June 30, 2011"). The loan document expressly states that this representation was made "[i]n order to induce Lender to accept this Guaranty and to enter into the Credit Agreement and the transactions hereunder." *Id.* at 4177-78.

[25] Ex. 356 at 4188 (Mr. Trump's signature).

"presents fairly [Mr. Trump's] financial condition as of June 30, 2013."[26] Personal guaranties signed by Mr. Trump signed concerning the Chicago property reflected similar representations.[27]

176.    Requisite documents in connection with these loans also required Mr. Trump to annually deliver his Statement of Financial Condition for the ensuing years accompanied by a similar certification, which Mr. Trump subsequently provided. For example, in a document dated November 11, 2014, Mr. Trump "hereby certifie[d]" that his Statement of Financial Condition for the year ending June 30, 2014 and other identified documents "presents fairly and accurately in all material respects the financial condition of Guarantor for the period presented."[28]

177.    Evidence obtained by the OAG establishes that Donald Trump, Jr. personally certified on an annual basis the truth and accuracy of the Statements of Financial Condition of Donald J. Trump for 2016, 2017, 2018, and 2019. On some such certifications, Donald Trump, Jr. specified that he was doing so as "attorney in fact" for Donald J. Trump.[29]

### 2.    Trump misrepresentations to an insurer

178.    The Trump Organization also submitted Mr. Trump's Statements of Financial Condition to insurers and its insurance broker, by allowing underwriters to review a copy of the

---

[26] Ex. 366 at DB-NYAG-003287. Evidence obtained by the Attorney General indicates that the Trump Organization obtained the Old Post Office loan proceeds in stages—with the last draws on the loan (totaling millions of dollars) occurring in 2017. *Id*. at Ex. 366.

[27] Ex. 364 at DB-NYAG-038878 (Chicago residential portion guaranty); Ex. 365 at DB-NYAG-003229 (Chicago hotel portion guaranty); Ex. 426 at DB-NYAG-003191 (amended and restated Chicago guaranty).

[28] Ex. 346 at DB-NYAG-060415. For the June 30, 2015 statement, Trump Organization employees in May 2016 initially submitted a document signed by him certifying the June 30, 2014 statement, (*see* Ex. 427 at DB-NYAG-024830, Ex. 428 at DB-NYAG-024831), but soon corrected the error by submitting a corrected first page of the compliance certificate. Ex. 429 at DB-NYAG-015494; Ex. 430 at DB-NYAG-015495.

[29] Ex. 431 at DB-NYAG-059755 (certifying June 30, 2016 statement); Ex. 432 at DB-NYAG-210893 (certifying June 30, 2017 statement); Ex. 433 at DB-NYAG-059824 (certifying June 30, 2018 statement); Ex. 434 at TTO_03595053 (certifying June 30, 2019 statement).

50

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 53 of 116

financial statement at the Trump Organization's offices. One of those entities was Zurich North American ("Zurich").

179.    From 2007 through 2021, Zurich underwrote a surety bond program (the "Program") for the Trump Organization through insurance broker AON Risk Solutions ("AON"). Under the Program, Zurich issued surety bonds on behalf of the Trump Organization within specified dollar limits in exchange for a premium calculated based on a rate times the face amount of the bonds. Most of the bonds were statutorily required for the Trump Organization's real estate business, such as liquor license bonds for golf courses or release of lien bonds for construction projects.

180.    Over the course of the Program, based on the financial disclosures made by the Trump Organization, Zurich agreed to increasingly more favorable terms—periodically increasing the limits and decreasing the rate. For example, in 2011, the Program had a single bond limit of $500,000, an aggregate limit for all bonds of $2,000,000, and a rate of $20 per thousand. Ex. 435 at ZURICHNA_008481. When the Program was canceled in 2021, the single bond limit was $6,000,000, the aggregate limit was $20,000,000, and the rate was $10 per thousand. Ex. 436 at ZURICHNA_008993.

181.    In accordance with its standard underwriting guidelines for surety business, Zurich required the Trump Organization to provide an indemnification against any loss should Zurich be required to pay under a bond. From the inception of the Program, the Trump Organization met this indemnification requirement through a General Indemnity Agreement ("GIA") executed by Donald J. Trump, pursuant to which (similar to a personal guaranty on a loan) he personally agreed to indemnify Zurich for claims under the Program, and an annual requirement that Mr. Trump disclose to Zurich's underwriter his personal financial statements.

51

This annual financial disclosure requirement permitted Zurich to ensure that the indemnification from Mr. Trump was sufficient to support the continued renewal of the Program.

182.    Indeed, on multiple occasions when AON was unable to secure in a timely manner the required financial disclosure—which took the form of an on-site review of the financial statements in a conference room at the Trump Organization's offices—Zurich put the Program into "cut-off" status, which means Zurich ceased writing new bonds and would cancel existing bonds on expiration, until Mr. Trump's personal financial statements were made available for review. Ex. 437 at ZURICHNA_008345.

183.    The indemnity was such a critical aspect of the Program, that in early January 2017, with Mr. Trump's inauguration fast approaching, Zurich insisted as a condition to renewing the Program that the indemnification be modified to address the potential difficulty Zurich might have in seeking to enforce the GIA against a sitting president. After some negotiation, during which the Trump Organization's lawyers sought to persuade Zurich that there was no legal impediment to suing a sitting president, Zurich and the Trump Organization agreed to resolve the issue by adding DJT Holdings LLC as an additional indemnitor on the GIA effective January 17, 2017. Ex. 438 at ZURICHNA_008573; Ex. 439 at ZURICHNA_008276; Ex. 367 at 179:15:02-180:10.

184.    Evidence indicates that the Trump Organization obtained Zurich's approval to renew the Program on at least two occasions through intentional misrepresentations concerning Mr. Trump's personal financial statements. During the on-site review of Mr. Trump's Statement of Financial Condition that occurred on November 20, 2018 for the 2019 renewal, Zurich's underwriter was shown the June 30, 2018 Statement. The Statement listed as assets the Trump Organization's real estate holdings with valuations that CFO Allen Weisselberg represented to

Zurich's underwriter were determined each year by a professional appraisal firm "such as Cushman & Wakefield" "using cap rates and net operating income as factors." Ex. 440 at ZURICHNA_008507.

185.    Zurich's underwriter considered the valuations to be reliable based on Weisselberg's representation that they were prepared by a professional appraisal firm. Also, based on her interactions with Weisselberg during the review, Zurich's underwriter found him to be "highly professional, well educated, and conscientious about" his work. Ex. 440 at ZURICHNA_ 008511. Weisselberg's representations about how the valuations were determined and the underwriter's impressions of Weisselberg factored favorably into her analysis leading to her recommendation that Zurich renew the Program for 2019 on the existing terms, which it did.

186.    During the on-site review for the next renewal, the Trump Organization disclosed to Zurich's underwriter Mr. Trump's June 30, 2019 financial statement. Weisselberg again represented to Zurich's underwriter that the valuations for the real estate holdings listed in the statements were appraised annually by a professional appraisal firm. He noted more specifically that the appraisals for the current statements were performed by Newmark Group and had previously been prepared by Cushman, explaining that "[t]he reason for the change is the individual at Cushman & Wakefield with whom [the Trump Organization] had a longstanding relationship with moved to work at Newmark." Ex. 441 at ZURICHNA_009000.[30]

187.    Again, Zurich's underwriter considered the valuations to be reliable based on Weisselberg's representation that they were prepared by the professional appraisal firm Newmark Group, and specifically by the same individual (Larson) who had historically

---

[30] The individual Weisselberg was referring to was Douglas Larson, who left Cushman & Wakefield to join Newmark Group in June of 2017.

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 56 of 116

RECEIVED NYSCEF: 01/24/2022

determined the previous valuations when he was an employee of Cushman & Wakefield. She again assessed Weisselberg to be "highly professional, well educated, and conscientious about the operations" of the Trump Organization. Ex. 441 at ZURICHNA_009004. Her impressions of Weisselberg and the representation that Newmark prepared the valuations all factored favorably into her analysis leading to her recommendation that Zurich renew the Program in 2020 on the existing terms, which it did.

188.    Weisselberg's representations to Zurich's underwriter that the valuations listed in Mr. Trump's personal financial statements were prepared annually by professional appraisal firms were false. With respect to nearly all valuations, the Trump Organization did not retain Cushman & Wakefield, Newmark Group, or any other professional appraisal firm to prepare the valuations of the Trump Organization's real estate holdings that appeared in Mr. Trump's personal financial statements shown to Zurich's underwriter. Rather, the valuations were prepared by Trump Organization staff, contrary to what Zurich's underwriter was expressly told and believed.

189.    Had Zurich's underwriter been advised that the valuations listed on the personal financial statements she reviewed during her on-site visits had been determined by Trump Organization staff and not a professional appraisal firm, she would have accorded them less weight and it would have negatively impacted her underwriting analysis. Moreover, had Zurich's underwriter discovered during the renewal process that Weisselberg had misrepresented to her how the valuations were prepared, it would have caused her to doubt the veracity of the rest of the information disclosed by the Trump Organization during the renewal and would have called into serious question whether Zurich should continue its insurance relationship with the Trump Organization, or renew on terms less favorable to the Trump Organization.

190.    The Trump Organization also failed to disclose that the valuation for the golf courses listed on Mr. Trump's personal financial statements, which was approximately $2.2 billion in the June 30, 2019 statement, Ex. 442 at ZURICHNA_008287, included a substantial brand premium baked into the reported valuations. *See supra* ¶¶ 80 - 98. Under Zurich's underwriting guidelines, intangible assets such as brand value are to be excluded. Had Weisselberg disclosed to Zurich's underwriter that the valuation listed for golf clubs included the Trump brand value, she would have been required under the guidelines to reduce that valuation to exclude the amount added for brand value.

## II.    The Misleading Appraisals Trump Submitted to the Internal Revenue Service

### A.  Trump National Golf Club – Los Angeles.

191.    On December 26, 2014, two Trump Organization subsidiaries donated a conservation easement over land used as a driving range on the Trump National Golf Course – Los Angeles ("Trump Golf LA") property. The donation meant foregoing the right to build 16 residential lots in the driving range's location but did not preclude the Trump Organization from continuing to use the site as a driving range. In a process quarterbacked by Mr. Trump's tax counsel, Sheri Dillon, two Cushman appraisers found that the development value donated was $25 million dollars. Mr. Trump submitted this valuation to the Internal Revenue Service to obtain a tax benefit.

192.    The appraisal substantially overstated the value of the Trump Golf LA donation by overstating the speed with which the site could be developed and failing to value a reduction in affordable housing requirements that the donation enabled. The Cushman appraisers made these misstatements in an atmosphere of pressure applied to them by the Trump Organization—which one appraiser said was "fighting for every $1"—and Ms. Dillon.

### 1.    Trump Golf LA's misstated development timeline

193.    Trump Golf LA was originally known as Ocean Trails Golf Club. Construction on the course started in 1997 and by June 1999, the golf course was almost complete—until a landslide dropped 300 yards of the 18th hole fairway into the Pacific Ocean. The landslide also caused most of the 18th hole to slide 50 feet toward the ocean, including the fairway and green. Development on the property ceased after the landslide and the Ocean Trails Golf Course construction project went into bankruptcy. VH Property Corp., a Trump Organization subsidiary, acquired the property out of bankruptcy in November 2002 for a reported price of $27 million.

194.    Given the site's instability, the landslide, and the site's proximity to the Pacific Coast, the Trump Organization needed approval from the City of Rancho Palos Verdes to develop the site. The Trump Organization's geologist worked with a Rancho Palos Verdes geologist to develop a geologic model and reach an understanding of any improvements necessary before the site could be further developed. Ex. 443, at MLB_EM00004563. This presented a particular hurdle for 16 planned lots on the driving range and putting green: In June 2011, the Trump Organization's geologist produced a report stating that 104 "shear pins," stabilizing implements drilled into the ground to provide engineering stability, would be required to develop the lots safely.

195.    Instead of developing the lots, the Trump Organization began to consider another option: donating a conservation easement over the 16 proposed lots that would allow it to continue to use the area as a driving range and putting green.

196.    The Trump Organization's outside counsel Sheri Dillon engaged an engineer and Cushman appraisers, Richard Zbranek and Brian Curry, to evaluate the value of a potential easement on Trump Golf LA. The Cushman appraisers would provide "initial valuation conclusions" for 16 lots on the Trump Golf LA driving range. This initial evaluation would not

56

involve a formal written report or assess value enhancement for the full Trump-owned parcel. If this valuation met with the Trump Organization's approval, the appraisers would then move on to provide a valuation suitable for income tax purposes. Ex. 444 at MLB_EM00005568.

197.     The Trump Organization, through Bingham McCutchen LLP (Ms. Dillon's law firm at the time), conveyed to the appraisers that it believed the lots might be worth $40 or $50 million. Ex. 445.

198.     In December 2012, Cushman, relying on costs and other information prepared by an engineer (also retained by Dillon and Bingham), reached a preliminary value conclusion for the development potential of the lots of $17,725,000. Ex. 571 at MLB_EM00014024; Ex. 447 at MLB_EM00014028. As Mr. Curry described it to Mr. Zbranek, "They did paper napkin analysis and suggested 40 to 50 million dollars. I sent them my analyses, we walked through the whole thing, and they couldn't argue with it. More like. 'Oh'." Ex. 445 at C&W_0079159.

199.     After this valuation, the Trump Organization put the conservation easement project on hold and did not pursue it further in 2012 or 2013. Despite receiving a valuation of sixteen lots at $17,725,000 (or roughly $1.1 million per lot after accounting for development time), Mr. Trump's Statements of Financial Condition for 2012 and 2013 valued unsold lots at the Trump Golf LA property at $4.5 million per lot and $2.5 to $4.5 million per lot. *See* Ex. 13 at row 471-477.

