**HABBA MADAIO & ASSOCIATES LLP**
Alina Habba, Esq.
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
         -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com
*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONALD J. TRUMP and TRUMP ORGANIZATION LLC, <br><br> Plaintiffs, <br><br> v. <br><br> LETITIA JAMES, in her official capacity as Attorney General for the State of New York, <br><br> Defendant. | Civil Action No.: 1:21-cv-01352-BKS-CFH |

## <u>PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS</u>

Alina Habba, Esq.
**HABBA MADAIO & ASSOCIATES LLP**
1430 U.S. Highway 206, Suite 240
Bedminster, New Jersey 07921
         -and-
112 West 34th Street, 17th & 18th Floors
New York, New York 10120
Telephone: (908) 869-1188
Facsimile: (908) 450-1881
E-mail: ahabba@habbalaw.com

*Attorneys for Plaintiffs,*
*Donald J. Trump and Trump Organization LLC*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS ................................................................................................... 1

LEGAL STANDARD ......................................................................................................... 3

ARGUMENT ...................................................................................................................... 4

I.   Abstention is Not Appropriate ................................................................................... 4

       A. The *Younger* Abstention Doctrine Does Not Apply .................................... 4

          i.   The Bad Faith Exception to *Younger* Applies ...................................... 7

                1.   The OAG's Investigation was Brought for a Retaliatory and/or
                     Harassing Purpose ......................................................................... 5

                2.   The OAG's Investigation was Brought for a Retaliatory, Harassing
                     and/or Bad Faith Purpose .............................................................. 7

       A. The *Colorado River* Doctrine is Inapplicable ............................................ 11

          ii.  The State and Federal Actions are not Parallel Proceedings ............... 12

          iii. Even if the Proceedings were Parallel, the Six Abstention Factors Weigh in Favor
               of the Plaintiff ................................................................................ 13

       B. Defendant Fails to Satisfy the Threshold Requirements for *Wilton* Abstention ..................... 17

II.  *Rooker-Felman* Does not Divest This Court of Subject-Matter Jurisdiction to Consider
     Plaintiff's Complaint ................................................................................................ 18

III. The Complaint is Sufficiently Plead ......................................................................... 20

       A. This Action is Not Barred by Res Judicata ................................................. 20

       B. Plaintiff has Asserted Valid and Meritorious Claims ................................. 22

          a)   First Amendment .............................................................................. 23

          b)   Fourth Amendment .......................................................................... 26

i

c)  Fourteenth Amendment ................................................................................27

d)  Abuse of Process ........................................................................................29

CONCLUSION...................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**

*All. of Am. Insurers v. Cuomo,*

854 F.2d 591, 603 (2d Cir. 1988)........................................................ 12, 15

*Ambac Assurance Corp. v. U.S. Bank, N.A.,*

328 F.Supp.3d 141, 152 (S.D.N.Y. 2018) ......................................................12

*Ashcroft v. Iqbal,*

556 U.S. 662, 678 (2009) ......................................................4

*Barrington v. New York,*

806 F. Supp. 2d 730, 741-42 (S.D.N.Y. 2011)......................................21

*Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.,*

800 F.2d 325, 328 (2d Cir. 1986)......................................16

*Brown Media Corp. v. K&L Gates,*

854 F.3d 150, 157 (2d Cir. 2017)......................................20,

*Citizens United v. Fed. Election Comm'n,*

558 U.S. 310, 340 (2010) ......................................23

*Clear Channel Outdoor, Inc. v. City of New York,*

594 F.3d 94, 105 (2d Cir. 2010)......................................24

*Cohens v. Virginia,*

19 U.S. 264, 404 (1821) ......................................4,

*Colorado River Water Conservation Dist. v. United States,*

424 U.S. 800, 817 (1976) ......................................4, 11, 14

*Cornelius* v. *NAACP Legal Def. & Educ. Fund, Inc.,*

473 U.S. 788, 812 (1985) ......................................22, 24

*Cullen v. Fliegner,*

18 F.3d 96, 103 n. 4 (2d Cir. 1994) ........................................................................... 5, 7, 10

*Curiano v. Suozzi,*

    63 N.Y.2d 113, 116 (1984) ...................................................................................... 29

*D'Amico v. Correctional Med. Care, Inc.,*

    120 A.D.3d 956, 960 (4th Dep't 2014) .................................................................... 30

*Dalzell Mgmt. Co. v. Bardonia Plaza, LLC,*

    923 F.Supp.2d at 598 ............................................................................................... 12

*De Cisneros v. Younger,*

    871 F.2d 305, 307 (2d Cir. 1989) ....................................................................... 14, 16

*Diamond "D" Construction Corp. v. McGowan,*

    282 F.3d 191 (2d Cir. 2002) ............................................................................... 5, 8, 9

*Dittmer v. Cty. of Suffolk,*

    146 F.3d 113, 118 (2d Cir. 1998) ................................................................. 13, 17, 18

*Dow Jones & Co. v. Harrods Ltd.,*

    *346 F.3d 357 (2d Cir. 2003)* ................................................................................... *17*

*Exxon Mobil Corp. v. Saudi Basic Industries Corp.,*

    544 U.S. 280, 284 (2005) ........................................................................................ 18,

*Fed. Trade Comm'n v. Am. Tobacco Co.,*

    264 U.S. 298, 306 (1924) ........................................................................................ 26

*Fountain v. Karim,*

    838 F.3d 129, 134 (2d Cir. 2016) .............................................................................. 3

*Hartman v. Moore,*

    547 U.S. 250, 256 (2006) ........................................................................................ 24

*Hawaii Housing Authority* v. *Midkiff,*

    467 U. S. 229, 36 (1984) ........................................................................................... 4

*Heffernan v. City of Paterson, N.J.,*

    578 U.S. 266, 270 (2016) ................................................................24

*Hoblock v. Albany Cty. Bd. of Elections,*

    422 F.3d 77, 85 (2d Cir. 2005) .........................................................19

*In re Nwamu,*

    421 F. Supp. 1361, 1366 (S.D.N.Y. 1976) .......................................22

*Kanciper v. Suffolk Cty. Soc'y for the Prevention of Cruelty to Animals, Inc.,*

    722 F.3d 88, 93 (2d Cir. 2013) .........................................................17

*Kern v. Clark,*

    331 F.3d 9, 12 (2003) ...................................................................8, 11

*Kugler v. Helfant,*

421 U.S. 117, 124 (1975) .......................................................................5

*Lance v. Dennis,*

546 U.S. 459, 464-466 (2006) ..............................................................18

*Landau v. LaRossa, Mitchell & Ross,*

    862 N.Y.S.2d 316, 320 (2008) ..........................................................20

*Levine v. Sherman,*

    86 Misc 2d 997, 1000 (Sup. Ct. 1976) ..............................................30

*Marwood Mech., Inc. v. Davis & Warshow, Inc.,*

    50 A.D.2d 900, 900 (2d Dep't 1975) .................................................30

*McMahan & Co. v. Bass,*

    680 N.Y.S.2d 238, 239 (1st Dep't 1998) ...........................................20

*Menucha of Nyack, LLC v. Fisher,*

    974 N.Y.S. 2d 485, 490 (2d Dep't 2013) ..........................................20

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,*

v

460 U.S. 1, 16, 103 S. Ct. 927 (1983) ....................................................................... 11, 14

*See Mosley v. Baker,*

2011  LEXIS 71822, at 13 (S.D.N.Y. 2011) ...............................................16

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Karp,* 108 F.3d 17, 22 (2d Cir. 1997) ...........................12

*New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.,*

946 F.2d 1072, 1074 (4th Cir. 1991) ......................................................13

*New Orleans Public Service, Inc. v. Council of City of New Orleans [NOPSI],*

491 U.S. 350, 359 (1989) .......................................................................4

*Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.,*

673 F.3d 84, 101 (2d Cir. 2012) ...............................................14, 15, 17, 18

*Okla. Press Publ'g Co. v. Walling,*

327 U.S. 186, 209 (1946) ........................................................................26

*Okwedy v. Molinari,*

333 F.3d 339, 344 (2d Cir. 2003)..............................................................23

*Pace v. Hazel Towers, Inc.,*

183 A.D.2d 588, 589, 584 N.Y.S.2d 22, 23 (App. Div. 1st Dept. 1992) ..................21

*Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist,*

426 F.3d 617, 633 (2d Cir. 2005)..............................................................22

*Pervu v. City of Oneonta,*

no. 6:19-cv-00861 (N.D.N.Y. Apr. 2, 2020)..................................................8