200.     In August 2014, Ms. Dillon contacted the appraisers again. MLB_EM00014026. On September 8, 2014, Dillon's law firm, Vinson & Elkins LLP, retained the appraisers to provide "a prospective market value estimate of the estimated value of 16 proposed lots, i.e., the development rights, on the driving range site of TNGC, as of December 15, 2014." Ex. 448.

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 60 of 116

201.     The engineer retained to provide hypothetical maps and cost estimates that Cushman would use to value the site sought estimates to build the shear pins, and also evaluated another hypothetical plan that would involve reconfiguring the Site. He estimated that approval of the final drawings, as required under the current approvals, would require a year, and that the necessary shear pins would cost about $1.5 million.

202.     Alternatively, the Trump Organization could reconfigure the layout of the entitled map to yield the same number of lots without constructing the shear pins. This reconfiguration "would take at least 2-3 years to obtain the necessary planning approvals from the City and Coastal and about one year to obtain final engineering approval." The planning and engineering cost would be about $2.5 million. Ex. 449 at MLB_EM00014148.

203.     Higher development costs would decrease the imputed value of any easement donation. As Cushman appraiser Brian Curry explained in forwarding this email to Trump Organization attorney Ms. Dillon, writing, "Sheri. FYI. Higher costs of development decrease the value of the property." Ex. 449 at MLB_EM00014148.

204.     On September 29, 2014, the engineer provided preliminary cost estimates for the plan that involved reconfiguring the lots without shear pins. In forwarding the estimates to Cushman appraiser Mr. Curry and Trump Organization attorney Ms. Dillon, the engineer reiterated the need for further approvals for the new plan. Ex. 446 at MLB_EM00014214. Later that day, Mr. Curry provided Ms. Dillon with a value for the sixteen lots. Calculating that value in two ways—"lot sales" and "home construction"—Mr. Curry reached valuations of $27,991,535 and $25,461,652, respectively. Ex. 450 at MLB_EM00014195, -204, -205.

205.     On or about October 8, 2014, Ms. Dillon and Mr. Curry had a conference call with Mr. Trump to discuss the valuation of the lots. On the call, Mr. Trump claimed that the 16

58

lots should be valued higher than previously sold lots in the Trump Golf LA project because they were in a "more prestigious" zip code and could thus command a "'zip code' premium." Mr. Curry asked Ms. Dillon to confirm whether the lots were in a different zip code. Trump Organization in-house counsel concluded they were not. Ex. 451 at VE_00001662, -63.

206.    On October 14, 2014, Ms. Dillon wrote to Mr. Curry that "we are now getting closer to year end so I would like to see where the estimates are so a final decision can be made." Mr. Curry wrote back on October 16, 2014 with an increased estimate, reaching a value of "around $27 to $28MM for the driving range property." Mr. Curry asked Ms. Dillon to "Let us know where we go from here"—adding a smiley-face emoticon. Ex. 452 at MLB_EM00014210.

207.    In early November 2014, the Trump Organization engaged Mr. Curry and Mr. Zbranek for an appraisal to "document the value of a conservation easement placed over a parcel of land located on the Trump National Golf Club Los Angeles for Federal and State income tax purposes." Ex. 453.

208.    As the project neared the end of the tax year, Mr. Curry warned Ms. Dillon that his previous estimates may have been too high, writing on December 5, 2014, "I would like to go over the numbers, which may not be as favorable as expected due to recent Trump lot sales, and then coordinate a delivery of the 'draft.'" Ms. Dillon replied, "I definitely would like to see the numbers first and am hopeful they don't dramatically vary from the prior range." C&W_0066474. On December 8, 2014, Mr. Curry provided a preliminary valuation of $20.5 million. Ex. 455; Ex. 456.

209.    After providing this conclusion (reduced from his initial estimates), Mr. Curry learned that the engineer might increase his cost estimates. The engineer explained that a

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 62 of 116

contractor providing an estimate for the cost of the stabilizing shear pins had said the engineer's estimates could be too low. Ex. 457 at C&W_0079824.

210.    Mr. Curry forwarded this email to Ms. Dillon who asked if there was "something wrong with the initial cost estimates." Mr. Curry explained that the engineer had "underestimated." Ex. 458 at C&W_0066566, -67. Mr. Curry explained that this cost increase would make him reconsider the lot arrangement he would choose to value. Ex. 459 at C&W_0066569, at -69.

211.    On December 10, 2014, the engineer provided a final cost budget to Mr. Curry that reflected his updated view of the cost of shear pins to stabilize the Trump Golf LA site. The budget included $40,000 for shear pin design, $10,000 for the City of Rancho Palos Verdes to review the shear pin plans, and $2,376,500 for installation of 99 shear pins. Ex. 460 at C&W_0079836, -37, -38. As the engineer had predicted to Mr. Curry, his estimates had risen-- substantially.

212.    The estimates and final appraisal generated by the Cushman appraisers after this date did not reflect the engineer's updated estimates, which would have decreased the value of the conservation easement. Rather, Cushman's estimates continuously rose: indeed, value estimates rose from $20.5 on December 8, to $22.1 million on December 11, and finally to $25 million on December 12. Ex. 461 at 182:17-184:07, 188:21-190:18; Ex. 462 at MLB_EM00014577 (value conclusion of $22.1 million while noting "the engineer increased development costs by $1.25MM"); Ex. 463 at VE_00010729 (value conclusion of $25 million); Ex. 464 at C&W_0066803 (using costs of $8,086,050).[31] In short, despite the engineer's

---

[31] This last estimate clearly conflicted with the December 10 costs of $10,099,165. *See* Ex. 460 at 798355.

increased costs, the appraisers increased their valuation by an average of more than a million

dollars a day from December 8 and December 12, 2014.

213.     The final appraisal report made clear that it relied on the engineer's estimates for

the development timeline and cost estimates. The appraisal states, "According to the engineer,

the planning and approvals could be completed in 1.5 years." Ex. 466 at MLB_EM00005409, at

-501. It further states, "Land development costs were prepared and provided by the development

engineer….The appraisers relied upon the cost budgets which were deemed reliable and assumed

true and correct." Ex. 460 at MLB_EM-00005419.

214.     But instead of using the engineer's final costs and estimates, the appraisal

incorporated the *preliminary* cost budgets that the engineer had prepared in September 2014.

These cost budgets did not include any provision for shear pins. Ex. 465 at VE_00010369-376.

Rather, they were the estimates the engineer had said "would take at least 2-3 years to obtain the

necessary planning approvals from the City and Coastal and about one year to obtain final

engineering approval"—i.e., that planning and approvals would take at least three to four years,

not 1.5 years. Ex. 449 at MLB_EM00014148.

215.     By using the "1.5 year" timeline the appraisal misattributes to the engineer—

shortening the timeline by *at least* one-and-a-half to two-and-a-half years—the Trump Golf LA

appraisal significantly overstates the development value of the 16 lots. The reason, in colloquial

terms, is that development revenue in the appraisal is worth much less for each year into the

future in which it occurs. In particular, the appraisal assumes discount rates of 15% to 18%,

meaning that a dollar received one year later is worth only 85 or 82 cents, and a dollar received

two years later is worth only $.7225 or $0.6724, and so on. Ex. 466 at MLB_EM00005409, -

5523. Thus, under the appraisal's methodology, revenue earned (for example) in year 3 would be

worth much less than revenue earned in year 1. Conversely, moving revenue to earlier years considerably increased estimated value. And, because the appraisal assumes that the 16 lots will sell for an average of $5,000,000 each (-5524), bringing forward the revenue from the sale of these lots by even a year and a half would increase the appraised value by millions of dollars.

216.    The engineer testified to OAG that he never changed his estimate for the timeline. He further testified that he never intended the preliminary cost budgets or the maps they included to be integrated into the appraisal. Ex. 467 at 124:14-125:13. Instead, the engineer had prepared the December cost estimates, which reflected a different layout—and which budgeted over $2.4 for the design and construction of stabilizing shear pins—for use in the appraisal. Ex. 460 at C&W_0079836, -37, -38.

217.    When asked to explain why he did not use the engineer's most current estimates, the appraiser did not have any record of his reasoning. Ex. 461 at 182:17-184:07, 188:21-190:18; 193:13-195:14. Moreover, when asked about the apparent contradiction between the engineer's timeline and the timeline stated in the appraisal, Mr. Curry admitted that, despite attributing the appraisal's timeline to the engineer, he had come up with it himself:

> You know, I'm talking two to three years. He didn't have any final timing. I looked at that and assessed my own timing and figured you could probably get through the process maybe a little more aggressively than [the engineer] estimated. I found that you could probably get lot sales done by quarter eleven started and home sales by quarter thirteen, which is a full three years subsequent.

Ex. 461 at 191:21-192:7.

### 2.    Omitted reduction in affordable housing requirements

218.    As a result of a settlement between the Trump Organization and the City of Rancho Palos Verdes over approvals for the Trump Golf LA development, the Trump Organization had agreed to build four affordable housing units offsite. However, the Trump Organization believed that, as a result of the Trump Golf LA easement donation, these

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 65 of 116

requirements would be set aside. As Jill Martin, Trump Organization Assistant General Counsel, explained the requirement to Cushman appraiser Mr. Curry: the units "have not been buil[t] and ultimately may not need to be. The number of units is all dependent on the number of housing units built on the property. With our changes to the plan and elimination of several houses, I am optimistic that this requirement will go by the wayside." Ex. 468 at VE_00001705; Ex. 466 at MLB_EM00005452.

219.    Martin further explained that "the affordable housing component is based on the number of houses built on the property- thus by eliminating some of the lots due to the easement, we are hopeful for elimination or a reduction of the requirement." Ex. 469 at VE_00010655.

220.    The Internal Revenue Service requires that an appraisal incorporate any enhancement a conservation easement donation provides to the value of other property held by the donor. If the appraisal were to accurately represent the value after the donation, it should have reflected the Trump Organization's expectation that placement of the easement would reduce or eliminate the offsite affordable housing requirements—a significant cost to the Organization that Ms. Martin thought would be eliminated by the conservation easement donation.

221.    Rather than account for the reduction in required affordable housing which Jill Martin thought would occur and was reflected in city resolutions, Mr. Curry told Trump Organization outside counsel Ms. Dillon, "Hi Sheri. I am going to add an 'allowance' in the cash flows for offsite affordable housing. As it will be in all of the cash flows it will not affect the bottom line," adding a smiley-face emoticon. Ms. Dillon thanked Mr. Curry. Ex. 470 at C&W_0067736.

63

222.     The Trump Golf LA appraisal includes a $1 million allowance for affordable housing. As Mr. Curry and Ms. Dillon discussed, it was included in both the "Before" and "After" scenarios, so the offsite affordable-housing requirement did not affect the valuation the Cushman appraisers reached. Ex. 466 at MLB_EM00005500.

223.     Consistent with the understanding reflected in the document Jill Martin received from Ranchos Palos Verdes that California Government Code Section 65590 required 10% affordable housing, when the Trump Organization received approval to add a driving range and reduce the total number of residential lots by 16, the City reduced the number of offsite affordable units required from 4 to 2. Ex. 471 at 5.

224.     The Trump Organization thus obtained a benefit by donating the Trump Golf LA conservation easement that Mr. Curry chose not to recognize in the appraisal. This decision was not justified; the appraisal is misleading because it fails to disclose the likely reduction in affordable housing.

### 3.     "Trump is fighting for every $1"

225.     Because the conservation easement allowed Trump Golf LA the continued use of the driving range, calculating the value of the donation required that the appraisers take into account the continued value of the driving range—i.e., any use value it derived was not considered "donated."

226.     In reaction to pressure from the Trump Organization, it appears that Mr. Zbranek, the appraiser responsible for the golf component, reduced this figure from $1.5 million to $1 million to increase the appraised value of what had been donated. On December 12, 2015, Mr. Curry wrote to Mr. Zbranek: "Rick. I know I asked to get the 'difference' higher between with and without golf course. How easy, and if your [sic] comfortable, could we get back to $1,000,000 difference. Trump is fighting for every $1. I know we were at $1MM before.

So....your call." Curry assured Zrbanek that he only wanted the change if it was "market supported." Ex. 472 at CW_0079851.

227.    Zbranek wrote back, "After looking at the numbers, I feel more comfortable with $16M with the range and $15M without the range, a variance of $1M." *Id.*

228.    The final appraisal indicated that the golf course without the driving range (before easement scenario) was worth $1 million less than the golf course with a driving range (post easement scenario). Ex. 466 at MLB_EM00005558.[32] This change, which Mr. Zbranek had made at Mr. Curry's request, had the effect of increasing the "donated" amount by $500,000.