*Phifer v. City of New York,*

289 F.3d 49, 61 (2d Cir. 2002)..................................................................19

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty.,*

653 F.3d 290, 297 (3d Cir. 2011) ..............................................................24

*Rochin v. California*

342 U.S. 165, 169 (1952) ............................................................................................................27

*Rosenberger v. Rector & Visitors of Univ. of Va.,*

515 U.S. 819, 828 (1995) ..........................................................................................................23

*Schlagler v. Phillips,*

166 F.3d 439, 442–43 (2d Cir. 1999) ..........................................................................................8

*Schulman v. Anderson Russell Kill & Olick, P.C.,*

117 Misc 2d 162, 172 (Sup. Ct. 1982) ......................................................................................30

*Sheerbonnet, Ltd. v. American Express Bank Ltd.,*

17 F.3d at 49-50 .......................................................................................................................13

*Sprint Communications, Inc. v. Jacobs,*

134 S. Ct. 584, 590 (2013) ..........................................................................................................4

*United States v. Constr. Prods. Research, Inc.,*

73 F.3d 464, 471 (2d Cir. 1996) ................................................................................................22

*United States v. Silver,*

103 F. Supp. 3d 370, 378-79 (S.D.N.Y. 2015) ..........................................................................29

*United States v. Simmonds,*

641 F. App'x 99, 104 (2d Cir. 2016) ..........................................................................................22

*United States v. Skelos,*

15-CR-317 (KMW), 2018 WL 2849712 at *10 (S.D.N.Y. June 8. 2018) ..................................28

*Village of Westfield v. Welch's,*

170 F.3d 116, 122 (2d Cir. 1999) .................................................................................. 14, 15, 16

*Wandering Dago, Inc. v. Destito,*

879 F.3d 20, 30–31 (2d Cir. 2018) ............................................................................................24

*Watkins v. United States,*

354 U.S. 178, 187–88 (1957) ....................................................................................................23

*Wayte v. United States,*

    470 U.S. 598, 608 (1985) ................................................................................................25

*Williams v. Williams,*

    No. 11-CV-246S, 2012 U.S. Dist. LEXIS 24846, 2012 WL 639697, at *5 (W.D.N.Y. Feb. 27, 2012)........................................................................................................................................19

*Wilmington Tr., Nat'l Ass'n v. Estate of McClendon,*

    287 F. Supp. 3d 353, 366 & n.7 (S.D.N.Y. 2018) ........................................................17

*Wilton v. Seven Falls Co.,*

    515 U.S. 277, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995) .................................... 17, 18

*Woodford v. Community Action Agency of Greene County, Inc.,*

    239 F.3d 517, 524 (2d Cir. 2001)................................................................................ 11, 16

*Youell v. Exxon Corp.,*

    48 F.3d 105, 113 (2d Cir. 1995).........................................................................................15

*Young v U.S. ex rel. Vuitton et Fils S.A.,*

    481 US 787, 810 (1987) ....................................................................................................27

*Younger v. Harris,*

    401 U.S. 377 (1971)...........................................................................................................4, 5

**Rules and Statutes**

ABA M.R.P.C. Rule 3.8.........................................................................................................28

## PRELIMINARY STATEMENT

Despite being premised on the theory that Plaintiffs have failed to adequately state a claim, Defendant's motion to dismiss largely ignores the substance of Plaintiffs' claims altogether. Rather, Defendant conspicuously shies away from the allegations levied against her and neglects to address them in any meaningful way.  Rather, in an obvious attempt to distract from the litany of unsavory, meticulously-sourced statements contained in Plaintiffs' complaint—exposing her years-long crusade to exploit her public position to 'take down' a political opponent—Defendant's motion is focused almost exclusively on jurisdictional arguments that are procedural in nature.  Given the gravity of the allegations set forth in Plaintiffs' complaint, Defendant's failure to defend, or even acknowledge, the conduct at the heart of this case speaks volumes.

Indeed, from the outset, Defendant has made clear that her 'investigations' are purely politically motivated, not in the pursuit of justice but rather the pursuit of her own personal and political agenda. Defendant has repeatedly and unrelentingly harassed Plaintiffs with her baseless fishing expedition—commenced under the guise of a legitimate investigation—which she has turned it into a public spectacle intended to tarnish Plaintiffs' reputation and garner attention for herself.  In doing so, Defendant has blatantly disregarded her prosecutorial ethics and knowingly advanced claims that were unwarranted under existing law. Her conduct is guided by her desire to harass, intimidate, embarrass and retaliate against Plaintiffs, all in fulfillment of a personal vendetta.

As described herein, Defendant's animus for Plaintiffs has transcended all ethical standards imposed upon her as Attorney General, and Plaintiffs are therefore seeking declaratory and equitable relief as set forth in the Complaint.

## STATEMENT OF FACTS

In the interest of brevity and judicial economy, the plaintiffs, Donald J. Trump ("Trump") and Trump Organization LLC ("Trump Organization") (collectively, "Plaintiffs") will rely upon the

1

recitation of facts set forth in the Complaint, which is annexed as **Exhibit A** to the Declaration of

Alina Habba, Esq.  However, a brief summary of the factual history is set forth below.

After Trump was inaugurated as President, the defendant, Letitia James ("Defendant"), who

at the time was a New York City Public Advocate for the Democratic party, became an outspoken

detractor of him and his administration. She joined numerous public protests—even leading "die in"

protests—against Trump and frequently made inflammatory statements like "we are all being killed

by this administration," and accusing Trump of exhibiting a "blatant disregard for human lives." *See*

Habba Dec., Ex. A ¶ 19.  She continued to publicly voice her disdain for Trump during his first term

in an effort to make him and his supporters "uncomfortable and not able to rest well." *Id.* ¶ 20.

In May of 2018, Defendant declared her candidacy for Attorney General of the State of New

York. The focal point of her campaign was her promise to "tak[e] on Donald Trump." *Id.* ¶ 26.  The

following non-exhaustive list is illustrative of the types of malicious and inappropriate attacks that she

frequently levied against Trump in furtherance of her campaign:

- Defendant's campaign website accused Trump of engaging in "public corruption." *Id.* ¶ 27.
- She frequently referred to Trump as an "illegitimate president" and vowed to "fight against Donald Trump and his harmful administration." *Id.* at ¶ 34; *see also* ¶¶ 36.
- She pledged to use the law as a "sword" against Trump and proclaimed that she "look[s] forward to going into the office of Attorney General every day, suing him, defending your rights, and then going home!" *Id.* ¶ 36.
- Defendant promised to "use every area of the law to investigate President Trump and his business transactions and "anyone in [Trump's] orbit." *Id.* ¶ 56.
- She tweeted that "[t]he president of the United States has to worry about three things: [Robert] Mueller, [Michael] Cohen, and Tish James. We're all closing in on him." *Id.* ¶ 37.
- Defendant stated that she was "getting ready to ask [Trump] some questions—under oath," that she had her "eyes on Trump Tower," that she would "make sure that justice was served" and that she was "just getting started" in "taking [him] on." *Id.* ¶ 39.
- She threatened that Trump "should be scared" about her run for AG and that she would "join with law enforcement . . . *in removing this President from office.*" *Id.* ¶ 47.

Upon swearing in as Attorney General, Defendant doubled-down on her campaign promises,

continued her public maligning of Plaintiffs, and employed the array of her office's resources to

formally open an investigation into Plaintiffs.  Her targeted attacks have continued throughout her tenure as Attorney General, as she has continually sought to harass, embarrass and retaliate against Plaintiffs due solely to her personal and/or political animus towards them. Her improper motive in pursuing Plaintiffs is evidenced by the many statements Defendant has made about since entering office, which put her biased motives on full display, including, but not limited to:

- In her victory speech, she vowed to "shin[e] a bright light into every dark corner of [Trump's] real estate holdings. *Id.* at ¶ 52.
- When asked if she planned to "sue [Plaintiffs]," she laughingly responded "[o]h, we're definitely going to sue him. *We're going to be a real pain in the ass. He's going to know my name personally.*" *Id.* ¶ 55.
- Defendant levied unfounded allegation that Plaintiffs were engaged in criminal activity: "We need to focus on Donald Trump and his abuses . . . we need to follow his money . . . we need to find out where he's laundered money . . . all of those transactions have happened here in New York City." *Id.* ¶ 74.
- She claimed that Trump "has spent his career hiding behind lawsuits" and promised to "vigorously fight" him. *Id.* ¶ 78
- She boasted that she had "sued the Trump Administration 76 times, but who is counting?" *Id.* ¶ 92.