229.    The Trump Organization was aware that this position was tenuous. Upon donation of the conservation easement, Mr. Trump held a press conference touting the value of the property and the donation—despite Ms. Dillon's view that it would call unwanted attention to the matter of purporting to have donated a "conservation" easement over a property that would continue to be used as a driving range on a golf course. She articulated those concerns in an email to inhouse counsel Ms. Martin. Among other things, Ms. Dillon expressed anxiety about the optics of a conservation easement that did not inhibit the use of driving range: as she explained, "effectively the US taxpayers are paying [Mr. Trump] to do what he would already do anyway, and perhaps this isn't the best use of taxpayer dollars." But she also expressed concern with the position the appraisers had taken about "the value enhancement to the other lots that Mr. Trump owns"—i.e., the golf course and other residential lots that Trump Golf LA would retain

---

[32] Despite commissioning this appraisal concluding based on financial performance and sales comparisons that the property as a golf course was worth either $15 million or $16 million (with and without the driving range), *see* Ex. 466 at MLB_EM00005562-63, supporting data for Mr. Trump's Statement of Financial Condition for the year ending June 30, 3014 asserted that the golf club at the property was worth $74.3 million—comprised of "fixed assets" and the brand premium described *supra* at ¶¶ 80-98. *See, e.g.*, Ex. 324 at rows 383-386.

after the easement—and that Mr. Trump's legal position that he was not a "developer" could be

challenged because he "is developing the other lots" at the site. Ex. 473 at MLB_EM00012146.

```
1)  We are taking an untested legal position with regard to whether the public's access to the drive
range constitutes an "outdoor recreation use for the general public" conservation purpose - the law is
unclear whether the "'public use" needs to be "unfettered" such that the public has free access to "use"
the outdoor space for recreation purposes; we backstopped this purpose with an open space purpose but
that must provide a significant public benefit under a clearly delineated government conservation policy
(which we did find some evidence of).  Of note, these standards are highly subjective and therefore
subject to manipulation by the IRS.  I believe we satisfy both but prefer not to test my beliefs.
2)  We want to be careful regarding any value statements as they relate to benefits to abutting or nearby
land or homeowners - our position is that there is a small $ value enhancement to the other lots that Mr.
Trump owns (every $ increase reduces the value of the donation for tax purposes); further we don't
believe there is much more value than already exists, given the property is not under development anyway
3)  We also need to be clear that while Mr. Trump had the rights to develop the driving range for
residential use, he had no intent to develop the property (and hasn't for some time) - while he was
holding (and preserving) the rights, his present intent was to use the property for a driving range, and
to otherwise hold the property for investment (understanding that a future buyer would pay more than the
$25 million for the property because a future buyer would have the rights to develop the housing).  If
Mr. Trump is determined to be a "developer", his donation for tax  purposes would be substantially
reduced because it is limited to his cost basis in the driving range property.  We do not want him to
make any statements against our position that he is NOT a developer with regard to the driving range
parcel.  Given he is developing the other lots, we see some potential for tension here.
4)  Lastly, please remind him that Congress and the IRS hate it when taxpayers place easements over golf
course properties and continue to OWN the golf course and operate it for income.  Remind him that the
larger the value and the more he makes of it, then he is telling the world how large a tax deduction he
is taking for it.  In this case, this is tantamount to the US taxpayers paying Donald Trump to keep his
driving range and use it for exactly what he is already using it for - and some could argue that as long
as he is operating the golf course, he would continue to keep the driving range - effectively, the US
taxpayers are  paying him to do what he would already do anyway, and perhaps this isn't the best use of
taxpayer dollars.  Bottom line - the more publicity this gets, the more we invite scrutiny.  This may
cause renewed interest in the issue.
```

* * * * *

230.    These matters were material to the Cushman Trump Golf LA appraisal. In

particular, shortening the described approval period by at least one-a-and-a-half to two-and-a-

half years would have had a significant effect on a hypothetical project in which 16 homes were

estimated to be sold at $5 million each. Because the discount rate adopted by the appraisers was

15% or 18%, moving the hypothetical project's revenues even a single year into the future could

have the effect of dramatically decreasing the project's profitability by millions of dollars. Ex.

466 at MLB_EM00005525.

231.    These matters were incorporated into the final valuation arrived at by the

Cushman appraisers and ultimately submitted to the Internal Revenue Service in connection with

a tax deduction Mr. Trump sought on the property.

66

232.    Mr. Trump's accountants have told OAG that this deduction resulted in millions of dollars of tax benefit to Mr. Trump.

233.    Ms. Dillon otherwise acted as a liaison between the Trump Organization, the engineer, and the Cushman appraisers. However, as the Court is aware, the Trump Organization has asserted privilege over many of Ms. Dillon's communications. In addition, Ms. Dillon has stated that she cannot remember numerous interactions related to the Trump Golf LA easement donation. Mr. Trump participated in phone calls with the appraisers and was familiar with the development's challenges. Mr. Trump's testimony is necessary to determine his role in the submission of the Trump Golf LA appraisal to the Internal Revenue Service.

### B.    Seven Springs

234.    Mr. Trump donated a conservation easement over a portion of the Seven Springs property in 2015. Mr. Trump had purchased the property in December 1995 for $7.5 million through Seven Springs LLC, which is part of the Trump Organization.

235.    As described above, see ¶¶ 32-46, Cushman & Wakefield was retained by Morgan Lewis on behalf of the Trump Organization to prepare a formal appraisal of a conservation easement to be donated over the Seven Springs property, which it provided to the Trump Organization on March 15, 2016 (the March 2016 Appraisal). Ex. 345. The March 2016 appraisal was also provided to the lender that held the mortgage on the property, and to the North American Land Trust, which received the Seven Springs conservation easement donation. Ex. 474; Ex. 475.

236.    OAG has identified information that raises serious questions regarding the March 2016 Appraisal's conclusions, including whether the value of the donated easement was improperly inflated because of actions by the Trump Organization, its agents, and attorneys.

67

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 70 of 116

237.     A key assumption in the March 2016 Appraisal related to the number of single-family residential lots into which the property could be subdivided. Specifically, Cushman assumed that the property's highest and best use was to subdivide the relevant portions into 24 single-family residential lots that could be developed. Ex. 345 at MLB_EM00009153-54, -9169.

238.     In reaching this conclusion, the March 2016 Appraisal relied on maps displaying potential subdivision lots prepared by an engineering firm, Insite Engineering, that showed ten potential lots in the town of Bedford, six potential lots in the town of New Castle, and ten potential lots in the town of North Castle. Ex. 345 at MLB_EM00009146-48, -9151; see also Ex. 476 at 75:05-81:25, 184:11-185:15, 188:02-188:20. It also concluded that the Trump Organization could begin building lots in Bedford in the first year of development, could sell six of those lots in the second year, and build and sell a total of 24 lots in Bedford, New Castle, and North Castle within five years. Ex. 345 at MLB_EM00009171.

### 1.  Seven Springs' development history

239.     OAG has identified evidence that the number of lots relied upon to calculate the value of the conservation easement was more than double what was permitted by development restrictions imposed by Bedford—restrictions that the Trump Organization was long aware of and had agreed to through its agents, including at town meetings at which Eric Trump was present. It has also identified evidence suggesting that the development timeline used to calculate the value of the easement donation was inconsistent with the disturbance restrictions contained in the approvals.

240.     In March 2004, the Trump Organization began a lengthy process that ultimately resulted in a Bedford Planning Board resolution (the "Bedford Resolution") preliminarily approving a subdivision on the portion of Seven Springs in the Town of Bedford. As has been discussed before the Court, Respondents Eric Trump and Trump Organization land-use counsel

Charles Martabano were heavily involved in negotiations with the Town of Bedford. The Bedford Resolution heavily restricted the use of a Bedford road to access hypothetical lots in New Castle and North Castle. It also explicitly stated a restriction on the speed with which the Trump Organization could build lots at the site, requiring that only five acres at one time be disturbed.

241. Minutes and an audio recording of the May 14, 2013 meeting of the Planning Board reflect Eric Trump's and Mr. Martabano's participation in a detailed discussion of the lot-number restriction. In resolving a difference of opinion between the Town and the Trump Organization, Chair Courtney-Batson stated, "I believe we reached a potential compromise," and Mr. Martabano, attorney for the Trump Organization agreed, "I think we have." Martabano then described that compromise. Ex. 477 at 42:22-43:03.

242. Mr. Martabano stated: "[W]e proposed to put a restrictive covenant on this portion of the road parcel south of the cul-de-sac and impose upon that a condition." Ex. 209 at 43:04-11. Mr. Martabano continued, "It'll only be used to potentially serve two new lots in the Town of North Castle, unless we are able to also provide access either from New Castle or North Castle so as to create access for additional lots." *Id* at 43:12-44:02. Mr. Martabano then stated: "This road, itself, can only be extended for two additional lots, and that's what we've described as that condition we provided to the board and to the town attorney." *Id.* at 44;02-05.

243. The compromise was memorialized in the Bedford Resolution. Among the conditions Bedford imposed on this plan were requirements reflecting Bedford's enforcement of Chapter 107 of its Land Subdivision Regulation. Ex. 208 at 2-3. In particular, the Bedford Resolution provided: "The road parcel south of the cul-de-sac as shown on the subdivision plat

shall be subject to a restrictive covenant which shall run with the land and be enforceable by the Town of Bedford." Ex. 478 at 2, ¶ 1(e)(2).

244.    The Bedford Resolution further stated that the covenant "shall provide" that "[u]nless an additional access road originating in either the Town of North Castle or the Town of New Castle is made available to provide access to the applicant's property located in the Town of North Castle to the south of the road parcel the Seven Springs subdivision road as constructed in said road parcel can only be extended to provide access to two additional, that is, in addition to the lot created containing the existing former Meyer main house, residential lots to be created in the Town of North Castle. As to such two additional residential lots, such lots shall not [be] further subdivided to create any additional lots." Ex. 478 at 2-3, ¶ 1(e)(2)(a).

245.    Finally, the Bedford Resolution provided that "No more than five acres of land shall be disturbed at any one time." Ex. 478 at 8, ¶ 14.

246.    While the wording of the Bedford Resolution was specifically negotiated at the March meeting, the substance of each of the requirements discussed above had long been part of the Bedford approval process. Among other documents, the restrictions had been previously discussed and memorialized in Draft Environmental Impact Statement ("DEIS") accepted by the Planning Board on June 10, 2008; the Final Environmental Impact Statement accepted on March 27, 2009; a March 2009 Findings Statement issued by the Planning Board; and a preliminary subdivision plat approval reached at a December 2010 Planning Board meeting. Each of these prior documents had significant legal consequence: the environmental impact statements and findings statements were required documents under the New York State Environmental Quality Review Act. And under New York law, when a locality approves a preliminary subdivision plat, it may not later decline to approve the layout of a final plat that conforms to the specifications

70

prescribed by the board. *See Sun Beach Real Estate Dev. Corp. v. Anderson*, 98 A.D.2d 367, 373 (2d Dep't 1983), *aff'd sub nom. Matter of Sun Beach Real Estate Dev. Corp. v. Anderson*, 62 N.Y.2d 965 (1984).

247.    The Trump Organization, including Eric Trump and outside counsel Ms. Dillon, understood the Bedford Resolution's significance. For instance, a July 2014 email, Eric Trump wrote Ms. Dillon, "Please find the proposed layout for North Castle. Let's discuss item 2(a) on the attached which is the final draft of the zoning resolution (i.e we could record this anytime)." Ex. 479 at C&W_0270138. The email attached a version of the Bedford Resolution; the reference to item 2(a) appears to relate to the provision restricting access to additional lots in New Castle and North Castle through Bedford. Ex. 480 at C&W_0270141-42.

248.    The Bedford Resolution was a partial success for the Trump Organization: it could develop the Bedford lots. However, it was also a partial failure: The Trump Organization could not build the lots quickly because of the five-acre restriction, and it could not develop additional lots on the site without secondary access from New Castle or North Castle.

249.    Evidence in OAG's possession further indicates that no secondary access was available. The Nature Conservancy owns property to the south and west of Seven Springs. In May 2006, Seven Springs LLC sued the Nature Conservancy (and others) seeking a determination that the Seven Springs parcel had an easement entitling it to a right-of-way over the portion of Oregon Road that lay on the abutting parcel owned by the Nature Conservancy to the south. *See* Ex. 483. In the course of that litigation, Seven Springs LLC (a Trump Organization entity) pleaded that "[t]he only viable secondary access to the Seven Springs Parcel is from the south." Ex. 482 at 6; Ex. 481 at ¶ 45. In addition, Mr. Trump personally filed a sworn affidavit attesting that "the only means by which access can be had to any public highway, street,

road or avenue from the Seven Springs Parcel to the south is via the road known as Oregon Road." Ex. 484 at 4; Ex. 485 (Affidavit of Alfred Donnellan, attorney for Seven Springs LLC) ¶ 31 (attesting that "secondary access" necessary to "develop the entire Seven Springs Parcel . . . can only be from the south").

250.    In 2012, the Appellate Division, Second Department held against Seven Springs LLC. The court concluded that Seven Springs LLC lacked the claimed easement over Oregon Road—and accordingly had no ability to use the portion of Oregon Road at issue in the litigation to connect to a public road to the south of the Seven Springs property. *See Seven Springs, LLC v. Nature Conservancy*, 95 A.D.3d 867, 871-72 (2d Dep't 2012).

251.    Mr. Trump's sworn assertion regarding access to the site was not the only evidence that access from the west (through the Town of New Castle) was unavailable: In the Trump Organization's prior SEQRA filings, it had concluded that access to Seven Springs from the west was not viable due to various legal, operational, and environmental constraints.[33] Ex. 486 at II-70 (item J); see also Ex. 487 at 43-44 (2001 draft findings statement that notes: "Emergency access to the site from another roadway other than Oregon Road (north) would be preferred; however, another alternative does not appear to be feasible based upon consideration of legal, operational and environmental factors.").

---

[33] The 2008 Draft Environmental Impact Statement prepared by environmental consultants retained by the Trump Organization states: "No development is currently proposed in the New Castle portion of the site." Ex. 486 at II-70 (item J). The 2008 DEIS analyzed these issues "for informational and cumulative impact analysis purposes only." *Id.* The DEIS noted that five single-family homes could be developed on the New Castle portion of the site "utilizing existing zoning and given existing environmental constraints," but noted that because access for such homes "would be from the terminus of Oregon Road (north) at the New Castle/Bedford town line with an additional 1,230 linear feet of roadway, ending in a cul-de-sac," any such development "would violate the Bedford Land Subdivision Regulations regarding the maximum number of lots permitted on a dead-end street." *Id.* (noting that "[t]here would be no access to Sarles Street," referring to access exiting to the west of the Seven Springs parcel).

252.     Based on these environmental impact reviews, the Town of Bedford determined in 2009 that "a secondary access to the [Seven Springs] site is not available at this time." Ex. 488 at 25.

### 2.     The misleading Seven Springs development plans

253.     The Cushman appraisal used to value Mr. Trump's donated conservation easement assumes 24 lots could be developed on the property across all three municipalities with access only through a single subdivision road exiting the subdivision to the north through Bedford. Ex. 345 at MLB_EM00009126, -9146-48.