Defendant's endless public promises to investigate Plaintiffs, her open disparagement of Trump, his family, and his business, and her unfounded accusations that Plaintiffs are guilty of wrongdoing despite admittedly lacking evidence to substantiate those claims, and her baseless, unwarranted, and unduly burdensome investigations into Plaintiffs' business activities all lead to only one reasonable conclusion: Defendant is unconstitutionally weaponizing her position as Attorney General against Plaintiffs for the purpose of fulfilling a political and personal vendetta against them.

## **LEGAL STANDARD**

"In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint … as true and draw all reasonable inferences in favor of the party asserting jurisdiction." *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016). To survive a motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true,

to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## ARGUMENT

## I.   Abstention is Not Appropriate.

It is black letter law that federal courts "have 'no more right to decline the exercise of jurisdiction which is given than to usurp that which is not given.'" *Sprint Communications, Inc. v. Jacobs*, 134 S. Ct. 584, 590 (2013) (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)).  In this sense, a federal court's "obligation to 'hear and decide a case is virtually unflagging.'" *Id.* at 591 (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).  Indeed, "[t]he right of a party plaintiff to choose a [f]ederal court where there is a choice cannot be properly denied." *New Orleans Public Service, Inc. v. Council of City of New Orleans [NOPSI]*, 491 U.S. 350, 359 (1989).

In her motion papers, Defendant attempts to argue that the Court should abstain from exercising jurisdiction over this action.  In so arguing, Defendant points to three separate federal doctrines—*Younger*, *Colorado River*, and *Wilton*—which, in her view, all conveniently dictate that this Court must be stripped of its "virtually unflagging" jurisdiction to hear this matter. *Cohens*, 19 U.S. at 404.  Of course, in straining to make these arguments, Defendant neglects the wealth of case law which dictates that none of these doctrines are applicable to the instant action.  Therefore, as outlined below, abstention is not appropriate in the instant scenario.

### A.   The *Younger* Abstention Doctrine Does Not Apply

As first promulgated in *Younger v. Harris*, 401 U.S. 377 (1971), a federal court may abstain from exercising jurisdiction over an action in rare, "exceptional circumstances." *Sprint Comm'ns, Inc.*, 134 S. Ct. at 591 (quoting *NOPSI*, 491 U.S. at 368).  Such a scenario is the "'exception, not the rule,'" *Hawaii Housing Authority* v. *Midkiff,* 467 U. S. 229, 36 (1984) (quoting *Colorado River,* 424 U. S. at 813), and, even when applicable, abstention is not required but merely "permissible," *NOPSI*, *supra*, at 359.

4

The Supreme Court, in *Younger* and its progeny, has consistently recognized that abstention is not appropriate when a federal plaintiff has made a "showing of bad faith, harassment, or any other unusual circumstance that would call for equitable relief." *Younger*, 91 S.Ct. at 755.  In such a scenario, "[a] showing of bad faith or harassment establishes irreparable injury for the purposes of the *Younger* doctrine." *Cullen v. Fliegner*, 18 F.3d 96, 104 (1994), since "a state cannot have a legitimate interest in discouraging the exercise of constitutional rights, or, equally, in continuing actions otherwise brought in bad faith." *Younger*, 91 S.Ct. at 755.

Generally, a 'bad faith' exception applies when: (i) "the party bringing the state action . . . had no reasonable expectation of obtaining a favorable outcome; or (ii) the "prosecution or proceeding has been brought to retaliate for or to deter constitutional protected conduct or . . . is otherwise brought in bad faith or for the purpose to harass." *Cullen v. Fliegner*, 18 F.3d 96, 103-104 (1994) (citing *Kugler v. Helfant*, 421 U.S. 117, 124 (1975).  As outlined below, both circumstances are present in the instant scenario.

1.  **The OAG's Investigation was Brought for a Retaliatory and/or Harassing Purpose**

In view of Defendant's own conduct, it is evident that she had "no reasonable expectation of obtaining a favorable outcome" when she commenced her investigation against Plaintiffs. *Id; see also Diamond "D" Construction Corp. v. McGowan*, 282 F.3d at 200 (noting that bad faith is shown when a state proceeding is "brought with no legitimate purpose.").

As detailed in the Complaint, Defendant repeatedly signaled her intention to investigate Plaintiffs *before* she took office as Attorney General, a time when she had no factual, legal or evidentiary basis to support a reasonable belief that such an investigation was warranted.  Indeed, well before she took office, Defendant premised her entire campaign for Attorney General on her pledge to 'take down' Trump and made countless promises to investigate Plaintiffs if she were to be elected as Attorney General.  Among other things, Defendant pledged that, if elected as Attorney General, she

would: "take on Donald Trump," Habba Decl., Ex. A. ¶ 33; go "into the office…every day" to "su[e] him, *Id.* ¶ 36; "ask him some questions – under oath," *id.* ¶ 40; immediately investigate Trump and his "cronies," *id.* ¶ 41; and "focus on Donald Trump and his abuses . . .  follow his money . . . find out where he's laundered money," *id.* ¶ 74. These statements served no legitimate purpose other than to threaten and intimidate Plaintiffs, such as stating that she had her "eyes on Trump Tower," *Id.* ¶ 39; stating that Trump should be "worried" about her, *Id.* ¶ 40; and claiming that Trump's "days of defrauding Americans are coming to an end," *Id.* ¶ 51.

Again, all of the above-referenced statements—which establish that Defendant was hell-bent on launching an investigation against Plaintiffs—were made *prior* to Defendant being elected Attorney General, when she possessed no information or insight into Plaintiffs' business activities other than what was available to the public.  In making these statements—without being privy to a single fact known to law enforcement or *any evidentiary basis whatsoever*—Defendant made her intention perfectly clear: once elected, she would utilize her position as Attorney General to commence an investigation into Plaintiffs, irrespective of whether there was any legitimate basis to do so.  Indeed, on account of her ill-advised 'get Trump' campaign platform, she was fully expected to launch a full-scale investigation into Plaintiffs' business activities after taking office. Failing to follow through on her campaign promise would have risked alienating her constituents and harming her political career. Thus, her decision to commence her investigation into Plaintiffs—which was expediently carried out a mere three months after she took office—was merely her realization of this expectation.

Further, Defendant's purported predicate for launching her investigation—the February 2019 Congressional testimony of Michael Cohen—is no more convincing.  It stretches all credibility to believe that Defendant put any legitimate stock into the testimony of Mr. Cohen, a man who has seemingly made his living off of publicly maligning Plaintiffs and who has already been convicted of perjuring himself in connection with the very same act—testifying before Congress—that Defendant

claims is the foundation for her investigation.   Even other law enforcement agencies have acknowledged, in no uncertain terms, that Mr. Cohen is an untrustworthy source. For instance, around the same time Defendant supposedly commenced its investigation in reliance on Mr. Cohen's testimony, the United States Attorney's Office for the Southern District of New York (SDNY), interviewed Cohen, who sought leniency, and had very substantial concerns about Cohen's credibility as a witness. *Id.* ¶ 70.   The SDNY went on to described Mr. Cohen as "a man who knowingly sought to undermine core institutions of our democracy," who "repeatedly use[s] his power and influence for deceptive ends" and is "motivated by personal greed and ambition." *Id.* As a matter of fact, the SDNY even noted that "Cohen lied to the SCO (The Special Counsel) at [a] meeting, repeating many of the prior false statements he had made to the Congress" and pointed to numerous "material false statements" that he had made to both the SDNY and FBI.  In other words, as described by the SDNY, his behavior was consistent with the "pattern of deception that permeated his professional life." *Id.* ¶Therefore, it is apparent that testimony from such an unreliable witness could not support a "reasonable expectation of obtaining a favorable outcome."  Rather, it is apparent from Defendant's campaign promises that she was looking for *any* justification to investigate Plaintiffs, no matter how tenuous, and her supposed 'reliance' on Mr. Cohen's testimony was merely a red herring intended to fulfill this purpose.

Based on the foregoing, it is readily apparent that Defendant's investigation lacked a legitimate basis at the time it was commenced.

2. **The OAG's Investigation was Brought for a Retaliatory, Harassing and/or Bad Faith Purpose**

The bad faith exception further applies here because Defendant's investigation was "brought to retaliate for or to deter constitutionally protected conduct or . . . is otherwise brought in bad faith or for the purpose to harass." *Cullen v. Fliegner*, 18 F.3d 96 (1994).