254.     The following map (the "2015 Plan"), also appended as Ex. 287, shows the final plan for the proposed Seven Springs subdivision, depicting 24 vacant lots for development (as well as two existing homes), as prepared by Insite Engineering:



255.    As this map depicts (and as the engineer who drew it agreed), the subdivision

road extending to the southern-most lot on the property ends in a cul-de-sac (with no access

through North Castle), and the subdivision road extending to the west ends (with no access

through New Castle). Ex. 489; see Ex. 490 at 89:18-90:17, 94:8-95:20, 105:13-17, 171:2-173:10,

177:16-178:3, 180:18-22.

256.    Insite's lead engineer, Scott Blakely, testified in sworn testimony before OAG

that in the subdivision maps he prepared, the only access point out of the subdivision is north

through Bedford. Ex. 490 at 171:18-173:10.

257.    A single subdivision road serving 24 lots in Bedford, North Castle, and New

Castle with access only through Bedford would violate the restrictions imposed by Bedford that

74

the Trump Organization negotiated and agreed to. *See Ex.* 491 at 246:04-19, 252:04-254:24, 256:07-257:23.

258.    In addition, evidence obtained by OAG indicates Insite Engineering and the Cushman appraisers who prepared the 2016 appraisal were misled (or at a minimum not informed) about the obstacles to the potential development of 24 lots as described above.

259.    On November 20, 2015, Mr. Martabano (the land-use attorney who worked with the Trump Organization in connection with the potential development of the Seven Springs property) emailed a copy of the Bedford Resolution to Mr. Blakely (Insite's lead engineer). Ex. 492.

260.    Mr. Blakely gave sworn testimony to OAG that Mr. Martabano conveyed to him that "there may be a problem with the way that we laid out the subdivision," Ex. 490 at 214:3-5, and that "Martabano questioned the number of lots that we had shown on the sketch plan and forwarded [Blakely] a copy of a draft approval resolution from the Town of Bedford planning board." *See id.* at 164:19-25, 167:8-169:7; *see also id.* at 37:22-25 (testifying that Mr. Martabano sent Mr. Blakely the 2013 Bedford Resolution and "had some concerns over its relationship to the sketch plans that our office had prepared and the lot yield.").

261.    That same day, November 20, 2015, Mr. Blakely forwarded Mr. Martabano's email (with a copy of the 2013 Bedford Resolution) to Eric Trump, writing: "Eric, Charlie [Martabano] referenced condition # 2 to me when we discussed the latest drawings. He was concerned about the # of lots we are indicating in North Castle and New Castle based on this condition. I told him I would mention[] this to you." Ex. 492.

262.    Mr. Blakely testified that Eric Trump called him in response. Ex. 490 at 169:24-170:18. Mr. Blakely memorialized their discussion in a handwritten note on a printed copy of the

75

email he had written to Eric Trump. Ex. 492. That note reads: "Tel conv. w Eric. 'Move forward as laid out. We have the rights.'" *Id.*

263.    In addition to memorializing his phone call with Eric Trump, Mr. Blakely sent an email two weeks later to Eric Trump and Sheri Dillon (along with other attorneys working on the Seven Springs conservation easement project) confirming that the final site-planning map for the 2015 Plan showing 24 lots was based on the assurances Mr. Blakely received from Eric Trump. Ex. 493. Mr. Blakely wrote: "Assumptions have been made in discussions with Eric regarding the proposed roads and access among the 3 municipalities." *Id.*

264.    Mr. Blakely testified that the "discussions with Eric" he noted in this email were a reference to his telephone call on November 20, 2015, during which Eric Trump assured him that "we have the rights." Ex. 490 at 187:10-189:19.

265.    Mr. Blakely testified that he relied on Eric Trump's assurance and representation: "Of course we relied on them, yeah." Ex. 490 at 215:3-9.

266.    Mr. Blakely further testified that, "if [Eric Trump] didn't have an answer, we would have had to look into it"; but given Eric Trump's answer, Mr. Blakely testified that he did not seek to verify the "statement that my client made to me." Ex. 490 at 215:3-17; see also id. at 209:12-19.

267.    Cushman, in turn, relied on the site-planning maps prepared by Insite Engineering to determine that 24 lots could feasibly be developed. Ex. 345 at MLB_EM00009125, -9146-48, -9153, -9163-64, -9170-71; see also Ex. 476 at 75:05-81:25, 184:11-185:15, 188:02-188:20.

268.    In the course of preparing the March 2016 Appraisal, the appraisers not only relied on the 2015 Plan, but requested zoning approvals and other information necessary to conduct their analysis. Ex. 494.

269.     The Trump Organization did not provide the 2013 Bedford Resolution to the appraisers preparing the 2016 appraisal. Instead, the Trump Organization—through Morgan Lewis—sent these appraisers only an approval of five zoning variances from another agency, the Bedford Zoning Board of Appeals. Ex. 495 at C&W_0043584-85; Ex. 496 at C&W_0043541.

### 3.     The misleading statements in the March 2016 Seven Springs appraisal

270.     The appraisers who prepared the March 2016 Appraisal testified that at the time they prepared the appraisal, (1) they were unaware of the restrictions in the Bedford Resolution; (2) they were unaware of the Nature Conservancy litigation preventing Seven Springs from using the extension of Oregon Road; (3) they would have wanted to know this information; and (4) had they been aware of the Bedford Resolution and the litigation, they would have questioned the subdivision plans that they received from Insite. Ex. 497 at 303:18-304:17, 431:4-433:14; Ex. 498 at 221:17-222:25, 223:15-224:17, 226:2-227:18; Ex. 499 at 368:10-13, 427:15-428:10, 435:9-24.

271.     Initially, the Trump Organization's outside counsel, Ms. Dillon, testified that she did not recall seeing the 2013 Bedford Resolution. Ex. 500 at 190:8-191:22, 202:7-19, 203:16-19, 262:4-263:3. In later testimony, she stated that she may have seen the document. Ex. 572 at 682:02-12.

272.     The appraisers who prepared the March 2016 Appraisal further testified that being able to develop fewer lots than shown on the 2015 Plan would be a significant issue that would be relevant to the value of the property—and in all likelihood would have reduced the appraised value. Ex. 497 at 304:25-305:22, 306:15-18; Ex. 499 at 339:21-340:4, 441:19-442:8, 443:14-444:13.

273.     On information and belief, reducing the number of potential subdivision lots that could be developed from 24 to 10 would have reduced the value reached by the appraisal by as

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 80 of 116

RECEIVED NYSCEF: 01/24/2022

much as approximately fifty percent. As one of the appraisers testified, holding other factors constant, a reduction in the number of lots would reduce the appraised value by the same proportion. Ex. 497 at 421:10-422:10.

274.    Another issue with the March 2016 Appraisal involves the timeline for construction of the hypothetical 24 lots. Referring to the table below, the appraisal states that "As displayed . . . , it is our opinion that the Bedford lots will not be ready for sale until the second year in the analysis, and the New Castle and North Castle lots will not be ready for sale until the third and fourth years, respectively." Ex. 345 at -9171. Because of the use of present-value technique (see *supra* at ¶ 214) to value the donated easement, the pace of development was a significant factor in the valuation.

| Seven Springs - Sellout Analysis | | | | | |
|---|---|---|---|---|---|
| Projection Period | 1 | 2 | 3 | 4 | 5 |
| Fiscal Year | 2015/2016 | 2016/2017 | 2017/2018 | 2018/2019 | 2019/2020 |
| Beginning Inventory | 24 | 24 | 18 | 12 | 6 |
| Plots Sold | 0 | 6 | 6 | 6 | 6 |
| Remaining Inventory | 24 | 18 | 12 | 6 | 0 |
| Price per Plot | $2,100,000 | $2,205,000 | $2,315,250 | $2,431,013 | $2,552,563 |
| | | | | | |
| Potential Gross Income | $        - | $ 13,230,000 | $ 13,891,500 | $ 14,586,075 | $ 15,315,379 |

275.    This assumption is in tension with the lengthy, unsuccessful development history of Seven Springs. For instance, it does not appear to acknowledge that the Trump Organization had never submitted any plans for the development of the New Castle site, and that it had withdrawn plans to develop lots in North Castle in 2007. The assumption also appears to ignore the difficulty of developing real estate in Westchester County—amply illustrated by the fact that the approval process that resulted in the Bedford Resolution was begun by the Trump Organization in March 2004, roughly nine years before approval was obtained.

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 81 of 116

276.    The development timeline also conflicts with another restriction imposed in the Bedford Resolution: while the appraisal anticipates developing a land area of 164.9 acres, including over 60 acres in Bedford, it does not consider the Bedford Resolution's restriction on disturbing more than five acres at a time. Ex. 345 at -9170. That restriction was well known to the Trump Organization.

277.    Indeed, to abide by this requirement, the Trump Organization's engineer was required to prepare a "staging plan," showing how each lot in Bedford would be developed. In 2014, Trump Organization counsel Mr. Martabano reviewed this document with the Bedford town planner. The phasing plan, excerpted below, depicts a process by which lots and infrastructure would be constructed in stages:

| Work Item Description | Work Phase | Precedent Work |
|---|---|---|
| | | |
| **Entire Roadway Reconstruction** | B | Temporary Sediment Basin on Parcel 'A' |
| | | Water Quality Basin 2 on Lot B-8 |
| | | |
| **Rebuild Driveway on Lot B-1** | C | Water Quality Basin 2 on Lot B-8 |
| | | |
| **House on Lot B-2** | D | Entire Roadway Reconstruction |
| | | Water Quality Basin 2 on Lot B-8 |
| | | |
| **House on Lot B-3** | E | Entire Roadway Reconstruction |
| | | Water Quality Basin 2 on Lot B-8 |
| | | Water Quality Basin 4 |
| | | Retention Basin Parcel 'A' |

Ex. 501 at TTO_023040.

278.    Mr. Martabano described this process in a March 27, 2014 memorandum to Eric Trump and others. Ex. 502 at TTO_01250330.

279.    Because this staging plan required a developer to proceed sequentially, instead of in parallel, in building lots and infrastructure, it would have materially affected the development of the Bedford lots, and the valuation reached by the appraisers.

79

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 82 of 116

280.    The lead appraiser on the project, Mr. Barnes, testified that, in generating the
timeline for approvals, he relied on an "Insite Report." According to Barnes, the Insite Report
stated that "the property was very long, very well down the road toward getting approvals." He
further testified that he relied on the Insite Report completely, saying, "I accepted the InSite
report as the expert report on the issue of subdivision approval and construction of the
subdivision"—and on the "potential approval in other towns and status of applications." Ex. 499
at 343:04-25, 432:02-18.

281.    As discussed, OAG has issued subpoenas to Insite, the Trump Organization,
Cushman, and both of Ms. Dillon's law firms. None of these productions has identified any
"Insite Report" regarding the timing of the Seven Springs development. OAG has obtained no
documentary evidence that Insite ever provided a written opinion on the length of the time it
would take to develop lots on Seven Springs.

282.    However, there is evidence that Ms. Dillon and employees of the Trump
Organization provided their views on development timing—and urged that the Cushman
appraisers assume it was shorter. After Mr. Barnes provided Ms. Dillon an estimated value on
December 11, 2015, she expressed the Trump Organization's disappointment with the valuation
and suggested some ways in which she believed Cushman could adjust its projections. In a
voicemail preserved on Cushman's email servers, Ms. Dillon stated,

> Just wanted to give you a call and follow up from our conversation this morning
> and in chatting with our clients and they were really quite disappointed which I
> think I told you I had expected. I was hoping to chat this through with you a little
> bit more. Either over the weekend or on first thing Monday. I did see a couple places
> where you know where perhaps would appreciate it if you'd at least [give] a little
> more consideration to some of the assumptions . . . since I don't know if it would
> really take a full year before things could get started or lots could be sold . . . . You
> know things along those lines or see [if] absorption is really gonna take that long
> etc.

80

INDEX NO. 451685/2020

RECEIVED NYSCEF: 01/24/2022

Ex. 503.

283.    This was the first of several communications from Morgan Lewis suggesting that the appraisal assume lots could be developed or sold sooner. Ms. Dillon emailed Mr. Barnes later that day, writing, "Thanks so much - maybe give some thought to whether a year is needed for approvals / permitting of lots, given the prior approvals. In addition, I recall Dave [McArdle] was using 2.5% inflation rate. Perhaps the absorption might also be reviewed." Ex. 504 at C&W_0053379. (The "absorption rate" refers to the rate at which hypothetical lots or homes are sold.)

284.    On February 4, 2016, a Morgan Lewis associate working with Ms. Dillon wrote, "We aren't sure if we previously had provided to you the fact that the Bedford subdivision area already has preliminary approvals; as a result, we understand from our client that final approvals would likely take another that 3-6 months, as opposed to one year. We would like you to consider whether this fact results in 6 or so lots being sold earlier in the sellout analysis."

285.    Ms. Dillon's and her associate's suggestions conflicted with the Bedford Resolution and reflect an intent to produce an appraisal that relied on the fact of the "preliminary approvals" the lawyers referenced—but that would not consider the restrictions imposed by those approvals.

### 4.    "[I]t seems like they are hiding something": Morgan Lewis and the Trump Organization's efforts to "reduce discovery"

286.    Evidence indicates that Mr. Trump adopted a practice of preventing the creation of written records with regard to his development efforts at Seven Springs. One witness, who described his role as the "direct representative of Donald Trump" for the Lower Hudson Valley testified that Mr. Trump directed his activities, that he spoke to Mr. Trump personally about Seven Springs "[a]bout once a week," and that he "seldom" communicated in writing with Mr.

Trump because Mr. Trump stated to him "that he did not want things put in writing in communications between us."[34] Ex. 505 at 13-16.

287.    Ms. Dillon also appears to have made efforts to avoid the creation of discoverable material. On June 18, 2015, Ms. Dillon instructed a Morgan Lewis associate to "call [Cushman appraiser] Tim [Barnes] and advise him to limit substantive emails with Scott Blakely (engineer) and instead use the phone to the extent possible (want to avoid creating discovery unnecessarily)." Ex. 506 at MLB_EM00025936. On September 28, 2015, Ms. Dillon sent an email to another Morgan Lewis associate, "Please use a fresh email when communicating with appraisers so that we avoid to the extent possible, email chains." Ex. 507 at MLB_EM00009685. In testimony before OAG, the Morgan Lewis associate testified that both emails were attempts to prevent creating documents that might be uncovered by adversaries potentially challenging the easement donation—i.e., the United States Internal Revenue Service or Department of Justice. Ex. 508 at 310:25-316:2.