In determining whether a proceeding was commenced in bad faith, "[t]he subjective motivation of the state authority in bringing the proceeding is critical to, if not determinative of, this inquiry." *Diamond "D" Const. Corp.*, 282 F3d 191, 199 (2d Cir 2002) (citing *Schlagler v. Phillips,* 166 F.3d 439, 442–43 (2d. Cir. 1999); *see also Kern v. Clark*, 331 F.3d 9, 12 (2003) ("Generally, the subjective bad faith of the prosecuting authority is the gravamen of the exception to *Younger* abstention.") (citation omitted). To make the requisite showing of a subjective, bad faith motive, a federal plaintiff must "show that the state proceeding was initiated with and is animated by a retaliatory, harassing, or other illegitimate motive." *Diamond "D" Const. Corp.*, 282 F3d at 199 (citing *Schlagler*, 166 F.3d at 442-444); *see also Pervu v. City of Oneonta*, no. 6:19-cv-00861 (N.D.N.Y. Apr. 2, 2020) ("[A] pattern of harassment both before and after institution of the state prosecution would be probative of the animus that attended the decision to prosecute.").

Turning to the instant action, there is no question that Defendant's investigation was driven and animated by a retaliatory, harassing and bad faith purpose. To elucidate this point, Plaintiffs' Complaint outlines an exorbitant number of statements made by Defendant—in public, no less— which, taken as a whole, expose her profound hatred for Plaintiffs – a disdain so strong that it permeates her actions as Attorney General. Defendant's egregious statements and actions are so innumerable that, in the interest of brevity and judicial economy, Plaintiff will rely upon the recitation of facts contained in the Complaint in support of this showing. *See generally* Habba Dec., Ex. A. To name a few, Defendant has frequently referred to Trump as an "illegitimate president" and vowing to "fight against [him] and his harmful administration," *id.* ¶ 34; pledged to use the law as a "sword" against him and proclaimed that "no one is above the law, including this illegitimate president…and so I look forward to going into the office of Attorney General every day . . .suing him . . . and then going home!" *id.* ¶ 36; promised to "use every area of the law to investigate [Trump] and his business transactions" and "anyone in [Trump's] orbit." *Id.* ¶ 56; and stated "we're definitely going to sue him.

We're going to be a real pain in the ass. He's going to know my name personally," *id.* ¶ 55.  Defendant's twisted mindset is perhaps best encapsulated by the following statement, which she made in a campaign video in connection with her bid to be elected as Attorney General:

> I'm running for attorney general, because I will never be afraid to challenge this illegitimate president when our fundamental rights are at stake….
>
> I believe that this president is incompetent. I believe that this president is ill equipped to serve in the highest office of this Land. And I believe that he is an embarrassment to all that we stand for. He should be charged with obstructing justice. I believe that the President of these United States can be indicted for criminal offenses and we would join with law enforcement and other attorneys general across this nation in removing this President from office.
>
> In addition to that, the office of attorney general will continue to follow the money because we believe he's engaged in a pattern and practice of money laundering. Laundering the money from foreign governments here in New York State, and particularly related to his real estate holdings. It's important that everyone understand, the days of Donald Trump are coming to an end.

*Id.* ¶¶ 46-47.

Astonishingly, Defendant contends in her motion papers—presumably with a straight face—that Plaintiffs have failed to make an adequate showing of bad faith.  In straining to come to this conclusion, Defendant describes the Complaint as being comprised of merely "snippets of statements, press releases, and tweets." Defendant's Memorandum of Law in Support of Defendant's Motion to Dismiss ("Def. Memo.) at 16. This description is not only grossly inaccurate, it is also a disingenuous attempt to downplay the severity of Defendant's own words.  As the record shows, the Complaint contains over *fifty* prejudicial statements from Defendant, each worse than the next, which collectively reveal an undeniable bias against Plaintiffs.

In support of her indefensible position that Defendant's conduct falls short of "bad faith," Defendant points to a single case, *Diamond "D" Construction Corp. v. McGowan*, 282 F.3d 191 (2d Cir. 2002), which is wholly distinguishable from the instant action.  In *Diamond "D" Const. Corp.*, the Second Circuit declined to apply the bad faith exception upon its finding that the plaintiff had failed to

adequately allege that it had been "singled . . . out for adverse treatment" or that the commencement administrative proceeding was "driven by a retaliatory motive or some other nefarious purpose" *Id.* at 26. In so finding, the Second Circuit specifically pointed to the fact that the complaint contained "no credible allegation that the [defendant] singled [plaintiff] out by reason of bias"; rather, the allegations were only direct at the "manner in which the administrative proceedings were *conducted*," which, the court noted, did not "speak to the subjective intent of the [defendant] in commencing the. . . proceedings." *Id.* (emphasis added). As such, the court concluded that the plaintiff failed to establish that the proceedings were "brought with an intent to harass or any other illegitimate motive." *Id.*

Here, unlike in *Diamond "D" Const. Corp.*, Plaintiff's well-sourced allegations are premised on the theory that Defendant "singled [Plaintiffs] out by reason of bias." In this way, the Complaint goes towards Defendant's "subjective intent . . . in commencing the. . . proceedings," in precisely the way in which *Diamond "D"* plaintiff fell short. *Id.* The Complaint contains a vast number of statements showing that Defendant's investigation was *commenced* for the purpose of harassing Plaintiffs and that her actions were driven by political animus and disdain for Plaintiffs. Indeed, the causes of action focus heavily on the "subjective intent" of Defendant's actions. Thus, this action is not in any way comparable to the situation in *Diamond "D" Const. Corp.* in which the allegations were only directed at "manner in which the administrative proceedings were conducted." *Id.*

Moreover, Defendant conveniently ignores a case which is dissected at length in *Diamond "D" Const. Corp.* and which is as a significantly more apt comparison to instant action – *Cullen v. Fliegner*, 18 F.3d 96 (1994). In *Cullen*, the Second Circuit affirmed the lower court's decision to apply the bad faith exception on the basis that the defendant's conduct displayed a sufficient "level of animus." *Id.* at 104. In so finding, the Second Circuit pointed to the "past history of personal conflict" between the parties and the "strictly *ad hominem*" nature of the investigation. *Id.* Here, similarly, there is a well-documented history of ill-will between Plaintiffs and Defendant and the OAG's investigation was commenced for

an improper motive. *See also Kern v. Clark*, 331 F.3d 9 (2003) (applying bad faith exception where plaintiff was "aggressively prosecuted . . . in a string of weak cases brought on behalf of [plaintiff's] enemies.").

Lastly, to the extent that the Court has any doubt as to whether Defendant's investigation was commenced in bad faith, the Court should direct an evidentiary hearing on this issue. *Id.* at 11-12.

## A. The *Colorado River* Doctrine is Inapplicable

In *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976), which similarly deals with abstention, the Supreme Court set forth another narrow set of circumstances in which abstention may be appropriate. Specifically, under the *Colorado River* doctrine, abstention is permissible when: "(1) the state and federal actions are 'concurrent' or 'parallel' and (2) evaluation of a six-factor test weighs in favor of abstention." *Id.* "These six factors include: (1) the assumption of jurisdiction by either court over any res or property; (2) the inconvenience of the federal forum; (3) the avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether state or federal law supplies the rule of decision; and (6) whether the state court proceeding will adequately protect the rights of the party seeking to invoke federal jurisdiction." *Id.*

When examining these factors, the Court's task "is not to find some substantial reason for the exercise of federal jurisdiction," but "to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' that can suffice under *Colorado River* to justify the surrender of that jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25–26 (1983). In this analysis "the balance [is] heavily weighted in favor of the exercise of jurisdiction," and "the facial neutrality of a factor is a basis for retaining jurisdiction, not for yielding it." *Woodford v. Cmty. Action Agency of Greene Cty*, 239 F.3d at 517, 522.

Here, Defendant fails to meet the weighty burden imposed by *Colorado River* since the State Action does not qualify as a "parallel proceeding" and, even if it did, abstention is not warranted under the six-factor test.

### i.  The State and Federal Actions are not Parallel Proceedings.

As an initial matter, Defendant fails to satisfy, or even address, the threshold issue of whether the State Action qualifies as a "parallel proceeding" for the purposes of the *Colorado River* doctrine. As such, Defendant has failed to make the requisite showing under *Colorado River*.

Federal and state court actions are parallel for purposes of abstention when the "proceedings are essentially the same; that, is there is an identity of parties, and the issues and relief sought are the same." *Nat'l Union Fire Ins. Co. of Pittsburgh v. Karp*, 108 F.3d 17, 22 (2d Cir. 1997). Even when two actions "arise out of a similar set of circumstances," they will not be considered to be parallel if "the nature of the claims in question differs." *Ambac Assurance Corp. v. U.S. Bank, N.A.*, 328 F.Supp.3d 141, 152 (S.D.N.Y. 2018); *Dalzell Mgmt. Co. v. Bardonia Plaza, LLC*, 923 F.Supp.2d at 598 (finding no parallelism despite "same core facts").