288.    The Cushman appraisers acceded to Ms. Dillon's request. As Mr. Barnes, the senior appraiser, wrote to the junior appraiser, "Bedford conversations with engineer, broker, or attorney should be phone calls, not email whenever possible. You and I can email no problem." Ex. 509 at C&W_0043607. The junior appraiser chafed under this instruction, writing to a Morgan Lewis associate who insisted on a phone call to discuss "factual changes" that, "If it is indeed just a few factual changes, wouldn't it be easier to just write them down and I can take care of it over the weekend? I understand the reluctance to put anything in writing, but since it's

---

[34] Even absent such direct testimony of Mr. Trump's involvement, knowledge of Mr. Trump's agents presumptively would be imputed to him as a matter of law in civil litigation. *See, e.g.*, *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010) ("Agency law presumes imputation even where the agent acts less than admirably, exhibits poor business judgment, or commits fraud.").

something factual, it would not be seen as anything controversial or influencing us one way or the other." As she explained in an email that she drafted—but never sent—to the senior appraiser, "I am only resistant to this because it seems like they are hiding something and want to push me to ask about stuff that you were reluctant to change . . . ." Ex. 510 at C&W_0062128.

289.    That same Morgan Lewis associate testified to using an unusual practice to provide comments to the Cushman appraisers. The associate inserted comments on a draft of the Cushman appraisal using Microsoft Word's "track changes" and commenting functions, including text stating "that there is nothing to indicate that all approvals will not be granted." Ex. 511 at MLB_EM00016341. But, instead of emailing the Word file reflecting the comments and tracked changes to the appraisers, he printed the Word document out with its tracked changes visible and sent the paper printout to the appraisers via Federal Express. He then left the junior appraiser a voicemail to make sure the appraisers reviewed the comments. Ex. 512 at C&W_0062105.

290.    The associate testified that providing the edits by email would have made implementing them easier for the appraisers and that it would have been faster to email the edits; he undertook these efforts as part of the practice of "avoiding email." Ex. 508 at 341:12-15. The associate could not recall any reason to have provided the edits in paper format other than to avoid creating unnecessary discovery, and he testified that he believed he had used this unusual practice at Ms. Dillon's instruction. Ex. 508 at 333:5-342:15.

291.    Although Ms. Dillon and Morgan Lewis had sent this document to Cushman—waiving any privilege—Respondent Morgan Lewis failed to disclose it until the Court ordered it produced. While Cushman has represented that it has performed a diligent search and document production, and OAG has raised the paper document's existence to Cushman, Cushman has

INDEX NO. 451685/2020

RECEIVED NYSCEF: 01/24/2022

never produced the document—raising the possibility that the Cushman appraisers destroyed or did not preserve the document.

* * * * *

292.    Mr. Trump's accountants have told OAG that the Seven Springs deduction resulted in a multi-million-dollar benefit to Mr. Trump.

293.    At various times, Ms. Dillon and Eric Trump acted as liaisons between the Trump Organization, its land-use counsel, its engineers, and the Cushman appraisers. However, as the Court is aware, the Trump Organization has asserted privilege over many of Ms. Dillon's communications. In addition, Ms. Dillon has stated that she cannot remember numerous interactions related to the Seven Springs easement donation—indeed, at one point, asked about her work with Eric Trump and David McArdle in 2014, she stated that "I don't recall who I communicated with in 2014 and I'm not even sure there was a project in 2014." Ex. 500 at 79:23-25; *see also* at 80:20-24; 86:2-24; Ex. 572 at 832:6-17; 861:3-862:14. For his part, Eric Trump has asserted his Fifth Amendment privilege in declining to answer OAG's questions on these matters. Ex. 338 at 315:3-324:25.

294.    Combined with privilege assertions and unclear memories, Mr. Trump and his agents' conscious efforts to limit the creation of records have only heightened the need for testimony from individuals—like Mr. Trump—who were directly involved in the events relating to Cushman's valuation of the Seven Springs donation. Mr. Trump's testimony is necessary to determine his role in the submission of the March 2016 Seven Springs appraisal to the Internal Revenue Service.

84

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 87 of 116

## INVESTIGATION BACKGROUND

295.    The foundations and progress of this investigation are well known to the Court and are thoroughly documented in the record of this action. As is relevant to the consideration of the pending motions, OAG supplements that record as follows:

## I.    Respondents Were Properly Served with Subpoenas

296.    Respondents do not dispute that they were each properly served with subpoenas calling for their testimony. Docket No. 354 at 10.

297.    OAG first contacted counsel for the Trump Organization about obtaining sworn testimony from Donald J. Trump, Donald Trump, Jr., and Ivanka Trump on November 1, 2021.

298.    On November 5, 2021 counsel for the Trump Organization informed OAG that they would not be representing the three individuals and that counsel information would be forthcoming.

299.    On November 8, 2021, OAG was contacted by counsel for Donald Trump, Jr. and Ivanka Trump. After an exchange of emails and telephone calls, counsel accepted service on their behalf on December 2, 2021. Ex. 301, 302, 303.

300.    On November 8, after OAG received counsel information for Donald J. Trump, it circulated a series of emails and calls to discuss OAG's subpoena, as well as to identify Mr. Trump's legal team. After an exchange of emails and telephone calls, on November 16, counsel agreed that one of the legal team members would be willing to accept service of the subpoena electronically. Counsel for Mr. Trump said they could not accommodate testimony in December but were available the first week of January.

301.    On November 19, 2021 OAG proposed January 7, 2021 for Mr. Trump's testimony. Having not received confirmation of that specific date, OAG issued a subpoena dated December 1, 2021 calling for the production of documents by December 17, 2021 and testimony

on January 7, 2022. Ex. 301. Counsel accepted service on behalf of Mr. Trump and acknowledged receipt on December 2, 2021.

302.    On December 3, 2021 counsel objected to the document return date and said he could not commit to a date for testimony. Counsel also noted that Mr. Trump was not afraid to testify and explained that Mr. Trump has previously testified about the valuations of his assets in litigation before.

303.    On December 9, 2021 counsel for Mr. Trump informed OAG that Mr. Trump would move to quash the subpoena; and by December 15, counsel for Ivanka Trump and Donald Trump, Jr., indicated that all three Respondents would move to quash the subpoenas jointly.

## II.    Respondents Have Had Ample Notice and Disclosure Concerning the Nature of the OAG Investigation and the Ongoing DANY Criminal Investigation

304.    As alleged in the Verified Petition filed in this action (Docket No. 181), OAG opened this investigation in March 2019 following sworn congressional testimony from Michael Cohen, the former Executive Vice President and Special Counsel at the Trump Organization, that Mr. Trump had a practice of falsely inflating and deflating the value of his assets when it served his purposes. *See* Docket No. 181 ¶ 52.

305.    On December 27, 2019, OAG served a subpoena *duces tecum* on the Trump Organization (and Seven Springs LLC) seeking records from TTO related to Mr. Trump's Statements of Financial Condition, and both subpoenas sought records related to the development potential and easement donation over Seven Springs. Docket No. 181 ¶¶ 83-84.

306.    By that time, Mr. Trump and the Trump Organization were already aware of a grand jury investigation being conducted by DANY. Indeed, on September 19, 2019, Mr. Trump filed an action in the United States District Court for the Sothern District of New York asking the court to "declare invalid" and enjoin the enforcement of certain subpoenas DANY served on

86

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 89 of 116

Mazars seeking information concerning "all statements of financial condition, annual statements, periodic financial reports, and independent auditors' reports prepared, compiled, reviewed, or audited by Mazars," as well as tax return information. *Trump v. Vance*, 19 Civ. 8694, Docket No. 1 (Sept. 19, 2019) at ¶ 47.[35]

307.    That action was eventually fully litigated resulting in a decision by the U.S. Supreme Court and further decisions by the district court and Second Circuit on remand. *See Trump v. Vance*, 591 U.S. ___ (2020) ; 941 F. 3d 631 (2d Cir. 2019); 395 F. Supp. 283 (S.D.N.Y 2019); also 977 F. 3d 198 (2d Cir. 2020); 481 F. Supp. 3d 161 (S.D.N.Y. 2020)..

308.    The DANY investigation was covered extensively by the press, with Mr. Trump commenting publicly on that investigation on numerous occasions.

309.    The Trump Organization and members of the Trump family have repeatedly raised the ongoing DANY investigation during the pendency of this OAG civil investigation. In addition, OAG has provided multiple updates to the Trump Organization, members of the Trump family, and their counsel about the status of the OAG investigation and the potential for criminal liability for individuals.

310.    As described in the opening Verified Petition in this action, on July 20, 2020 counsel for the Trump Organization and Eric Trump raised questions about the "scope of [OAG's] civil inquiry" and sought confirmation that OAG was conducting a civil investigation. Docket No. 181 ¶ 136.

311.    Although not legally required to provide such confirmation, OAG responded the next day, on July 21, and informed the Trump Organization that "[t]his Office does not currently

---

[35] The complaint in *Trump v. Vance* cited many of the same statements now points to in the Motion. *Compare* Docket No. 354 at 3-4 *with Trump v. Vance*, 19 Civ. 8694, Docket No. 1 at ¶ 38.

have an open criminal investigation into these matters," that "we have not coordinated with another criminal law enforcement agency on matters related to this investigation," and that "if at any point we become aware of information that prompts this Office to open a criminal investigation or referral, we will advise counsel and proceed accordingly." Docket No. 181 ¶ 137.

312.    Consistent with the terms of that letter, OAG updated counsel on January 29, 2021. Specifically, on January 29, 2021, OAG informed counsel for the Trump Organization, counsel for Eric Trump and the counsel representing Donald Trump, Jr. and Ivanka Trump in this proceeding, that evidence reviewed to date could lead to criminal liability and prompt OAG to open a criminal investigation or make a criminal referral:

> This letter is to provide you with notice that earlier today we informed counsel for Mr. Weisselberg that based on certain records we have reviewed, it appears that Mr. Weisselberg's residential apartment at 140 Riverside Boulevard, Apartment 2102, was paid for by the Trump Organization from at least 2013 through 2016. A review of Mr. Weisselberg's payroll records, including his form W-2's and 1099's, did not identify any reported compensation for said apartment.

> We confirmed to counsel that we do not have an open criminal investigation, that we have not coordinated with another criminal law enforcement agency, and that we have not sought a criminal referral for Mr. Weisselberg at this time. Nevertheless, we informed his counsel that the conduct that was the subject of our phone call could lead to criminal liability.

> Consistent with our July 21 letter, please also consider this our notice to the Trump Organization and its officers, directors and employees that the above information could prompt this Office to open a criminal investigation or referral into the matter to which that information relates. We will not be providing any further updates on decisions or communications concerning this subject matter, except as we may decide in our sole discretion. Nor will we be making any further representations concerning any coordination or communication with other civil or criminal law enforcement agencies about any subject matter under investigation, including those addressed in the July 21 letter.

Ex. 513.

313.    OAG provided a further update on April 27, 2021. Again, OAG informed counsel for the Trump Organization, counsel for Eric Trump and the counsel representing Donald Trump, Jr. and Ivanka Trump in this proceeding, of the following:

> This letter constitutes further notice that in addition to our ongoing civil investigation, this Office is also engaged in a criminal investigation. The potentially criminal conduct under review goes beyond the scope of the issues identified in the January 29 letter and may implicate the actions of other current and former officers, directors and employees of the Trump Organization and its affiliates, including matters that are the subject of the ongoing civil investigation.
>
> As indicated in January, we will not be providing any further updates on decisions or communications concerning this investigation, except as we may determine in our sole discretion.

Ex. 514.

314.    As Respondents note in their papers, this change was also publicly disclosed almost a month later in May 2021. Docket No. 354 at 6. Indeed, Respondents cite numerous press articles discussing the investigation and the role of OAG personnel cross-designated to DANY. *Id.* at 6-7.

315.    Given the public litigation between Mr. Trump and DANY, the public reporting on the DANY investigation and the multiple disclosures from OAG, there is no risk that any witness, much less these Respondents, would appear for civil testimony without being aware of the possibility of criminal liability.

316.    In fact, as evidence of that knowledge, two Trump Organization witnesses invoked their Fifth Amendment privilege against self-incrimination more than a year ago: Eric Trump and Allen Weisselberg.

317.    During his examination on October 5, 2020, when asked a question that went beyond basic background information, Eric Trump delivered extended prepared remarks objecting to the investigation and invoked his rights against self-incrimination:

```
                                                    Page 39
1              E. Trump
2  fundamental violation of due process.  It
3  is a fundamental violation of my rights as
4  a citizen.
5         Accordingly, under the direction
6  of my counsel and for all of the above
7  reasons, I respectfully decline to answer
8  the questions under the rights of
9  privileges afforded to every citizen under
10 the United States Constitution and all
11 parts thereof and thereto including, but
12 not limited, to the separation of powers
13 doctrine, the First Amendment, the Fourth
14 Amendment, the Fifth Amendment, the Sixth
15 Amendment, and the Fourteenth Amendment as
16 incorporated through the Fifth Amendment
17 due process clause.
18        This will be my answer to all
19 further statements.
20    Q.   Mr. Trump, when you joined The
21 Trump Corporation, what was your title?
22    A.   For all the reasons provided in
23 my answer which are incorporated herein in
24 its entirety, I decline to answer that
25 question.
```

318.    Eric Trump then invoked his Fifth Amendment right against self-incrimination in response to more than 500 questions over six hours.