The case at bar mirrors the Second Circuit's consideration of the *Colorado River* factors in *Alliance of American Insurers v. Cuomo*, 854 F.2d 591, 593 (2d Cir. 1988). Though there were concurrent federal and state actions dealing with the same state insurance laws, the Second Circuit found that *Colorado River* abstention was not appropriate because the two actions were not "parallel proceedings." *Id.* at 593, 603. The Second Circuit held that "the issues engendered in the state actions [were] dissimilar to those presented" in the federal action because the federal action raised constitutional questions while the state action raised issues concerning the adequacy of rates and money in a specified fund. *Id.* The Court explained that the "overlap of subject matter" was "not sufficient to make these actions concurrent," and the "differences in parties and issues [were] strong factors against invoking exceptional circumstances as the basis for dismissal." *Id.*

Here, likewise, the State Action and the instant action deal with similarly separate issues. The State Action deals exclusively with subpoenas served by Defendant and the enforceability of same. Conversely, the instant action involves issues that are constitutional in nature, namely claims arising under the First, Fourth, and Fourteenth Amendment. In this regard, Plaintiffs are challenging the improper motive underlying Defendant's investigation, not the merits of the investigation itself. Moreover, the facts at issue are significantly more expansive, as this action scrutinizes the complete history of Defendant's conduct towards Plaintiffs – including the time before she took office as the Attorney General. These issues have not been considered, much less adjudicated, in the State Action, nor would they be appropriately raised in an Article 4 special proceeding.

Moreover, the actions do not seek the same relief. The State Action is a summary proceeding wherein Defendant merely seeks to force compliance with certain subpoenas that have been served on Plaintiffs. This action, in contrast, looks beyond these particular subpoenas and seeks declaratory and injunctive relief affirming that Defendant's investigation is unconstitutional in its entirety. In other words, Plaintiffs are seeking to stop the investigation *as a whole*, not just quash certain subpoenas. Such a distinction in the scope of relief militates against a finding of parallelism. *New Beckley Mining Corp. v. Int'l Union, United Mine Workers of Am.*, 946 F.2d 1072, 1074 (4th Cir. 1991) ("A difference in remedies is a factor counseling denial of a motion to abstain. . . . The difference in remedies becomes more pronounced when one suit requires a jury and the other does not[.]")

As the two proceedings in this matter are not parallel, the Court need not proceed to weigh the six abstention factors. *Sheerbonnet, Ltd. v. American Express Bank Ltd.*, 17 F.3d at 49-50 ("We need not examine the factors to determine whether 'exceptional circumstances' exist, because the state and federal proceedings here are not 'concurrent'"); *Dittmer v. County of Suffolk*, 146 F.3d at 118 (finding of parallel proceedings is a "necessary prerequisite" to abstention under *Colorado River*).

> ii. **Even if the Proceedings are Parallel, the Six Abstention Factors Weigh in Favor of Plaintiffs.**

Even if, for the sake of argument, the State Action was deemed to be a "parallel proceeding" with this action (it is not), the six *Colorado River* factors weigh heavily in Plaintiffs' favor, thereby precluding abstention.

As to the first factor, there is no risk of piecemeal litigation in permitting the instant action to continue. Since Plaintiffs has not, and could not, raise the affirmative constitutional relief it is seeking in the state action, there is no risk of piecemeal litigation. The Supreme Court has held that "mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction." *Colorado River*, 424 U.S. at 816. In *Woodford*, the Second Circuit similarly concluded that the first factor did not support abstention because, although the actions were based on misconduct by the same party, the claims in the two actions were different, the required showings by the plaintiff were different, and the relief sought was different. 239 F.3d at 523.

The second factor is not applicable here since neither this action nor the State Action involves jurisdiction over property. While Defendant creatively attempts to argue that a mere control of documents favors abstention, the absence of a res "points toward exercise of federal jurisdiction." *De Cisneros v. Younger*, 871 F.2d 305, 307 (2d Cir. 1989). Since the present action is not an *in rem* action and does not involve jurisdiction over real property, it is irrelevant to the second factor. *See Village of Westfield v. Welch's*, 170 F.3d 116, 122 (2d Cir. 1999).

With regard to the third factor, which deals with the chronological order in which the courts obtained jurisdiction, it has been emphasized that "priority should not be measured exclusively by which complaint has been filed first, but rather in terms of how much progress has been made in two actions." *Moses*, 460 U.S. at 21. Defendant's argument that the mere motion practice in the state action favors abstention actually strengthens the argument *against* abstention. *See Niagara Mohawk Power Corp*, 673 F.3d 84, 102 (2d Cir. 2012) (finding that abstention is not appropriate where state courts have made "little headway over the past decade"). Here, Defendant has admitted that she has gathered,

and will continue to gather, millions of documents in her quest to denigrate Plaintiffs. However, as conceded in its moving papers, Defendant has made little headway in concluding its investigation. Thus, Defendant's lack of progress and her continued harassment of Plaintiffs is the precise reason why federal intervention is necessary.

As to the fourth factor, convenience of forum, where the federal court is "just as convenient" as the state court, this factor favors retention of the case in the federal court. *See Youell v. Exxon Corp.*, 48 F.3d 105, 113 (2d Cir. 1995). A federal court is just as convenient as state court when the two are geographically similar and the parties raise no challenge to the convenience of the federal forum. *See Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 101 (2d Cir. 2012) (concluding that the second factor "militate[d] against abstention" because "the fora appear[ed] to be equally convenient. . .". It does not matter that litigating in multiple fora is less convenient than litigating in only one because the "inconvenience of litigation, rather than forum, is insufficient to establish exceptional circumstances justifying dismissal." *All. of Am. Insurers*, 854 F.2d 591, 603 (2d Cir. 1988). Indeed, a rule that allowed abstention on the ground that litigating in two fora is less convenient than litigating in one "would eviscerate *Colorado River*, as federal courts consider abstaining under Colorado River only in cases where there are concurrent and simultaneous federal and state proceedings." *Vill. of Westfield*, 170 F.3d 116, 122 (2d Cir. 1999)

This maxim rings true in the case at bar, as the convenience factor has limited applicability in the face of the Covid-19 pandemic. Both state and federal courts are presently conducting virtual appearances to avoid increased transmissibility. Further, although Defendant argues that the Northern District Courthouse is "dramatically inconvenient" since "[a]ll of the lawyers working on the OAG investigation are located at the Attorney General's offices at 28 Liberty Street in New York City," those same attorneys have represented that the 28 Liberty Street office is closed due to COVID-19 and the entire staff is working remotely. *See* Habba Aff at ¶4. It is therefore of no material consequence

15

that the OAG attorneys assigned to this case are based in New York City. Further, the OAG's principal office is located in the Northern District, which makes this point of contention particularly confounding. Contrary to the OAG's assertion, it has failed to demonstrate that the Northern District—a court in which the OAG routinely appears—is "dramatically inconvenient."

The fifth factor is whether state or federal law provides the rule of decision on the merits. *See Moses*, 460 U.S. at 23. This factor weighs heavily in favor of retaining jurisdiction. *See Village of Westfield, N.Y.*, 170 F.3d at 124 ("[the] presence of federal issues strongly advises exercising federal jurisdiction"); *see also Younger v. De Cisneros*, 871 F.2d 305, 308 (2d Cir. 1989) ("[W]hen the applicable substantive law is federal, abstention is disfavored."). Contrary to Defendant's contention, state interests are not "necessarily raised" in Plaintiffs' Complaint, as the crux of Plaintiffs' complaint is the constitutional violations alleged, weighing this factor heavily in Plaintiffs' favor. *See Mosley v. Baker*, 2011 LEXIS 71822, at 13 (S.D.N.Y. 2011) (where a federal complaint alleges constitutional violations, federal law supplies the rule of decision and weighs heavily against abstention.)

The sixth factor weighs against abstention because the state action is not adequate to protect Plaintiff's rights. This fact matters only when it weighs in favor of federal jurisdiction and is "of little weight" when a state proceeding may adequately protect a party's interests.); *Bethlehem Contracting Co. v. Lehrer/McGovern, Inc.*, 800 F.2d 325, 328–29 (2d Cir. 1986). Thus, simply because a state court proceeding might protect a party's interests "is not enough to justify the district court's deference to the state action." *Id.* at 328–29. Further, the Second Circuit has recognized that, where the relief sought in two matters substantially differs the state proceeding might not adequately protect those parties' rights. *See Woodford*, 239 F.3d 517, 525 (2d Cir. 2001) (holding that the district court's finding that the sixth factor favored abstention was incorrect because the claims in federal court allowed an award of attorneys' fees and the state court action did not).