319.    Counsel for Donald Trump, Jr. and Ivanka Trump participated in the examination of Eric Trump on October 5, 2020.

320.    At testimony held on September 24, 2020, after answering a number of preliminary questions, Allen Weisselberg invoked his Fifth Amendment right against self-incrimination to more than 500 questions over five-and-a-half hours.

90



Page 583
```
1        ALLEN WEISSELBERG
 2   A.   No.
 3       MR. WALLACE:  Alex, can I ask
 4   you to pull up the documents at tab
 5   One.  Can we go to the top -- we're
 6   at the top.
 7   Q.   Mr. Weisselberg, this document
 8   was designated Exhibit 16 during your
 9   testimony in July and it was identified as
10   a supporting data spreadsheet for 2011;
11   does that appear to be correct?
12   A.   Under advice of Counsel, I am
13   invoking my rights under the Constitution.
14   Q.   What Constitutional rights are
15   you invoking?
16   A.   Can I talk to my attorney?
17   Q.   You may.
18       VIDEOGRAPHER:  Do you want to
19   go off the record?
20       MR. WALLACE:  No, let's stay
21   on.
22   A.   That would be under the Fifth
23   Amendment.
24   Q.   Why are you invoking that
25   right?
```

Page 584
```
1        ALLEN WEISSELBERG
 2   A.   I would like to consult with my
 3   attorney.
 4   Q.   You may.
 5   A.   It protects me against
 6   self-incrimination.
 7   Q.   Mr. Weisselberg, if you are
 8   going to invoke that right repeatedly, it
 9   would be helpful if you could cover all of
10   those statements that we just got through
11   each time, thank you.
12       Mr. Weisselberg, during your
13   prior testimony in July you stated that
14   Jeff McConney prepared a supporting data
15   spreadsheet for the purpose of calculating
16   asset values for the statement of financial
17   condition, do you recall that testimony?
18   A.   Again, under the advisement of
19   Counsel, I'm invoking my right under the
20   Constitution.
21   Q.   What right is that?
22   A.   Under the Fifth Amendment.
23   Q.   Why are you invoking that
24   right?
25   A.   Self-incrimination.
```

## III. The Trump Organization and Respondents Still Have Not Produced a Complete Set of Responsive Documents for Donald J. Trump

321.    As the Court is aware, there have been ongoing issues with the production of documents by the Trump Organization.

322.    As a result of those delays, as of today, more than two years after the issuance of the initial subpoena to the Trump Organization, OAG still does not have a complete production of responsive custodial documents for Donald J. Trump.

323.    Background information concerning the documentary subpoenas issued to the Trump Organization is laid out in the opening Verified Petition. *See* Docket No. 181 at ¶¶ 82-126.

324.    In the course of preparing for the testimony of Trump Organization counsel Jill Martin, OAG determined that certain documents—responsive to the subpoenas issued to the Trump Organization and containing search terms agreed to as part of the production process—

91

had been produced by third parties but not the Trump Organization. Ex. 515. At that time, the

Trump Organization had produced roughly 7,400 documents in total, substantially fewer than

many third parties had produced.

325.     By July 27, 2021, after conducting an audit of the production and taking four days

of testimony from corporate representatives, OAG informed the Trump Organization that there

were "number of serious failures in the Trump Organization's subpoena responses." Ex. 516.

326.     Among the failures identified in that letter was the fact that the Trump

Organization "appears to have produced only three custodial documents for Donald J. Trump,

and these only in the last week." *Id.* at 1. As set out in the letter:

### 5.   The Trump Organization Produced Only Three Custodial Documents for Donald J. Trump

For more than 18 months, the Trump Organization failed to produce a single document held by its owner and former president Donald J. Trump – despite the fact that the focus of the subpoena, and the investigation, is Mr. Trump's statement of financial condition. Mr. Trump personally executed documents central to the issues under investigation, like certifications of his statement of financial condition and conservation easements. Moreover, the statements on their face purport to contain valuations based on his evaluation. Mr. Garten testified that there were file cabinets at the Trump Organization holding Mr. Trump's files, that Mr. Trump had assistants who maintained files on his behalf, that he received and maintained hard copy documents, and that he used Post-It Notes to communicate with employees. It is impossible to take at face value the Trump Organization's conclusion that there was no reason to believe Mr. Trump was in possession of responsive information about his own personal financial statements, or that his custodial files lacked such information.

And that conclusion was proven false based on the July 22, 2021 production by the Trump Organization. Three documents in that production are flagged as being from the custodial files of Donald J. Trump.[5] Each of the three documents is a personal letter from Mr. Trump to an executive of a financial institution expressly discussing and touting his statement of financial condition. For example, attached at Tab F is a letter from Mr. Trump to Richard Byrne, the CEO of Deutsche Bank Securities, dated November 2011 and enclosing his financial statement ("hopefully, you will be impressed!"), touting the prospects of the Doral property and enclosing a separate letter that "establishes my brand value, which is not included in my net worth statement." This document, as well as any other similar documents from Mr. Trump's individual files are of obvious relevance to the investigation and were plainly called for in the original subpoena.

*Id.* at 6.

92

Case 1:21-cv-01352-BKS-CFH    Document 16-9    Filed 01/26/22    Page 95 of 116

327.    The Trump Organization offered no specific response to the point about the Donald J. Trump custodial files.

328.    Following receipt of the letter, on August 27, 2021, the Trump Organization entered into an agreement with OAG tolling the statute of limitations for potential civil claims until October 31, 2021 with an option for OAG to extend the period to April 30, 2022 in its "sole discretion." Ex. 517. OAG provided such notice extending the tolling agreement on September 28, 2021. Ex. 518.

329.    In addition to the tolling agreement, after the July 27 letter, the Trump Organization agreed to enter into the Stipulated Order signed by this Court and docketed on September 3, 2021. Docket No. 314. Pursuant to the terms of that Order, the Trump Organization would undertake diligent efforts to comply with all outstanding subpoenas by October 15, 2021. After that date, if OAG reasonably determined that the Trump Organization had not met its obligation to comply with any outstanding subpoenas, the Trump Organization would retain an independent third-party e-discovery firm ("eDiscovery Firm").

330.    On November 1, 2021, OAG provided notice to the Trump Organization of the need to retain an eDiscovery Firm pursuant to the Stipulated Order. That letter highlighted again the failure to produce a set of custodial documents for Donald J. Trump:

93

### 1. The Trump Organization has not complied with its subpoena obligations

Although OAG's initial subpoena duces tecum was served in December 2019, productions from the Trump Organization only seem to have begun in earnest over the past two months; since the execution of a tolling agreement and entry of the Stipulated Order. During that time the Trump Organization has produced 751,035 documents which constitutes more than 97 percent of its total production of 769,813 documents. While OAG is still in the process of reviewing these documents, significant issues are already apparent. First, we still do not have a production of custodial documents for Donald J. Trump. Indeed, we have received no production of custodial documents for Mr. Trump since the production of the three letters from Mr. Trump on July 22, 2021, which we noted in our letter of July 27, 2021. All of this is despite testimony from the General Counsel, Alan Garten that there were file cabinets at the Trump Organization holding Mr. Trump's files, that Mr. Trump had assistants who maintained files on his behalf, that he received and maintained hard copy documents, and that he used Post-It Notes to communicate with employees. Moreover, while the Trump Organization has interviewed 64 custodians to date, Rhona Graff is the only executive assistant to Donald J. Trump on that list. Attached at Tab A is a list of executive assistants at the Trump Organization and addresses for scanners and other imaging machines they used. At least five of those executive assistants worked for Donald J. Trump, nearly all of whom have sent documents to or on behalf of Mr. Trump.[2] The failure to fully search these custodians and sources is a significant gap in compliance.

Ex. 519.

331.    The Trump Organization has offered no specific response to the point about the Donald J. Trump custodial files.

332.    After initially objecting to the notice and a series of meet-and-confer discussions in advance of a potential court filing, on November 17, 2021 the Trump Organization agreed to retain an eDiscovery Firm. That eDiscovery Firm was formally retained on December 15, 2021. OAG has identified the custodial documents of Donald J. Trump as a priority item for the eDiscovery Firm.

333.    Since the July 27 letter highlighting the discovery failures by the Trump Organization, the company has produced more than 900,000 documents. Of the roughly 933,000 documents produced in total, only three documents, produced on July 22, 2021, have metadata indicating they are the from the custodial files of Donald J. Trump. Productions continue to come

94

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 97 of 116

in, with the most recent production on January 13, 2022, but there have been no further productions of documents tagged as Donald J. Trump custodial files since July 22, 2021.

334.    The Trump Organization has provided more than a dozen weekly reports on the status of their ongoing production. None of those reports have addressed the custodial files of Donald J. Trump.

335.    Indeed, Trump Organization productions appear lack even the most basic governing documents of the Donald J. Trump Revocable Trust—the trust entity that owns all or substantially all of the entities or assets comprising the Trump Organization apparently for Mr. Trump's sole benefit and thus can be viewed as directing the operations of the Trump Organization. Some of what OAG has uncovered regarding this trust has been produced by third parties. For example, Donald J. Trump appears to have been the donor, sole trustee and sole beneficiary of the trust at one time. Ex. 520 (document dated January 4, 2017 and signed by Mr. Trump and reflecting certain transfers of interests). Mr. Trump then resigned as trustee, Ex. 521, and Allen Weisselberg and Donald Trump, Jr. accepted appointments as trustees effective January 19, 2017, Ex. 522. Documents also indicate significant transfers of Mr. Trump's business interests to this trust. *E.g.*, Ex. 523, Ex. 524.

336.    But neither the Trump Organization nor Mr. Trump has produced a set of records, so far as OAG is aware, that comprehensively articulates how and under what rules this trust has operated. For example, the Trump Organization produced a document signed by Donald Trump, Jr. and Allen Weisselberg purporting to contain "true and correct portions of the Second Amendment of The Donald J. Trump Revocable Trust dated April 7, 2014" and including a document purporting to be such an amendment signed by Mr. Trump. Ex. 525. The attached amendment identifies Donald Trump, Jr. as "initial Trustee" and "Allen Weisselberg" as "initial

Business Trustee." *Id.* at -346. The amendment purports to be 34 pages long, but numerous pages plainly are missing, because the document is only eleven pages long and the document skips, for example, from "Page 2 of 34" to "Page 8 of 34." *Id.* at -346, -347. The amendment articulates that "The trust shall be managed by my Trustees, including my Business Trustee (collectively, my "Trustees"), acting unanimously and in consultation with the Advisory Board, if any, subject to the limitations and requirements set forth therein." *Id.* at -347. Eric F. Trump was identified as "initial Chairman of the Advisory Board" and empowered "in his sole discretion the number of members of the Advisory Board and the qualifications for membership." *Id.*[36]

## OAG SUBPOENAS TO RESPONDENTS, THEIR MOTION TO QUASH, AND THEIR FAILURE TO COMPLY WITH THE SUBPOENAS

I.   **Donald J. Trump Must Be Compelled to Testify and Produce Relevant Documents**

A.   **Donald J. Trump must be compelled to testify about his misleading Statements of Financial Condition**

337.   The financial statements under investigation purport to reflect his financial condition, purport to be his responsibility, and were the subject of certifications that he signed as to their truth and accuracy in connection with obtaining more than $300 million in loan proceeds (as well as other business transactions).

338.   The financial statements under investigation are entitled, "*Donald J. Trump Statement of Financial Condition.*"[37] They purport to reflect assets owned or controlled, directly or indirectly, by Donald J. Trump (or a revocable trust of which he is [sole] beneficiary)—and the statements are replete with contentions that the valuations presented are assessments made

---

[36] Another document is a two-page document entitled "The Donald J. Trump Revocable Trust" in which the two pages are labeled "Page 1 of 46" and "Page 46 of 46." Ex. 526. This document contains Mr. Trump's signature and is dated April 7, 2014 (the date OAG understands was the trust's inception date) and reflects that the trustee of the trust "shall pay such part or all of the net income or principal of the trust to me as I may direct from time to time." *Id.* at -545.

[37] Exs. 304-319.

by, *inter alia*, Mr. Trump. *See, e.g.,* Ex. 307 at PDF 14 (2009); Ex. 313 at MAZARS-NYAG-0003139 (2011); Ex. 312 at MAZARS-NYAG-0000732 (2014).[38] For example, the June 30, 2012 Statement of Financial Condition claims that Mr. Trump's assets were identified at values "determined by Mr. Trump in conjunction with his associates and, in some instances, outside professionals" and asserts that a group of "club facilities and related real estate" was valued at more than $1.5 billion in an "assessment [that] was prepared *by Mr. Trump* working in conjunction with his associates and outside professionals." Ex. 310 at MAZARS-NYAG-00006313, -317. Moreover, in the years before Mr. Trump placed his assets into a revocable trust, the Statements of Financial Condition reflected that "*Donald J. Trump is responsible* for the preparation and fair presentation of the financial statement . . . ." Ex. 309 at MAZARS-NYAG-0003139 (2011) (emphasis added).

339.    Furthermore, some evidence obtained by the Attorney General indicates that Mr. Trump was personally involved in reviewing and approving the Statements of Financial Condition before their issuance—a natural and logical focus of an investigation into whether a financial statement was fraudulent or misleading and, if so, who was responsible. Jeffrey McConney, Senior Vice President and Controller at the Trump Organization, appears to have been one of the principal participants in preparing the Statements of Financial Condition.[39] When asked who reviewed these statements before they were finalized, he testified that his understanding was that "Allen Weisselberg I believe reviewed it with Mr. Trump," that "Allen

---

[38] The assets included therein include, for example, assets with which Mr. Trump has publicly associated himself—such as his own triplex apartment in Trump Tower in New York, NY; Trump Tower; the Mar-a-Lago social club in Palm Beach, Florida; and many other properties that colloquially considered part of the Trump Organization.