These principles have the same effect here. As discussed at length herein, the relief sought by Plaintiffs in this action cannot be awarded in the limited state action because they implicate constitutional claims that can only be adequately adjudicated here.  Therefore, there are no exceptional circumstances that warrant dismissal and the six-factor test weighs in favor of retaining jurisdiction.

### B.  Defendant Fails to Satisfy the Threshold Requirements for Wilton Abstention.

Abstention based on the *Wilton* abstention doctrine, established in *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995), is inappropriate in this case.  *Wilton* abstention is reserved for cases in which there is a pending state-court proceeding between the same parties presenting the same issues "not governed by federal law" and the federal plaintiff seeks only declaratory relief. *Wilton*, 515 U.S. at 282; *Dittmer*, 146 F.3d 113, 118 (2d Cir. 1998).  Here, Plaintiff raises federal issues and seeks injunctive relief, not "purely declaratory relief." *Kanciper v. Suffolk Cty. Soc'y for the Prevention of Cruelty to Animals, Inc.*, 722 F.3d 88, 93 (2d Cir. 2013).  For these reasons, abstaining under *Wilton* in favor of a preempted state proceeding would be inappropriate.

Simply put, where a federal action seeks more than "purely declaratory" relief, the Second Circuit has held that *Wilton* abstention does not apply. *Id* at 93. *see also Niagara*, 673 F.3d at 106. These principles preclude application of *Wilton* abstention here where Plaintiff seeks both declaratory and injunctive relief.  *Wilton* does not apply to "actions [], like this one, [that] involve … claims for injunctive relief." *See Wilmington Tr., Nat'l Ass'n v. Estate of McClendon*, 287 F. Supp. 3d 353, 366 & n.7 (S.D.N.Y. 2018) (*Wilton* abstention inapplicable where plaintiff "seeks … injunctive relief"). Defendant relies on *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357 (2d Cir. 2003) to support its assertion that the Plaintiffs' request for injunctive relief does not foreclose the application of *Wilton* abstention. Yet, Defendant fails to recognize that this ruling predates and directly contradicts the holdings in both *Kanciper* and *Niagara,* which held that *Wilton* cannot apply in actions seeking more than "purely declaratory" relief.

In any event, Defendant's arguments for why abstention is appropriate under *Wilton* are entirely duplicative of its arguments for abstention under *Colorado* River.  They also fail for the same reasons since, as with *Colorado River*, *Wilton* requires the state court proceeding to present "the same issues" as the federal action. *Dittmer v. Cty. of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998). As explained above, the State Action does not present the same issues as the instant action. There is no doubt that "cases like this one that involve questions of federal law 'are fundamentally distinct from *Wilton* because federal law supplies a rule of decision,' whereas *Wilton* 'involved state law only.'" *Niagara*, 673 F.3d at 105. That this action is centered on federal claims is reason alone to find *Wilton* abstention inapplicable. *Dittmer*, 146 F.3d at 118.

## II.     *Rooker-Feldman* Does Not Divest This Court of Subject-Matter Jurisdiction to Consider Plaintiff's Complaint.

The *Rooker-Feldman* Doctrine limits the subject-matter jurisdiction of federal courts by barring claims "brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284 (2005). The Supreme Court's post-Exxon decisions have held that the *Rooker-Feldman* Doctrine was previously subject to overbroad interpretations and was impermissibly being used to effectively negate the federal court's jurisdiction. *Exxon*, 544 U.S. at 283 ("the doctrine has sometimes been construed to extend far beyond the contours of the Rooker and Feldman cases"). *Rooker-Feldman* is a "narrow doctrine" that "applies only in limited circumstances." *Lance v. Dennis*, 546 U.S. 459, 464-466 (2006).

In *Exxon*, the Supreme Court stressed a crucial limitation on the *Rooker-Feldman* Doctrine holding: "If a federal plaintiff presents an independent claim," it is not an impediment to the exercise of federal jurisdiction that the "same or a related question" was earlier litigated between the parties in state court. *Id.*, 292-293.  Further, the Second Circuit has held that a movant must satisfy four requirements before *Rooker-Feldman* is applied: (i) the federal plaintiff must have lost in state court; (ii)

the plaintiff must "complain [ ] of injuries caused by [a] state court judgment [.]"; (iii) the plaintiff must "invite district court review and rejection of [that] judgment [ ]."; (iv) the state-court judgment must have been "rendered before the district court proceedings commenced."  In other words, *Rooker-Feldman* has no application to federal court suits when the state court litigation has not been resolved but, rather, remains *ongoing. Hoblock v. Albany Cty. Bd. of Elections,* 422 F.3d 77, 85 (2d Cir. 2005).

Under the Second Circuit's holding in *Hoblock*, federal plaintiffs are not subject to the *Rooker-Feldman* bar unless they "complain of an injury caused by a state judgment." *Hoblock*, 422 F.3d at 87. The Second Circuit has referred to this requirement as "the key" to the *Rooker-Feldman* analysis and the "core requirement from which the others derive." *Id.* Thus, there is no doubt that *Rooker-Feldman* is inapplicable to the instant action – Plaintiffs do not complain of the September 2021 Order which was entered into by the Trump Organization; rather, Plaintiffs are seeking relief from a politically-motivated investigation that runs afoul of the Constitution and continues to cause them harm.  As a result, Plaintiffs do not complain of an injury caused by the state court judgment nor do they invite "review and rejection" of that judgment, precisely because a final order has not been entered in the State Action. *See Phifer v. City of New York*, 289 F.3d 49, 61 (2d Cir. 2002) (concluding that the *Rooker-Feldman* did not apply to plaintiff's claim that "would not call into question any of the state court findings"). Furthermore, Plaintiff's claims are not "inextricably intertwined" with the state court judgment as they raise federal questions that have not yet been adjudicated in the State Action. *See Williams v. Williams*, No. 11-CV-246S, 2012 WL 639697, at *5 (W.D.N.Y. Feb. 27, 2012) ("[W]here the claims were never presented in the state court proceedings and the plaintiff did not have an opportunity to present the claims in those proceedings, the claims are not 'inextricably intertwined' and . . . not barred by *Rooker-Feldman*.").

### III.   **The Complaint is Sufficiently Plead**

### I.   **This Action is Not Barred by Res Judicata**

Here, Defendant exhibits a flawed understanding of the res judicata doctrine in her attempt to dismiss the Plaintiffs' Complaint. "The doctrine of res judicata, or claim preclusion, holds that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. '" *Brown Media Corp. v. K&L Gates*, 854 F.3d 150, 157 (2d Cir. 2017). The *res judicata* doctrine applies if "1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties, 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same." *Id.*  Because of the serious consequences stemming from the application of res judicata or collateral estoppel to a pending lawsuit, courts have exercised strict scrutiny whenever either one of these defenses are raised. *See McMahan & Co. v. Bass*, 680 N.Y.S.2d 238, 239 (1st Dep't 1998) ("[A]n overarching concern in applying the doctrine of res judicata is fairness."). Consequently, courts "remain mindful that if applied too rigidly, res judicata has the potential to work considerable injustice" and deprive litigants of their day in court. *Landau v. LaRossa*, 862 N.Y.S.2d 316, 320 (2008).

Res judicata is therefore strictly applied to deter repetitious litigation where a prior court has already "necessarily decided" the issues. See, e.g., *Menucha of Nyack, LLC v. Fisher*, 974 N.Y.S. 2d 485, 490 (2d Dep't 2013) (holding that while a prior court order ruled on easement issues concerning certain pieces of land, but "did not 'necessarily decide" the issue in the subsequent litigation, "the doctrine of res judicata is inapplicable."); *Landau*, 11 N.Y.3d at 383 (finding that the "doctrine of res judicata gives binding effect to the judgment of a court of competent jurisdiction and prevents the parties to an action, and those in privity with them, from subsequently re-litigating any questions that were necessarily decided therein.")

Defendant references two prior stipulations from the State Action which she argues preclude the instant action under res judicata.  Yet, Defendant fails to acknowledge that these stipulations are just that—stipulations—which were narrowly limited in scope.  In particular, the stipulations were entered into for the sole purpose of resolving certain discovery disputes between the parties. *See Pace v. Hazel Towers, Inc.*, 183 A.D.2d 588, 589, 584 N.Y.S.2d 22, 23 (App. Div. 1st Dept. 1992) (noting that a stipulation should not be accorded "any greater scope" than what the parties intended.).  Critically, neither of these stipulations contain any concession that could be construed as an adjudication on the merits as to any of the pertinent issues raised in this action.  The constitutionality and legitimacy of the underlying investigation is not addressed in any way, nor is there any waiver of Plaintiffs' ability to assert these claims.  Defendant's argument fails to withstand even the smallest measure of scrutiny when considering that the state court has yet to even issue a final adjudication as to the limited discovery issues before it. Defendant has also failed to demonstrate that Plaintiffs had a "full and fair opportunity" to raise the claims at issue here in the State Action. *See*, *Barrington v. New York*, 806 F. Supp. 2d 730, 741-42 (S.D.N.Y. 2011) ("The Court therefore reads the [Davidson v. Capuano, 792 F.2d 275 (2d Cir. 1986)] line of cases for the proposition that a plaintiff who makes use of a limited state proceeding does not sacrifice claims to broader relief available under Section 1983 in federal court. In other words, nothing in res judicata doctrine requires a plaintiff to choose between the limited right the State has given him and the more expansive right Congress has given him to vindicate violations of the Constitution of the United States.")