[39] Evidence obtained by the Attorney General to date indicates that an Assistant Vice President at the Trump Organization became a principal participant in the creation of the Statements of Financial Condition approximately in November 2016. Ex. 352 at 177.

spoke with Mr. Trump about something with the statement," and that "I guess we can assume"

that Mr. Trump approved the statements before their issuance.[40] Mr. McConney testified that he

"wasn't part of the conversations with Allen and Mr. Trump so I don't know what they said."[41]

340.    Mr. Weisselberg, the Chief Financial Officer of the Trump Organization during

the relevant period, similarly testified that it was "certainly possible" Mr. Trump discussed

valuations with him and that it was "certainly possible" Mr. Trump reviewed the Statement of

Financial Condition for a particular year before it was finalized.[42] When pressed about whether

Mr. Trump and he approved particular Statements of Financial Condition before their issuance,

Mr. Weisselberg repeatedly invoked his Fifth Amendment privilege.[43]

341.    Given the testimony of Mr. McConney and Mr. Weisselberg, Mr. Trump is the

next logical subject of questioning regarding his participation in the creation of the Statements of

Financial Condition and his approval of their contents.[44]

342.    Mr. Trump also was personally involved in using the Statements of Financial

Condition in numerous commercial transactions for his own financial benefit. Three loans issued

by Deutsche Bank are cases in point. Mr. Trump's personal guaranty in connection with that

lender's $125 million loan in connection with the Trump National Doral stated that Mr. Trump's

---

[40] Ex. 337 at 82:3-83:14.

[41] *Id.* at 83:4-14.

[42] Ex. 357 at 140:21-141:24.

[43] Ex. 527 at 589:03-08, 607:03-13, 627:06-16, 671:03-08, 697:08-698:02.

[44] Evidence obtained by the Attorney General also suggests that Donald J. Trump had awareness of the financial picture of the Trump Organization. A memo dated October 15, 2016 and addressed to Mr. Trump reads, "per your request enclosed please find a detailed analysis setting forth our various business segments and their resulting operations." Ex. 528 at TTO_658594. The financial performance of Trump Organization businesses is a matter relevant to their value.

Statement of Financial Condition for a particular year was "true and correct in all material respects" and "presents fairly Guarantor's financial condition."[45] Mr. Trump signed that guaranty.[46] In the personal guaranty Mr. Trump signed in connection with the loan for the Old Post Office property, Mr. Trump stated that his Statement of Financial Condition for the year ending June 30, 2013 was "true and correct in all material respects" and "presents fairly [Mr. Trump's] financial condition as of June 30, 2013."[47] Personal guaranties Mr. Trump signed in connection with the Chicago property reflected similar representations.[48]

343.    Loan documents in connection with these loans also required Mr. Trump to annually deliver his Statement of Financial Condition for the ensuing years accompanied by a similar certification, and Mr. Trump in fact did so. For example, in a document dated November 11, 2014, Mr. Trump "hereby certifie[d]" that his Statement of Financial Condition for the year ending June 30, 2014 and other identified documents "presents fairly and accurately in all material respects the financial condition of Guarantor for the period presented."[49]

---

[45] *See* Ex. 356 (Guaranty dated as of June 11, 2012 (Doral Guaranty) DB-NYAG-004169), at 4178004177; *id.* at 4173 (defining "Prior Financial Statements" to include Mr. Trump's "Statement of Financial Condition, dated as of June 30, 2011"). The loan document expressly states that this representation was made "[i]n order to induce Lender to accept this Guaranty and to enter into the Credit Agreement and the transactions hereunder." *Id.* at 4177-78.

[46] *Id.* at 4188 (Mr. Trump's signature)

[47] Ex. 366 at DB-NYAG-003287. Evidence obtained by the Attorney General indicates that the Trump Organization obtained the Old Post Office loan proceeds in stages—with the last draw on the loan (totaling millions of dollars) occurring in 2017. [EH-18] at DB-NYAG-217183.

[48] Ex. 364 at DB-NYAG-038878 (Chicago residential portion guaranty); Ex. 365 at DB-NYAG-003229 (Chicago hotel portion guaranty); Ex. 426 at DB-NYAG-003191 (amended and restated Chicago guaranty).

[49] Ex. 346 at DB-NYAG-060415. For the June 30, 2015 statement, Trump Organization employees in May 2016 initially submitted a document signed by him certifying the June 30, 2014 statement (Ex. 427 at DB-NYAG-024830, Ex. 428 at DB-NYAG-024831) but soon corrected the error by submitting a corrected first page of the compliance certificate (Ex. 429 at DB-NYAG-015494, Ex. 430 at DB-NYAG-015495).

344.     Misrepresentations on such certifications and the Statements of Financial Condition to which they relate carried potentially serious consequences—even if only under the terms of these various loans. At origination, the truth of Mr. Trump's representations was a condition precedent to the bank's obligation to lend. Ex. 420 at DB-NYAG-005853, at 5911. In addition, an "event of default" would occur if "[a]ny representation or warranty of Borrower or Guarantor herein or in any other Loan Document" (including a compliance certificate) "shall prove to have been false or misleading in any material respect at the time made or intended to be effective." Ex. 420 at DB-NYAG-005916.[50]

345.     Mr. Trump also sent letters boasting to third parties about the contents of the Statements of Financial Condition—documents that are among the [extremely small] number of Mr. Trump's custodial documents produced to NYAG to date.[51]

346.     At the outset, Donald J. Trump offers no objection to that portion of his subpoena seeking the production of documents. To the contrary, on December 3, 2021, while leaving open the question of whether he would appear for testimony and objecting to the document return date of December 17, 2021, counsel for Mr. Trump agreed to produce responsive documents in advance of his testimony. At the same time, however, counsel indicated an understanding that all relevant documents were in the possession of the Trump Organization: "As I explained, I believe the documents you are seeking are in the possession of the Trump Organization and not in the possession of my client. We agreed that document production would not be addressed by the date

---

[50] The term "Loan Document" included Mr. Trump's guaranty and "any other document, agreement, consent, or instrument which has been or will be executed in connection with" the loan agreement and guaranty. *Id.* at 5865. The same conditions applied to the Chicago and OPO properties. Ex. 422 at DB-NYAG-006019, -6023; Ex. 423 at DB-NYAG-005307-12; Ex. 421 at DB-NYAG-005025, 5031.

[51] Ex. 529; Ex.533; Ex. 534.

of December 17. We will, of course, work on getting the documents you seek, if any, prior to his testimony." Ex. 530.

347.    To date, Mr. Trump has made no production of documents. Nor for that matter has the Trump Organization made anything approaching a complete production of documents for Mr. Trump. While Mr. Trump famously does not use email or a computer, he regularly generated handwritten documents.[52] In testimony as a corporate representative, General Counsel Alan Garten testified that there were file cabinets at the Trump Organization holding Mr. Trump's files, that Mr. Trump had assistants who maintained files on his behalf, that he received and maintained hard copy documents, and that he used Post-It Notes to communicate with employees.[53] Yet as of June 30, 2021—more than 18 months after receiving the initial subpoena from OAG—the Trump Organization still had not searched for those documents. Indeed, Mr. Garten testified that, despite maintaining a "chron file" of correspondence for Mr. Trump, this file was never searched because the Trump Organization determined, improbably, that Mr. Trump was not involved in the preparation of his own financial statements. Ex. 531 at 317:18-318:03 ("Q. Was the chron file searched for responsive information? A. No, because we did not believe he had any involvement in any of the areas that were the subject of the subpoenas. Q. How did you reach that conclusion? A. By interviewing other key witnesses and determining who was involved.")

---

[52] *See, e.g.*, Ashley Parker and Philip Rucker, *Donald Trump waits in his tower — accessible yet isolated*, Washington Post, January 17, 2017 ("He does not use email and rarely surfs the Internet, meaning that telephone calls, television appearances or physical proximity are the best ways to reach him."); Ex. 531 at 316:09-316:10 ("Well, he doesn't use e-mail, so there – so there is no e-mail.")

[53] *See* Ex. 531 at 310:09-310:24 (file cabinets containing DJT documents); 312:24-313:10 (assistant holding documents); 316:03-316:17 (DJT correspondence file); 318:09-318:21 (communication by Post-It Note).

101

348.     The Trump Organization reached this conclusion despite the representation in the financial statements that, "Donald J. Trump is responsible for the preparation and fair presentation of the financial statement in accordance with accounting principles generally accepted in the United States of America and for designing, implementing, and maintaining internal control relevant to the preparation and fair presentation of the financial statement."[54] The Trump Organization reached this conclusion despite testimony from Jeff McConney that Donald J. Trump would review and approve the financial statement with Allen Weisselberg.[55]

349.     Less than a month later, the Trump Organization produced documents further demonstrating that its conclusion was unfounded. On July 22, 2021, the Trump Organization produced three letters from Mr. Trump, forwarding his financial statement an executive of a financial institution expressly discussing and touting his statement of financial condition.[56] In one example, Mr. Trump wrote to Richard Byrne, the CEO of Deutsche Bank Securities, dated November 2011 and enclosing his financial statement ("hopefully, you will be impressed!"), touting the prospects of the Doral property and enclosing a separate letter that "establishes my brand value, which is not included in my net worth statement."[57] Metadata included with the production of those documents indicated that they were the custodial files of Donald J. Trump. But there have been no further productions of Mr. Trump's custodial files since July 2021.

---

[54] Ex. 312 (2015 Statement of Financial Condition at MAZARS-NYAG-00000688.).

[55] McConney Tr. at 82 ("Prior to November of '16, once all the information was provided to Bender's firm, Bender would produce a paper document, a draft document, and Allen Weisselberg I believe reviewed it with Mr. Trump. So I would go through the paper document. Allen would go through it to see if there's any typos or any corrections or make sure everything was -- the interest rates were correct or whatever. But I believe Allen spoke with Mr. Trump about something with the statement."); McConney Tr. at 98 ("He would review it with Allen as the final review, I guess you would call it. But that's what I know about that.").

[56] *See* Ex. 529 at TTO_214580; Ex. 533 at TTO_214579; Ex. 534 at TTO_214581.

[57] Ex. 529 at TTO_214580

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 105 of 116

350.    Beyond such direct correspondence about his financial statement, there are also documents concerning his involvement in the valuation of his property and the financial transactions that arose from those valuations. For example, Mr. Trump initialed and approved as "OK" an email from Allen Weisselberg providing for the Trump Organization to sign a 15 year master lease for retail space in 40 Wall Street as part of the refinancing of that property with Ladder Capital in 2015.[58] Likewise, files from the Trump Organization reflect Mr. Trump's signed and initialed certification attesting to certain aspects of his financial condition as part of the 2015 application to Ladder Capital.[59]

351.    Yet neither Mr. Trump nor the Trump Organization have confirmed that an adequate search has been conducted, much less that all of his responsive documents have been produced. Both parties should be ordered to produce all responsive documents and certify to the completeness of that production within two weeks of a decision from this Court, and two weeks in advance of any testimony from Mr. Trump.

**B.      Donald J. Trump must be compelled to testify about the misleading appraisals he submitted to the Internal Revenue Service**

352.    The Attorney General's investigation likewise has obtained evidence indicating Mr. Trump's intimate involvement in the development of the Seven Springs property. For example, one witness, who described his role as the "direct representative of Donald Trump" for counties including Westchester testified that Mr. Trump directed his activities, that he spoke to Mr. Trump personally about Seven Springs "[a]bout once a week," and that he "seldom" communicated in writing with Mr. Trump because Mr. Trump indicated to him "that he did not

---

[58] Ex. 535 at TTO_122958

[59] Ex. 536 at TTO_122961

103

want things put in writing in communications between us."[60] Mr. Trump has also publicly

spoken about the development of the Seven Springs Property in a 2019 speech to the National

Association of Realtors—stating that he that he fired a consultant who identified wetlands at the

site:

> But, you know, the environmental stuff was very tough. It was getting worse and
> worse every year. And I actually had this beautiful piece of land — 216 acres —
> and I was going to do something with it, and then I decided to do this. I'm glad I
> did this, because I can help more people. But, Tracy, they had a little area where
> water would sort of form when it rained. And all of a sudden, I found out that I
> can't build on the land. Does that make sense to you? I can't build on the land
> because it was considered, for all intents and purposes, a lake. And how did people
> find out about the lake? My consultant told them. Because, this way, you have to
> use your environmental consultant longer, pay them more money to get you out of
> the jam. Isn't that nice? (Laughter.) I fired his ass so fast.

353.     Matters related to the Seven Springs easement donation were reflected on Mr.

Trump's personal federal income tax returns for a series of years, which were produced to the

Attorney General's Office with Mr. Trump's personal authorization. Moreover, the accounting

firm that participated in preparing his tax returns has advised that conservation easements at

Seven Springs and TNGC LA generated a federal tax benefit for Mr. Trump personally to the

tune of more than $5 million over the course of tax years 2014 through 2018. The Attorney

General's Office obtained that concession only after Mr. Trump personally authorized his

accounting firm to communicate it to this Office.

---

[60] Ex. 505, at 13:3-16:15. Even absent such direct testimony of Mr. Trump's
involvement, knowledge of Mr. Trump's agents presumptively would be imputed to him as a
matter of law in civil litigation. *See, e.g.*, *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010)
("Agency law presumes imputation even where the agent acts less than admirably, exhibits poor
business judgment, or commits fraud.").

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 107 of 116

## II.      Donald Trump, Jr. Must Be Compelled to Testify

354.     Donald Trump, Jr.'s testimony similarly must be compelled because it similarly will bear a "reasonable relation" to matters under investigation by the Attorney General. Indeed, the Trump Organization (where Mr. Trump has been employed through much, if not all, of the relevant period) has already agreed that Donald Trump, Jr. is a custodian whose documentary evidence would be produced in response to the Attorney General's subpoenas. There is no basis to deny the Attorney General the ability to examine Donald Trump, Jr. regarding that evidence and evidence OAG has received from other sources.