Defendant also continually alludes to the fact that Plaintiffs have complied in good faith with her baseless investigation for more than two years.  Indeed, Plaintiffs do not dispute that they have complied in such a manner.  Yet, contrary to Defendant's contention, compliance of this sort does not waive or endanger their ability to challenge the legitimacy of the investigation.  Indeed, it is well established under New York law, that compliance with the demands of a subpoena is compulsory, not

consensual, since it is required by law. *See United States v. Simmonds*, 641 F. App'x 99, 104 (2d Cir. 2016) ("[W]here consent is granted only in submission to a claim of lawful authority, the consent is not considered voluntary."); *see also In re Nwamu*, 421 F. Supp. 1361, 1366 (S.D.N.Y. 1976) (finding compliance with a subpoena mere "acquiescence to a claim of lawful authority," not a "voluntary" consent to search.). As the documents Plaintiffs have produced were under the compulsion of subpoena, there has been no voluntary waiver of any right nor any invocation of res judicata.

Therefore, contrary to Defendant's assertion, the instant action is not barred by res judicata.

**J.   Plaintiff has Asserted Valid and Meritorious Claims**

Defendant attempts to argue that Plaintiff's claims are inadequately plead because Plaintiff has failed to show that the "[i]nvestigation is without any legitimate justification." Def. Memo. at 26. First, as detailed in paragraph I(A)(ii)(1), Plaintiff has firmly established that Defendant's investigation was commenced without a factual basis and, to this day, remains wholly unsubstantiated. Second, Defendant's contention that proving the investigation is without merit is a "necessary element of each of [Plaintiff's] claims" is entirely inaccurate and ignores the wealth of case law confirming that an investigation initiated and/or carried on for an improper motive is *per se* unconstitutional. This holds true whether the violation arises from the First Amendment, *see Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.* 426 F.3d 617, 633 (2d Cir. 2005) (holding that viewpoint discrimination is "prima facie, unconstitutional" even if the government action is "reasonably related to legitimate . . . interests."); *Cornelius* v. *NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 812 (1985) (noting that even "valid[] and reasonable[] . . . justifications . . . cannot save" government action that is "based on the desire to suppress a particular point of view"), the Fourth Amendment, *see United States v. Constr. Prods. Research*, 73 F.3d 464, 471 (2d Cir. 1996) (stating that, in the context of the Fourth Amendment, a civil investigation must serve "a legitimate purpose," and the service of subpoenas must be "relevant to the purpose."), or the Fourteenth Amendment, *see Young v U.S. ex rel. Vuitton et Fils S.A.*, 481 US 787,

810 (1987) (noting that the presence of an interested prosecutor, or one who is "influenced by improper motives," is a "fundamental and pervasive error" warranting even reversal of a conviction).

### a. **First Amendment**

The First Amendment condemns government action that restricts or chills speech because of the message conveyed. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints."); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). There is no question that First Amendment protections apply "to investigations as to all forms of governmental action." *See, e.g., Watkins v. United States*, 354 U.S. 178, 187–88 (1957); *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 245 (1957). In this regard, "investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *See Watkins*, 354 U.S. at 187. Indeed, "a public-official defendant who threatens to employ coercive state power to stifle protected speech violates a plaintiff's First Amendment rights, regardless of whether the threatened punishment comes in the form of the use (or, misuse) of the defendant's direct regulatory or decision-making authority over the plaintiff, or in some less-direct form." *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003).

Speech addressing "governmental affairs" and "the manner in which government is operated or should be operated" is consistently recognized as political speech entitled to the utmost protection under the First Amendment. *See Mills v. Alabama*, 384 U.S. 214, 218-19 (1996). It is well-established that the First Amendment affords the "freedom to associate with others for the common advancement of political beliefs and ideas, a freedom that encompasses (t)he right to associate with the political party of one's choice." *Buckley v. Valeo*, 424 U.S. 1, 15 (1976). Indeed, there is the "broadest protection to such political expression 'to assure (the) unfettered interchange of ideas for

the bringing about of political and social changes desired by the people,'" *Id.* (quotation omitted), and is rooted in a "hostility to government action that "prescribe[s] what shall be orthodox in politics," *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 270 (2016) (citation omitted).

Generally, courts recognize two types of government conduct that is proscribed by the First Amendment: (i) viewpoint discrimination and (ii) retaliatory action. Here, Defendant's own words conclusively show that Plaintiff's targeted investigation of Plaintiffs qualifies as both viewpoint discrimination and retaliatory conduct. *See Cornelius v. NAACP,* 473 U.S. 788, 812 (1985) (statements by government officials on the reasons for an action can indicate an improper motive); *see also Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty.*, 653 F.3d 290, 297 (3d Cir. 2011) (noting that, since the government "rarely flatly admits it is engaging in viewpoint discrimination," courts recognize that "statements by government officials on the reasons for an action can indicate an improper motive.").

Viewpoint discrimination occurs when the government "disfavors certain speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30–31 (2d Cir. 2018) (citation omitted); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints."). "[I]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 105 (2d Cir. 2010); see also *Wandering Dago, Inc.*, 87 F.3d 20 at 31 ("[g]overnment 'discrimination against speech because of its message is presumed to be unconstitutional.'").

Likewise, the law is well-settled that the "First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions" for exercising their First Amendment rights." *See Hartman v. Moore*, 547 U.S. 250, 256 (2006). To establish a

retaliation claim, a plaintiff must show that: (1) his conduct was protected by the First Amendment, and (2) such conduct prompted or substantially caused defendant's [retaliatory] action." *Wayte v. United States*, 470 U.S. 598, 608 (1985).

Here, as detailed *ad nauseum* in the Complaint, Defendant has repeatedly, publicly and viciously attacked Trump's political views and has made clear that she vehemently disfavors the policies and ideologies of the former President. As set forth in the Complaint, Defendant has: frequently referred to Trump as an "illegitimate president," *see* Habba Aff., Ex. A. ¶¶ 32, 36, 46, 48, 50, 66; led "die-in" protests against him while claiming that "we are all being killed by [the Trump] administration," *Id.* ¶ 19; accused Trump of showing a "blatant disregard for human lives," *Id.* ¶ 22, engaging in "public corruption," *Id.* ¶ 27, and "defrauding Americans," *Id.* ¶ 51; declared that Trump is waging a "cruel crusade against…invaluable members of our society," *Id.* ¶ 79, claimed that he "doesn't believe in the rights and liberties of marginalized and vulnerable populations," *Id.* ¶ 83; and even accused him of "abus[ing] [the] power" of his presidency, *Id.* ¶ 80. These statements, on their own, provide a standalone basis to infer that Defendant's investigation is motived solely by political animus and that she is intentionally targeting Plaintiffs to tarnish the reputation of Trump and his political party. Yet, drawing such an inference is not necessary since Defendant has *directly acknowledged* that her investigation is driven by her desire to retaliate against him for his political speech. In fact, her entire campaign for New York Attorney General was premised on her promise to "take Trump on" if elected. *See* Habba Decl., Ex. A ¶ 33. She even went so far as to say that she would employ her power as Attorney General as a "sword" against Trump and that she "looked forward to going into the office of Attorney General every day, suing him…and then going home." *Id.* ¶ 36. Her stated objective was to "fight" against "Donald Trump and his harmful administration." *Id.* ¶ 34, by being a "real pain in the ass" to him, *Id.* ¶ 66, and "us[ing] every area of the law to investigate" him and "anyone in his orbit," *Id.* ¶ 56.

That Defendant's conduct and public statements are overtly political cannot be reasonably disputed. She not only staked her election for Attorney General on the defeat and removal of Trump from Presidential office, but since becoming Attorney General, Defendant has made attacking and assailing Plaintiffs a centerpiece of her agenda, even going so far as proclaiming that investigating them "fuels [her] soul." In short, it is beyond dispute that Defendant has, and continues to, use her public position to further the agenda of her political party and advance her own political career.