355.     As set forth above, Donald Trump, Jr. is an Executive Vice President of the Trump Organization who manages the Trump Organization with Eric Trump. Evidence obtained by the Attorney General indicates that Donald Trump, Jr. was involved with certain Trump Organization properties that are valued on Mr. Trump's Statement of Financial Condition, including 40 Wall Street, and was consulted in connection with the matters on the Statements of Financial Condition. Ex. 537 at CAPITALONE-00348338 (email sent to Donald Trump, Jr. providing him with the bank's internal DCF projection of how the 40 Wall property will perform); Ex. 405 at CAPITALONE-00348333 (memo following September 2009 meeting attended by Donald Trump, Jr. discussing financial troubles at 40 Wall); Ex. 322 at C117-119 (2013 supporting data reflecting Donald Trump, Jr.'s consultation on vacant space); Ex. 538 at TTO_01158462 (email reflecting Donald Trump, Jr.'s participation in a phone call in which Mr. Trump told a reporter in 2012 that 40 Wall Street had been appraised as being worth $600 million).

356.     Moreover, after Mr. Trump became a federal official and his assets were placed into a revocable trust, Donald Trump, Jr. and Allen Weisselberg were the only two trustees of that trust. Ex. 521. The Statements of Financial Condition for the years ending June 30, 2016 and

INDEX NO. 451685/2020

RECEIVED NYSCEF: 01/24/2022

later purport to have been Donald Trump, Jr.'s responsibility, in addition to Mr. Weisselberg's. As the June 30, 2016 statement articulates: "The Trustees of the Donald J. Trump Revocable Trust dated April 7, 2014, as amended, on behalf of Donald J. Trump are responsible for the accompanying statement of financial condition . . . ." Ex. 314 at MAZARS-NYAG-00001982. Statements to that effect are included on the Statements of Financial Condition from 2016 through 2020. *E.g.*, Ex. 315 at MAZARS-NYAG-00001841; Ex. 316, Ex. 317, Ex. 318 at MAZARS-NYAG-00162247.

357. Donald Trump, Jr. also was directly involved in the loan transactions identified above. In particular, evidence obtained by the Attorney General establishes that he personally certified on an annual basis the truth and accuracy of the Statements of Financial Condition of Donald Trump to Deutsche Bank for 2016 through 2019.[61] On some such certifications, Donald Trump, Jr. specified that he was doing so as "attorney in fact" for Donald J. Trump. Ex. 431 at DB-NYAG-059755 (certifying June 30, 2016 statement); Ex. 432 at DB-NYAG-210893 (certifying June 30, 2017 statement). In addition to those certifications, Donald Trump, Jr., signed other made representations concerning the financial performance of [individual properties] to Deutsche Bank in connection with those loans. Ex. 539 at DB-NYAG-026821 (certification of August 31, 2017 OPO financial statement); Ex. 540 at DB-NYAG-018107 (DSCR Certification as of December 31, 2017); Ex. 541 at DB-NYAG-266198 (certification of August 2018 OPO financial statement); Ex. 542 at DB-NYAG-407776 (certification of January 2019 OPO financial statement and DSCR); Ex. 543 at DB-NYAG-233879 (certification of

---

[61] Ex. 431 (certifying June 30, 2016 statement); Ex. 432 (certifying June 30, 2017 statement); Ex. 433 (certifying June 30, 2018 statement); Ex. 434 (certifying June 30, 2019 statement).

August 2019 OPO financial statement and DSCR); Ex. 544 at DB-NYAG-407789 (certification of DSCR as of January 2020).

358.    Beyond the Statements of Financial Condition and particular assets therein, documents obtained by the Attorney General establish that Donald Trump, Jr. received his own memoranda discussing the financial position of the Trump Organization as a general matter. There are multiple memoranda addressed to him enclosing spreadsheets which provided a "detailed financial analysis" on the business segments in the Trump portfolio. Ex. 545 at TTO_041325; Ex. 546 at TTO_041347; Ex. 547 at TTO_041326; Ex. 548 at TTO_658823; Ex. 549 at TTO_658601. The analyses contained projected cash flow figures, actual cash flow figures, and other data which would be relevant to the Statement of Financial Condition of Donald J. Trump. For example, the Statement of Financial Condition for 2017 includes cash in certain entities in which Mr. Trump is a minority limited partner in a figure reported as Mr. Trump's own liquidity—but other internal documents sent to Donald Trump, Jr. reflected that any cash distributions from those entities were "at the discretion of" the general partner, not Mr. Trump. *Compare* Ex. 315 at MAZARS-NYAG-00001842 *with* Ex. 549.

## III.    Ivanka Trump Must Be Compelled to Testify

359.    Ivanka Trump began serving as an Executive Vice President in the Trump Organization in 2005. Ex. 330 at TTO_01751760. She left the Trump Organization in or around 2017.

360.    While at the Trump Organization she "direct[ed] all areas of the company's real estate and hotel management platforms." Ex. 330 at TTO_01751760. This included active participation in all aspects of projects, "including deal evaluation, pre-development planning, financing, design, construction, sales and marketing" as well as "involve[ment] in all decisions—large and small." Ex. 330 at TTO_01751760.

INDEX NO. 451685/2020

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 110 of 116

RECEIVED NYSCEF: 01/24/2022

361.    Ivanka Trump was the lead negotiator for the leasehold with the General Services Administration (GSA) for the Old Post Office Property. Ex. 550 at 9:02-10:22; Ex. 551 at TTO_03342133 at 15:21-16:04.

362.    As part of that process, she submitted the Trump Organization's proposal to the GSA in July 2011. Ex. 552 at TTO_02114052.

363.    That proposal incorporated the Statement of Financial Condition of Donald J. Trump. Ex. 552 at TTO_02114204. ("Trump's real estate investments are funded from Donald J. Trump's significant net worth, which is composed of a wide range of capitalized affiliates. Please find Trump's Statement of Financial Condition in an envelope submitted with each copy of this proposal.").

364.    The Trump Organization represented to the GSA that the Statement of Financial Condition was compiled under GAAP with any departures noted in the accountant's compilation report. Ex. 552 at TTO_02114204.

365.    While at the Trump Organization Ivanka Trump, along with Allen Weisselberg, was the primary point of contact for representatives of Deutsche Bank. Ex. 553 at 25:06-11.

366.    As part of an ongoing search for financing on the Doral property, she was copied on a letter from Donald Trump to the CEO of Deutsche Bank Securities along with which he transmitted his Statement of Financial Condition and an additional letter meant to "establish [his] brand value." Ex. 529 at TTO_214580.

367.    Ms. Trump also discussed other, less favorable terms with respect to Doral with another financial institution for financing options not personally guaranteed by Mr. Trump. Ex. 554 at Beal 001652-53; Ex. 555 at BEAL001510; Ex. 556 at BEAL001511.

108

368.    In the course of negotiating with Deutsche Bank financing for the Doral property,

Ms. Trump was responsible for securing loan terms, which included a personal guaranty by Mr.

Trump for which his representations regarding his financial condition would be (and were) made.

Ex. 557 at DB-NYAG-012113. Deutsche Bank then issued a loan on Doral to Trump Endeavor

LLC, an entity in the Trump Organization, and personally guaranteed by Mr. Trump. This loan

(initially comprised of one secured tranche and one unsecured tranche) was for a total of $125

million and closed in June 2012. Ex. 368 at DB-NYAG-001693420; Ex. 356 at DB-NYAG-

004169.

369.    An internal bank credit memorandum makes clear that the "Financial Strength of

the Guarantor" (referring to Mr. Trump) and his personal guaranty were factors in favor of

approving the loan. Ex. 368 at DB-NYAG-001693.

370.    Following the Doral loan, Ivanka Trump was involved in negotiations regarding

the Trump International Hotel and Tower Chicago.

371.    As part of that transaction, she received term sheets from two different divisions

of Deutsche Bank. Some term sheets included recourse through a personal guaranty while others

did not. See Ex. 558 at TTO_01555089; Ex. 559 at TTO_01555090; Ex. 560 at TTO_01748494;

Ex. 561 at TTO_01748497; Ex. 562 at TTO_01748510.

372.    The bank's internal credit memorandum, in recommending approval, noted the

"unique nature" of the loans and stated that "the credit exposure is being recommended based on

the financial profile of the Guarantor." Ex. 424 at DB-NYAG-068526.

373.    The final Chicago loans included a personal guaranty wherein it was represented

that Mr. Trump's June 30, 2012 Statement of Financial Condition was "true and correct in all

INDEX NO. 451685/2020
RECEIVED NYSCEF: 01/24/2022

material respects" and that the statement "presents fairly Guarantor's financial condition as of June 30, 2012." Ex. 364 at DB-NYAG-038878; Ex. 365 at DB-NYAG-003229.

374.    After winning the bid to lease the Old Post Office, Ivanka Trump helped negotiate financing for the property. Ex. 563 at DB-NYAG-011630; Ex. 564 at DB-NYAG-011631. The personal guaranty for this loan required submission of Mr. Trump's Statement of Financial Condition annually, along with a compliance certificate attesting that the statement presented fairly in all material respects Mr. Trump's financial condition. Ex. 366 at DB-NYAG-003290-91, 3300-02.

375.    In order to receive funds from Deutsche Bank, Ivanka Trump submitted several requisition draw requests. Ex. 565 at DB-NYAG-133282, -285, -290; Ex. 566 at DB-NYAG-139707, -710, -715; Ex. 567 at DB-NYAG-129968, -9971, -9976; Ex. 568 at DB-NYAG-140534, -537, -542; Ex. 569 at DB-NYAG-136544, -547, -552.

376.    In her tenure at the Trump Organization, other employees would provide Ivanka Trump with financial analyses and projections relevant to the Statements and assets valued therein. Ex. 570 at 163:17-23; Ex. 545 at TTO_041325; Ex. 549 at TTO_658601.

377.    One such analysis was an overall picture of the Trump Organization's corporate cashflow prepared, in part, by Allen Weisselberg. Ex 545 at TTO_041325; Ex. 546 at TTO_041347; Ex. 549 at TTO_658601.

378.    That analysis contained information on the operations of the "various business segments" in the Trump portfolio.

379.    The information contained in the analysis which was prepared for internal use could provide insight into the valuations in the Statement of Financial Condition sent to lenders and insurers. For example, the golf club properties were valued using purported fixed assets in

the financial statements rather than through the net operating income figures listed on the sheet. Many of those net operating income figures are below $1 million—while the clubs are valued in the tens or hundreds of millions—suggesting that the fixed assets approach could result in higher values for the golf clubs than a more typical income-based approach. Ex. 547 at TTO_041339.

380.    Ivanka Trump's Park Avenue Penthouse was incorporated into the valuation of the Trump Park Avenue asset on Donald Trump's Statement of Financial Condition.

381.    As discussed above, Ivanka Trump had an option to purchase a penthouse unit in Trump Park Avenue at $8,500,000. Ex. 394.

382.    During the pendency of that option her unit was valued at between $12 million and $17 million higher than the option price. Ex. 380 at MAZARS-NYAG-00003290; Ex. 381 at MAZARS-NYAG-3476; Ex. 382 at MAZARS-NYAG-00000184.

383.    When Ivanka Trump acquired a different option on another penthouse unit, that option price was reflected in the SOFC backup. Ex. 395 at TTO_02226839; Ex. 384 at MAZARS-NYAG-00000846.

**CLAIM FOR RELIEF**

**Compelling Subpoena Compliance—C.P.L.R. § 2308**

384.    The Attorney General repeats and realleges the preceding paragraphs as though fully set forth herein.

385.    OAG's subpoenas to respondents Donald J. Trump, Donald Trump, Jr., and Ivanka Trump dated December 1, 2021 (Exs. 301-303) were issued in a legally authorized investigation for which there is a sufficient factual basis, and the requests in the subpoenas are reasonably related to that investigation.

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 114 of 116

386.     Respondents have not identified any legally cognizable basis for withholding from OAG any testimony, documents, or other communications responsive to OAG's subpoenas.

387.     Expedited briefing and resolution of OAG's application to compel is necessary to prevent further unnecessary delay and interference with OAG's investigation.

**WHEREFORE**, Petitioner respectfully requests that the Court grant the Supplemental Verified Petition in all respects and that a judgment and order be entered:

1.  Compelling Donald J. Trump, within fourteen (14) days of the Court's Order, to comply in full with that portion the OAG subpoena seeking documents and information, by producing all responsive records in his possession, custody and control, including but not limited to his documents held by the Trump Organization, and to certify such compliance in writing and under oath;

2.  Compelling Donald J. Trump to testify pursuant to the OAG subpoena within twenty-one (21) days of certifying the completion of production of all documents, with every right to invoke the Fifth Amendment Privilege on the record in response to any specific question;

3.   Compelling Ivanka Trump and Donald Trump, Jr. to testify pursuant to OAG's subpoenas *ad testificandum* within twenty-one (21) days of the Court's Order, with all Respondents being afforded every right to invoke the Fifth Amendment Privilege on the record in response to any specific question; and

4.  For such further relief as this Court deems just and proper.

DATED: January 18, 2022

Respectfully submitted,

LETITIA JAMES
*Attorney General of the State of New York*

By: _____

Austin Thompson

Andrew Amer
Colleen K. Faherty
Alex Finkelstein
Wil Handley
Eric R. Haren
Louis M. Solomon
Austin Thompson
Stephanie Torre
Kevin Wallace
Office of the New York State Attorney General
28 Liberty Street
New York, NY 10005
Phone: (212) 416-8464
Austin.Thompson@ag.ny.gov

*Attorneys for the People of the State of New York*

Case 1:21-cv-01352-BKS-CFH   Document 16-9   Filed 01/26/22   Page 116 of 116

## VERIFICATION

Austin Thompson, an Attorney admitted to the Bar of this State, hereby affirms and certifies that:

I am an attorney in the Office of Letitia James, Attorney General of the State of New York, who appears on behalf of the People of the State of New York as Petitioner in this proceeding. I am duly authorized to make this verification and am acquainted with the facts in this matter.

I have read the annexed verified petition, know the contents thereof, and state that the same are true to my knowledge, except for those matters alleged to be upon information and belief, and as to those matters I believe them to be true.

Dated: New York, New York
      January 18, 2022

                                          _____
                                          Austin Thompson

114