Therefore, based on the robust, well-sourced allegations set forth in the Complaint, there is no question that Plaintiffs set forth valid and cognizable claims of viewpoint discrimination and retaliation under the First Amendment.

### b. **Fourth Amendment**

The Fourth Amendment expressly prohibits "fishing expeditions into private papers on the possibility that they may disclose evidence of crime." *Fed. Trade Comm'n v. Am. Tobacco Co.*, 264 U.S. 298, 306 (1924). While executive agencies may have broad powers of inquisition, "[t]his is not to say that an agency may conduct any investigation it may conjure up; the disclosure sought must always be reasonable." *United States v. Constr. Prods. Research, Inc.*, 73 F.3d 464, 471 (2d Cir. 1996) (citing *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186, 209 (1946) (additional citation omitted). Indeed, New York courts have consistently held that a subpoena is reasonable when, among other things, "an agency establishes that an investigation will be conducted pursuant to a legitimate purpose, [and] the inquiry may be relevant to the purpose." *United States v. Constr. Prods. Research*, 73 F.3d 464, 471 (2d Cir. 1996).

In accordance with this principle, Plaintiffs have set forth a voluminous record of statements made by Defendant which clearly demonstrate that Defendant's investigation were not "conducted pursuant to a legitimate purpose." *Constr. Prods. Research*, 73 F.3d at 471. Rather, as extensively asserted throughout this brief, Defendant's targeted investigation is guided by an improper motive – she seeks to harass, intimidate, embarrass and retaliate against Plaintiffs due to her personal and political animus.

In other words, Defendant commenced and continued this investigation in bad faith, and it is therefore unconstitutional by design.

Based on the foregoing, Defendant's investigation exceeds the bounds of the Fourth Amendment since it is an "arbitrary fishing expedition" that was commenced for an improper purpose and without a justifiable basis.

### c. **Fourteenth Amendment**

Pursuant to the Fourteenth Amendment, it is guaranteed that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.   In deciding whether a government action implicates due process concerns, courts consider whether the action "'offend[s] those canons of decency and fairness which express the notions of justice of English speaking peoples'…. [and is] 'so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Rochin v. California,* 342 U.S. 165, 169 (1952) (citations omitted).

Due process concerns are particularly relevant in a prosecutorial context, since prosecutors "have available a terrible array of coercive methods to obtain information," including "civil investigatory demands, [and] enhanced subpoena power," the misuse of which "would unfairly harass citizens, give unfair advantage to [the prosecutor's personal interests], and impair public willingness to accept the legitimate use of those powers." *Young v. U.S. ex re. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987).  To guard against this risk, the Fourteenth Amendment expressly prohibits a prosecutor from "injecting a personal interest, financial or otherwise, into the enforcement process." *Marshall v. Jericho, Inc.*, 446 U.S. 238, 249-250 (1980).  Indeed, a "disinterested prosecutor"—one who is not "influenced by improper motives"—is required by due process. *Vuitton*, 481 U.S. at 788.

Here, given the vast array of statements that Defendant has made demonstrating her overt political agenda, coupled with her well-documented disdain for Plaintiffs, she cannot possibly be construed as a disinterested prosecutor in her investigation of Plaintiffs.  Among the vast array of

prejudicial statements outlined in Plaintiff's Complaint, Defendant's pernicious bias is perhaps best exemplified in her callous disregard for the presumption of innocence, a hallmark of prosecutorial ethics which requires a prosecutor to "refrain from speaking in public about pending and impending cases except in very limited circumstances." *United States v. Bowen*, 799 F.3d 336, 353-354 (5th Cir. 2015); *see also* N.Y.R.P.C. 3.6 ("A lawyer who is participating in or has participated in a criminal or civil matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."); ABA M.R.P.C. Rule 3.8 ("[A] [p]rosecutor shall…refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused"); *United States v. Skelos,* 15-CR-317 (KMW), 2018 WL 2849712 at *10 (S.D.N.Y. June 8. 2018) ("[I]t is generally inappropriate for the Government to make extrajudicial statements about guilt.").

Far from merely informing the public of the existence of an on-going investigation, Defendant – as both a candidate and now as Attorney General – has made public pronouncements on countless occasions that amount to determinations that Plaintiffs are guilty of crimes or wrongdoing.  In fact, Defendant has seemingly jumped at every opportunity to do so.  For example, among other things, she has stated: "We need to focus on Donald Trump and his abuses. We need to follow his money. We need to find out where he's laundered money," Habba Aff., Ex. A ¶ 74; "[Trump's] days of defrauding Americans are coming to an end." Id. ¶ 51; "I believe that the president of these United States can be indicted for criminal offenses." Id. ¶ 46-47; and "we're definitely going to sue him. We're going to be a real pain in the ass. He's going to know my name personally," *Id.* ¶ 55.  In addition, Defendant's campaign website accused Trump of engaging in "public corruption." *Id.* ¶ 27.  There is no question that these statements are improper, as they are not only made short of a conviction, but without so much as even an *indictment* against Plaintiffs.  New York federal courts have rebuked

precisely these types of remarks which "bundle together unproven allegations regarding [a] [d]efendant with broader commentary on corruption and a lack of transparency in certain aspects of . . . politics." *United States v. Silver*, 103 F. Supp. 3d 370, 378-79 (S.D.N.Y. 2015). Statements of this nature are inherently prejudicial because "it would not be unreasonable for members of the media or the public to interpret" them "as a commentary on the character or guilt of" the individual or entity under investigation. *Id.* at 379.

Based on the foregoing, it cannot be reasonably disputed that Defendant's repeated public pronouncements concerning Plaintiffs' purported guilt are highly prejudicial, have tainted the public's perception of Plaintiffs, and are a blatant violation of the presumption of innocence.

### d. Abuse of Process

Defendant concludes her motion papers with a half-hearted argument that Plaintiffs' abuse of process claim is legally insufficient. In doing so, Defendant ignores the wealth of case law confirming that Plaintiffs have indeed set forth a valid claim for abuse of process.

Abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 63 N.Y.2d 113, 116 (1984) (citing *Farmingdale*, *supra*, at 403). Here, Defendant does not dispute that Plaintiffs have adequately pleaded the first two elements of abuse of process. Instead, she focuses on the third prong and contends that Plaintiffs have failed to allege that the investigations were undertaken to obtain a "collateral objective." *Id.* In so arguing, Defendant ignores not only the substance of the allegations contained in the Complaint but also the vast amount of case law concerning this issue.

Namely, Plaintiffs' allegation that Defendant "intended to obtain a collateral detriment to Plaintiffs" clearly satisfied this prong, as Plaintiff alleges that Defendant "sought to tarnish [Plaintiffs'] reputation personally, professionally and politically" by seeking to, among other things, "diminish

Trump's likelihood of winning the 2020 Presidential Election, bring about the end of Trump's political career, and injure Plaintiffs' business relations in the State of New York." *See* Habba Dec., Ex. A ¶ 152(b).  The Complaint contains numerous facts supporting these allegations, such as Defendant's promise that she would "join with law enforcement and other attorney generals across the nation in *removing this President from office,*" *Id.* ¶ 47, her ominous warning that "the days of Donald Trump are coming to an end," *Id.*, her promise to "take on [Trump] and his business in New York," *Id.* ¶ 43, and the litany of statements demonstrating her continuous pattern of publicly demeaning, belittling and defaming Plaintiffs, *see generally Id.*  These statements, which are premised on Defendant's misuse of the legal process to harass, demean and embarrass Plaintiffs and to harm their reputation and business relations, are undoubtedly sufficient to establish that Defendant intended to obtain a "collateral objective." *See D'Amico v. Correctional Med. Care, Inc.*, 120 A.D.3d 956, 960 (4th Dep't 2014) (finding that employing legal process for the purpose of "demeaning, humiliating, or defaming" is a collateral objective); *see also Levine v. Sherman*, 86 Misc 2d 997, 1000 (Sup. Ct. 1976) ("The court's process is abused when it is used to harass"); *Marwood Mech., Inc. v. Davis & Warshow, Inc.*, 50 A.D.2d 900, 900 (2d Dep't 1975) (finding collateral objective when legal process is utilized to "inflict substantial damage upon plaintiff's business"); *Schulman v. Anderson Russell Kill & Olick, P.C.*, 117 Misc 2d 162, 172 (Sup. Ct. 1982) (finding collateral objective when process employed to "harm [the plaintiff's] reputation and damage his business.").

Based on the foregoing, Plaintiffs have asserted a meritorious claim of abuse of process.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss must be denied in its entirety.

Dated: February 16, 2022      Respectfully submitted,
  New York, New York

                Alina Habba, Esq.
               **HABBA MADAIO & ASSOCIATES LLP**