# EXHIBIT C

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 2 of 39

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | Index No. 451685/2020 |
| Petitioner, | Motion Seq. No.: 008 |
| -against- | Oral Argument Requested |
| THE TRUMP ORGANIZATION, INC.; DJT HOLDINGS LLC; DJT HOLDINGS MANAGING MEMBER LLC; SEVEN SPRINGS LLC; ERIC TRUMP; CHARLES MARTABANO; MORGAN, LEWIS & BOCKIUS, LLP; SHERI DILLON; MAZARS USA LLC; DONALD J. TRUMP; DONALD TRUMP, JR.; and IVANKA TRUMP, | |
| Respondents. | |

**MOVING PARTIES' JOINT MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO QUASH AND/OR STAY SUBPOENAS AND IN
OPPOSITION TO THE ATTORNEY GENERAL'S MOTION TO COMPEL**

## PRELIMINARY STATEMENT

In its 160 page response to Respondents' Motion showing that the Attorney General is seeking to use "office" subpoenas to avoid the grand jury protections guaranteed to every witness even though the OAG is entwined in a criminal grand jury investigation of the very same matters – the OAG punts. The OAG deliberately avoids addressing the extent of its coordination with the District Attorney's Office (DANY). And it studiously avoids any mention of the public statements of its leadership. Indeed, the OAG runs from the words of Letitia James, deliberately avoiding the fact that she has taken equal ownership of the current criminal case and the ongoing grand jury investigation. And the OAG runs from Letitia James's statements that have improperly and repeatedly threatened investigation and prosecution of former President Trump and his family as a campaign promise to garner votes, money and support, and now, as Attorney General, to gain political support.

And the OAG runs from the very issue presented in this case – which is certainly not about whether garden variety parallel investigations are permitted under federal law. In over 160 pages of memoranda and Declarations, the OAG's responsive papers avoid answering the question presented: whether the OAG -- a law enforcement agency in New York, actively participating in a criminal prosecution where a grand jury is impaneled and is targeting certain people and circumstances -- violates the rights of those same targeted people under the New York Constitution and CPL 190.40 when it simultaneously requests their testimony under the guise of a supposedly administrative "office" subpoena.

Instead, the OAG writes about something else – deciding to reveal *ad verbosus* the current state of its investigation, with a throw-in of some discovery disputes. While we appreciate the free disclosure, the OAG's response completely sidesteps the legal and factual issues presented in the

Movants' Motion to Quash (Movants' MOL) (ECF 354)(Jan. 3, 2022).[1] An evidentiary hearing is requested. (*See* POINTS ONE and TWO, *infra*).

We address the OAG's deficiencies head on. We demonstate that the OAG's attempt to rely on federal standards is misplaced since those standards are not consistent with New York's Constitution and CPL 190.40 (POINT ONE (A)); the OAG's response flatly admits an endeavor to circumvent New York's Constitution and CPL 190.40 (POINT ONE (B)); the OAG's plan squarely violates New York's Constitution and CPL 190.40 (POINT ONE (C));  the authorities cited by the OAG are inapplicable to the facts here and, indeed, fail to address relevant authorities (POINT ONE (D)); and as much as they wish to ignore them,  Letitia James's statements are material and  binding on the OAG (POINT ONE (E)). POINT TWO addresses the alternative request for a stay.

The OAG's MOL Response also cross-moves to compel document disclosure and testimony. For efficiency and the convenience of the Court, this Reply Memorandum of Law responds to that motion as well. In this regard, we cannot ignore the obvious. Many years ago, then United States Attorney General Robert Jackson famously warned that "the most dangerous power of the prosecutor" is that he "will pick people that he thinks he should get, rather than pick cases that need to be prosecuted." The Federal Prosecutor, an Address by Robert H. Jackson,

---

[1] The Memorandum of Law in Support of Respondents/Moving Parties Donald J. Trump, Donald J. Trump, Jr., and Ivanka Trump's Motion to Quash Subpoenas or, in the Alternative, to Stay Enforcement of the Subpoenas or, in the Alternative, to Stay Enforcement of the Subpoenas Pending Resolution of the Criminal Investigation (the "Movants' MOL") (ECF 354), filed January 3, 2022, includes their Amended Notice of Motion (ECF 321); the January 3, 2022 Affirmation of Alan S. Futerfas (the "First Futerfas Aff.") (ECF 322); the Exhibits attached to the First Futerfas Aff. (Exhibits A-EE) (ECF 323-253); and the Memorandum of Law in Support of Respondents/Moving Parties Donald J. Trump, Donald J. Trump Jr., and Ivanka Trump's Motion to Quash Subpoenas or, In the Alternative, to Stay Enforcement of the Subpoenas Pending Resolution of the Criminal Investigation (ECF 354). The Moving Parties incorporate by reference those filings herein.

Attorney General of the United States (April 1, 1940). He warned that rather than "discovering the commission of a crime and then looking for the man who has committed it," a prosecutor may, instead, be "picking the man and then searching the law books, or putting investigators to work, to pin some offense on him." *Id*. "It is in this realm," Jackson explained, "in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies." *Id*.

   As demonstrated below and in response to the OAG's Motion to Compel, what Attorney General Letitia James has done in this case is exactly what Justice Jackson warned against more than 80 years ago. For the last three years, Ms. James has relentlessly targeted former President Donald J. Trump, his family, his companies and his associates because of her dislike of his speech and political views. It is a blatant and obvious attempt to suppress his voice, interfere with his political ambitions and silence the will of millions of voters – a violation of our nation's most fundamental constitutional rights. Rather than follow the evidence, Ms. James has made clear in her own words – over and over again – that she would, "pick the entities and individuals they wanted to harass" and then "search[ ] the law books" and "put investigators to work" in an effort to "pin some offense" on them. *Id*.  Even more concerning, Ms. James has targeted these individuals and entities, not in secrecy but, rather, unabashedly and publicly without reservation and without expressing the slightest concern that her actions violate the most basic ethical and professional duties of prosecutors. We cannot ignore these facts. For these reasons, in response to the OAG's Motion to Compel, the Respondents/Movants raise the defense of Selective Prosecution. The claim of Selective Prosecution here is not just amply supported – the evidence is

overwhelming from the record, as amplified in this Reply. An evidentiary hearing is requested. (*See* POINT THREE, *infra*).

## ARGUMENT

## POINT ONE

### THE OAG'S SUBPOENAS VIOLATE CPL § 190.40 AND THE NEW YORK STATE CONSTITUTION AND SHOULD BE QUASHED

**A.  The OAG's Reliance on Federal Law and Standards is Misplaced. New York's Constitution and CPL 190.40 Enumerate More Protective Legal Standards Governing Witnesses in a Criminal Investigation**

The question presented in this case is whether the OAG, a law enforcement agency in New York actively participating in a criminal prosecution where a grand jury is impaneled, and which criminal investigation is targeting certain people and circumstances, violates the rights of those same targeted people under the New York Constitution and CPL 190.40 when it simultaneously requests testimony that will be used in the criminal investigation under the guise of a supposedly administrative "Office" subpoena?

The OAG avoids this question and cites, instead, to the federal DOJ Manual, federal cases and what it asserts is practice in the federal arena (OAG MOL Response at 21-25), to argue that because a federal agency such as the DOJ can simultaneously engage in civil and criminal investigations, the OAG can do the same here. *Id*. at 25-26.  But it is wrong. The New York Constitution, as interpreted by the Court of Appeals, and the CPL promulgated thereunder, created protections for subpoenaed witnesses that federal law does not provide. Under the New York Constitution and the CPL, an agency conducting a criminal investigation through an active grand jury is required, if the witness is subpoenaed, to examine the subject or target of the investigation before the grand jury.

New York Constitution Article I, § 6 guarantees that "No person shall be held to answer for a capital or otherwise infamous crime . . . unless on indictment of a grand jury . . . . No person shall . . . . be compelled in any criminal case to be a witness against himself or herself." N.Y. Const. art. I, § 6. In New York, the right against compelled incriminating testimony is broader than its federal counterpart. Under the New York Constitution, "a prospective defendant or one who is a target of an investigation may not be called and examined before a Grand Jury and, if he is, his constitutionally-conferred privilege against self-incrimination is deemed violated even though he does not claim or assert the privilege.'" *People v. Steuding*, 6 N.Y.2d 214, 216–17 (1959) citing *People v. De Feo*, 308 N.Y. 595, 603 (1955); *People v. Ferola*, 215 N.Y. 285, 288–89 (1915); *People v. Gillette*, 126 App. Div. 665, 667 et seq. (1st Dep't 1908); *People v. Bermel*, 71 Misc. 356, 359 (N.Y. Sup. Ct. 1911). "An automatic result of the violation of this constitutional privilege is that the defendant is protected not only from indictment based on any incriminating testimony which he may have given, but also from use of such evidence. And the right and protection thus accorded by the Constitution may not be taken away or cut down by statute." *People v. Steuding*, 6 N.Y.2d 214, 217 (1959).

The constitutional principal that no prospective defendant may be compelled to give testimony before the grand jury is codified in CPL 190.40, which provides that "A witness who gives evidence in a grand jury proceeding receives immunity[.]"[2]

As the Commentary explains:

> The automatic immunity feature provided in this section was put forward as a method of solving a long and tangled history of confusing litigation revolving about the issue of the rights of a suspect or "target" subpoenaed to give evidence before the Grand Jury. The Court of Appeals has held that compelling a target to appear before the Grand Jury violates the New York constitutional Privilege

---

[2] CPL § 190.40(2) includes three excerptions not pertinent here.

Against Self-Incrimination (see e.g., *People v. Steuding*, 6 N.Y.2d 214, 189 N.Y.S.2d 166, 160 N.E.2d 468 (1959). Moreover, various other holdings have ruled that such witnesses not only would have immunity but also could not be charged with perjury or contempt for their answers or refusal to answer (see Judge Denzer's original practice commentary for the present section in the 1971 edition of this volume). Accordingly, the CPL neutralized the New York constitutional problems by granting automatic immunity to all witnesses, so that a subpoena to appear and give evidence would not violate the rights of any witness, whether target or not.

Peter Preiser, Commentary to CPL 190.40 (McKinney).

For these very reasons, the OAG's reliance on the federal DOJ Manual is misplaced. (*See* OAG MOL Response at 23-25). The U.S. Department of Justice operates within federal constitutional bounds, but it need not comply with New York's Constitution. Neither the federal Constitution, nor any federal statute, grants automatic immunity to a grand jury witness. Indeed, under federal law, immunity for a witness can only be obtained by application to a federal judge for a grant of immunity under 18 U.S.C. § 6002. There is thus no reason or motivation for DOJ agencies and prosecutors to circumvent the grand jury.

New York law is different; witnesses in grand jury investigations are granted automatic immunity in the grand jury. Accordingly, there is a strong motivation for New York City and State investigations to avoid putting witnesses before the grand jury, *ergo* the instant "office" subpoenas. Indeed, as we discuss directly below, the OAG's responsive papers <u>effectively admit</u> that they are endeavoring to circumvent CPL § 190.40 and deprive the Moving Parties of their constitutional rights.

**B.    In an Extraordinary Admission, the OAG Reveals that the Purpose of the "Office" Subpoena is to Support the Criminal Investigation in Direct Circumvention of the Moving Parties' New York Constitutional and Statutory Rights**

In Movants' MOL, we asserted that the OAG and DANY were both investigating valuation matters involving the same properties. The OAG's 115 page Petition conclusively concedes this

7

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 9 of 39

fact: they are looking into the identical properties as the criminal investigation. But their responsive papers reveal much more. Utilizing the inapplicable (Federal) DOJ Manual, the OAG's papers admit that they fully intend to use the "office" subpoenas for testimony and documents to support, buttress and further the OAG's criminal investigation. *See* OAG's MOL Response at 23 ("The DOJ recognized [in 1997] that '[i]n order to maximize the efficient use of resources, it is essential that our attorneys consider whether there are investigative steps common to civil and criminal prosecutions' and '[w]hen appropriate, criminal [and] civil . . . attorneys should coordinate an investigative strategy,' noting in particular that 'evidence can be obtained without the grand jury by administrative subpoenas' . . . and 'can then be shared among the various personnel responsible for the matter.'") (quoting from the 1997 DOJ Justice Manual) (emphasis added**); OAG's MOL Response at 24 ("During the investigation, attorneys should consider investigative strategies that maximize the government's ability to share information among criminal, civil, and agency administrative teams, including the use of investigative means other than grand jury subpoenas for documents or witness testimony . . . .") *Id.* (emphasis in original).

The endeavor to bypass the grand jury protections of New York's Constitution and CPL 190.40 is thus made crystal clear for all to see. "The Attorney General's position calls to mind the venerable prohibition on public officials doing indirectly what they are forbidden from doing directly." *People ex rel. Spitzer v. Grasso*, 42 A.D.3d 126, 140, n. 9, 836 N.Y.S.2d 40 (1st Dept. 2007), citing *Matter of Diamond Asphalt Corp. v. Sander,* 92 N.Y.2d 244, 259, 678 N.Y.S.2d 567 (1998); *People ex rel. Burby v. Howland,* 155 N.Y. 270, 280–281, 49 N.E. 775 (1898).  As starkly presented by the OAG here, the agency that is co-prosecuting the criminal case, and conducting an ongoing grand jury criminal investigation, is seeking testimony through an "office"

subpoena that it fully intends to use in the criminal case - without providing to the witnsses the protections guaranteed under New York law. The OAG's improper plan is plain.

### C.   The OAG's Plan Violates the New York Constitution and CPL 190.40. The Court Should Not Permit the OAG to Eviscerate New York's Constitutional Protections or the Legislature's Statutory Requirements

As envisoned by the OAG, New York's Constitutional and statutory protections can be easily avoided, indeed, eviscerated, if the same agency involved in the criminal investigation simply opens a "civil" investigation into the very same matters. But the protections that New York provides cannot be so easily nullified. The law is clear that constitutional provisions and statutes are to be interpreted to effectuate the intent and purpose of the protections or obligations set forth therein.

This principle was made clear in *People v. Coss*, 178 A.D.3d 25, 28, 111 N.Y.S.3d 137 (3d Dept. 2019). There, the Third Department interpreted CPL 195.20 to be consistent with Article 1 § 6 of the N.Y. Constitution which provides an exception to the requirement that felony charges be prosecuted by indictment by a grand jury where "a person . . . may waive indictment by a grand jury and consent to be prosecuted on an information." CPL 195.20 provides that a superior court information (SCI) "may include any offense for which the defendant was held for action of a grand jury and any offense or offense properly joinable therewith . . ." *Id.* at 27.

The question presented in *Coss* was whether, "under CPL 195.20, and consistent with the constitutional waiver provision, an SCI that charges an offense for which a defendant was held for action of the grand jury may also charge a *joinable* offense which is 'higher in grade or degree than the triggering offense.'" *Id.* at 28. The *Coss* Court recognized that the plain language of the pertinent provision in CPL 195.20 did not appear to prohibit such a charge. However, permitting an offense of higher grade to be joinable in the SCI would frustrate the intent of the legislature

which was to "strike a balance between judicial efficiency and the constitutional right to prosecution by indictment." *Id.* at 30.

In a holding directly applicabable here, the Third Department held that a literal interpretation of CPL 195.20 would "circumvent" and "undermine[] the protections provided in N.Y. Constitution, article I, sec. 6."

> A literal interpretation of the phrase "any offense or offenses properly joinable therewith" in CPL 195.20 would permit the circumvention of this constitutional imperative by the simple expedient of permitting the inclusion of joinable offenses in a higher degree or grade that were never charged in a felony complaint. Such a statutory interpretation is inconsistent with and undermines the protections provided in N.Y. Constitution, article I, § 6. It is well settled "that the Legislature in performing its law-making function may not enlarge upon or abridge the Constitution" (*People v. Allen*, 301 N.Y. 287, 290, 93 N.E.2d 850 [1950]), and that "courts must avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional." (*Overstock.com, Inc. v. New York State Dept. of Taxation & Fin.*, 20 N.Y.3d 586, 593, 965 N.Y.S.2d 61, 987 N.E.2d 621 [2013], *cert denied* 571 U.S. 1071, 134 S.Ct. 682, 187 L.Ed.2d 549 [2013] ).

*Id.* at 30. (Emphasis added) *See also People v. Reichman*, 26 N.Y.Crim.R. 313, 73 Misc. 212 (N.Y. Co. July 1, 1911)(prosecutor deprived defendant of his grand jury protections by hauling him before a judge to answer questions without the privilege against self-incrimination, resulting in his indictment. "There are certain constitutional protections thrown around those accused of crime that prosecuting officers are constantly striving to circumvent and destroy.")

Similarly, the Court of Appeals rejected a Freedom of Information Law (FOIL) request that would have effectively circumvented a statutory scheme designed to protect personnel records of police officers. In *Matter of New York Civ. Liberties Union v. New York City Police Dept,* 32 N.Y.3d 556, 94 N.Y.S.3d 185 (2018), the question was the enforcement and interpretation of Civil Rights Law § 50-a. That law requires police officer personnel records to be kept confidential and notice given to the police officer and a court order obtained before any disclosure was made. In response to the FOIL request, and recognizing compelling policy arguments in favor of disclosure,

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 12 of 39

the lower court ordered the NYPD to produce disciplinary records after redacting the identity of the subject of the complaints. The Court of Appeals found that this solution would "eviscerate the legislature's mandate" reflected in Civil Rights Law § 50-a.

> [T]he legislature made the "policy choice" to "shield the personnel records of these officers from disclosure" by extending broad statutory protection while providing only limited exceptions for their release [citation omitted]. We are not at liberty to second-guess the legislature's determination, or to disregard—or rewrite—its statutory text (*see Matter of Wolpoff v Cuomo*, 80 N.Y.2d 70, 79 (1992). The alternative "redacted disclosure" regime proposed by the parties would eviscerate the legislature's mandate. Civil Rights Law § 50-a sets up a "legal process whereby the confidentiality of the records may be lifted by a court, but only after an in camera inspection and affording affected parties notice and an opportunity to be heard" (*Daily Gazette*, 93 NY2d at 154). The parties' proposal would, instead, enable an agency to circumvent the host of statutory protections belonging to covered officers by simply applying redactions that the agency, in its sole discretion, deems adequate. That scheme would transform Civil Rights Law § 50-a into an optional mechanism applicable only when (and if) the agency chooses to invoke it.

Id., 32 N.Y.3d at 567. (Emphasis added).

These cases apply with full force here. The OAG's interpretation of CPL 190.40 is that it applies, unless the investigating body has a "civil" investigation into the very same matters being investigated by the grand jury – and then it doesn't. Under this interpretation, the OAG and/or the DANY could strip grand jury witnesses of the protections guaranteed by Art. I § 6 and CPL 190.40 at will by the simple expedient of having the OAG serve civil subpoenas with the resulting testimony provided to the joint criminal investigation. Neither the New York Constitution nor the legislature intended for the OAG to, at will, "eviscerate the legislature's mandate" reflected in CPL 190.40 through the use of "office" subpoenas to obtain testimony it would use in a criminal investigation.[3] That is not, and cannot be, the law.

---

[3] For these reasons, OAG cannot draw support from this Court's previous order compelling Eric Trump's compliance with an office subpoena. (*See* OAG Response at 10) While that

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 13 of 39

### D.    The OAG's Cited Authorities are Inapplicable to the Facts Presented Here; and the OAG Failed to Provide the Relevant Authorities Cited Below

Ignoring its boss's public statements,[4] the use of OAG prosecutors,[5] the sharing of information, and the display of a joint prosecution, evident from the conduct of Ms. James and Mr. Vance at the arraignment, the OAG pretends that this is a garden variety parallel investigation. That is simply not an honest description of this case.[6]

---

subpoena was pending, OAG represented in July 2020 that it was not conducting a criminal investigation nor coordinating with any other law enforcement agency in a criminal investigation of the matters at issue. *See* Movants' MOL at 5, *citing* Colangelo Aff. at ¶ 109. That representation implicitly acknowledged that Eric Trump's grand jury rights would otherwise be implicated, i.e., that OAG could not have obtained Eric Trump's testimony if it were pursuing its own criminal investigation or coordinating with DANY. These circumstances no longer adhere, and OAG cannot have it both ways. Having decided to pursue a criminal investigation into these matters, it cannot violate witnesses' grand jury rights by exercising an exclusively civil discovery tool available for civil investigations.

[4] *See Statement from Attorney General James on Criminal Indictment of Trump Organization and CFO Weisselberg*, Office of the N.Y. Attorney General Press Release, July 1, 2021 annexed to the First Futerfas Aff. as **Exhibit CC**); Transcript of Excerpts from *The View* (ABC television Broadcast Dec. 14, 2021) annexed as **Exhibit D** to the First Futerfas Aff.); Michael Sisak, *New York AG has 2 lawyers working with DA on Trump probe*, ABC NEWS, May 21, 2021 annexed to the First Futerfas Aff as **Exhibit R**.

[5] *Id.*

[6] Though the OAG has publically stated on numerous occasions that her office is conducting a "joint" investigation with the DANY, the only place in the OAG's papers where it even ventures to characterize the nature of its joint investigation with the DANY is in footnote 22, where it obliquely refers to the "cross-designation of OAG attorneys to DANY." (OAG MOL Response at n. 22) While presumably accurate, the reference is hardly limiting, and the OAG studiously avoids any discussion of the "joint" OAG/DANY criminal investigation in its 115-page Petition, where it talks about everything but its work with DANY (which is why we request an evidentiary hearing). The decision in *Haggerty*, cited by the OAG in n. 22, is instructive. There, the Court of Appeals held that the cross-designation of Assistant Attorneys-General to the local District Attorney did not violate Executive Law §63(2) because "the record is devoid of any proof of any appearance by the Attorney-General in any of the criminal proceedings in this case, either personally or on his behalf." *Haggerty v Himelein*, 89 N.Y. 2d 431, 436 (1997) Here, the opposite is true. The Attorney General theatrically entered the courtroom with then-District Attorney Cyrus Vance and sat with him in the front row of the courtroom. (*See* Melissa Macaya, Melissa Mahtani, Maureen Chowdhury, Veronica Rocha and Fernando Alfonso III, *Trump Organization and its*

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 14 of 39

The cases cited by the OAG do not reflect the facts of this case and thus do not provide an answer to the question presented by the Motion to Quash.[7]  For example, the OAG cites to a federal decision, *United States v. Kordel*, 397 U.S. 1, 4-8 (1970), for the rather standard proposition that the government may pursue parallel civil and criminal investigations and that the government is not required to stay or forego either investigation.  OAG MOL Response at 27-28, citing *Kordel*, 397 U.S. at 11. But as the OAG recognizes, the *Kordel* court placed limitations on improper government conduct.  *Id.* at n. 24. Indeed, to salvage its reliance on *Kordel*, the OAG claims that "Respondents do not and cannot allege any improper purpose here." *Id.*

The OAG is mistaken. The Moving Parties have been crystal clear from the get-go that the OAG's purpose is improper.  Movants allege – and the OAG has now admitted – that the purpose of issuing the subpoenas is to circumvent the grand jury process. *See* Point One (B), *supra*. And, this investigation is predicated on improper animus toward President Trump and Letitia James's corresponding campaign promises to prosecute Mr. Trump, his family, associates, and companies. *See* Point Three, *infra*. Finally, federal law, including *Kordel*, sets a floor, not a ceiling, on constitutional protections. New York law affords prospective criminal defendants and targets of grand jury investigations greater protections than federal law. *See People v. Steuding*, 6 N.Y.2d 214 (1959); N.Y. Const. art. I, § 6; and CPL 190.40. *See* Discussion at Point One (A), *supra*.

---

*CFO Charged with Tax Crimes*, CNN, Jul. 1, 2021, annexed to the First Futerfas Aff. as **Exhibit AA**) She then proceeded to give a post-arraignment press conference.  And Ms. James has repeatedly asserted that her office indicted the Trump criminal case on July 1, 2021 and is fully engaged in the ongoing criminal grand jury investigation. *See generally,* Movants' MOL at 2, 6-10.

[7] Contrary to the OAG's assertions (*see* OAG's MOL Response at 26), Movants accurately described the law governing run of the mill parallel investigation cases. *See* Movants' MOL (ECF 354) at 12-14.

The OAG also relies on *Access Capital v. DeCicco*, 302 A.D.2d 48, 49-50 (1st Dept 2002). *See* OAG MOL Response at 26. Other than its discussion of a stay, *Access Capital* bears no relationship to the facts in the case. *Access Capital* involves a private civil litigation over Super Bowl tickets, on the one hand, and a subsequent criminal prosecution about those same events, on the other. The defendant, DeCicco, asserted the fifth amendment in his answer to the civil complaint and apparently presented no other evidence to defeat summary judgment. The court found that plaintiff's evidence, combined with DeCicco's failure of proof, was sufficient to sustain summary judgment. That case in no manner compares to the facts here where New York's principal law enforcement agency, the OAG, working hand in hand with the DANY, and taking equal responsibility for criminal charges and an ongoing <u>grand jury investigation</u>, issues "civil" subpoenas to potential targets to deprive them of the protections afforded by that very same grand jury process.

Similarly, *New York State Comm'n on Gov't Integrity v. Congel*, 156 A.D.2d 274, 275 (1st Dep't 1987), also relied on by the OAG, concerns a real estate development group in Syracuse. It has nothing to do with joint investigations and whether an investigative agency, with an active grand jury, can evade the protections of CPL 190.40. There is no reference in the opinion to a simultaneous criminal investigation, and the decision turns on the First Department's interpretation of the scope of Executive Order No. 88.1 (9 NYCRR 4.88).

*Campbell v. New York City Transit Auth.,* 32 A.D.3d 350, 351 (1st Dep't 2006), also cited by the OAG (*see* OAG MOL Response at 27), concerns a civil arbitration proceeding for a fired Transit Authority employee, on the one hand, and an arrest and prosecution by DANY for the same

misconduct, on the other. Put simply, *Campbell* is a run of the mill parallel civil and criminal proceedings case. It has no factual relevance to the unprecedented circumstances at issue here.[8]

Faced with a lack of factually relevant precedent under New York law, the OAG resorts to federal constitutional and statutory law and process. But, as we have shown above (*see* Point One (A)), those authorities are inapplicable because they arise under federal law, which is markedly different from New York's Constitution and governing CPL 190.40.

Indeed, the most analogous and relevant federal authorities are not cited by the OAG. For example, in *United States v. Bases*, No. 1:18-cr-00048 (N.D.Ill. February 24, 2021), information in the possession of the DOJ from the Commodity Futures Trading Commission (CFTC) was held discoverable under *Brady* because the DOJ and CFTC's extensive coordination and information sharing constituted a "joint investigation." The investigation concerned trading activities among various financial institutions and their traders, particularly market manipulation in the precious metals futures markets. The evidence showed that from 2015 until charges were filed in 2018, the DOJ and CFTC shared information and jointly participated in interviews, meetings, and calls.

In arguing against a finding of a joint investigation, the DOJ asserted that the CFTC's involvement was limited, since it attended only some of the witness interviews and provided trading data only in response to an access request. Similarly, the CFTC argued that its investigation was conducted parallel to, not jointly with, the DOJ. Both agencies cited cases holding that jointly attended witness interviews were not enough to find a joint investigation.

The Court rejected these arguments and found a coordination of efforts investigating the same allegations. In particular, CFTC and DOJ sought production of the same documents from the same investment bank around the same time, and the investment bank "made sure" in its response

---

[8] The *Campbell* decision's discussion of a Stay is addressed in POINT TWO *infra*.

to the DOJ's information requests that it included data it had already provided to the CFTC. *Id.* at

*4. In addition, a chief trial attorney for CFTC, who was "detailed" to the DOJ's investigation to

develop his attorney skills, "admit[ed] (without further elaboration) that he had multiple contacts

and calls with the CFTC as part of the DOJ's prosecution team." *Id.*

Topping off this proof, the district court cited the press statements. Officials representing

the CFTC and DOJ jointly announced criminal charges against eight individuals on the same day.

*Id.* (citing press releases). The public statements praised their shared commitment to bringing the

criminal case. "The DOJ's press release emphasized that the CFTC 'is committed to identifying

individuals responsible for unlawful activity and holding them accountable' and that the DOJ

received 'invaluable assistance from' the CFTC." *Id.* In sum, the *Bases* court found that "extensive

cooperation, joint participation, and sharing of resources between the CFTC and DOJ related to

the investigation of this case" constituted a joint investigation triggering *Brady* obligations. *Id.* at

6.

In *United States v. Connolly*, 2019 WL 2120523 (May 2, 2019)(McMahon, J), *rev'd on

other grounds,* 2022 WL 244669 (2d Cir. Jan. 27, 2022), another case not cited by the OAG, the

district court found that an outside entity, Deutsche Bank (DB), had effectively served as an arm

of the government to extract statements from its own employees in the course of an internal

investigation into the manipulation of the London Inter-Bank Offered Rate ("LIBOR"). *Id.* at *1.

Accordingly, the Court held that DB's attorneys were essentially acting as agents of the US

Attorney's office and thus statements made by a bank employee to DB's lawyers, Paul Weiss,

were improperly obtained in violation of the employee's Fifth Amendment rights.

The *Connolly* court found that early in the investigation, Deutsche Bank cooperated in the

hopes of receiving cooperation credit and "that the Government was kept abreast of developments

on a regular basis, and that the federal agencies gave considerable direction to the investigating Paul Weiss attorneys, both about what to do and about how to do it." *Id.* at *3*. Indeed, "Deutsche Bank representatives and counsel continued to update the Government about their findings and coordinate next steps" and directed DB and Paul Weiss's activites. *Id.*

Further, Paul Weiss procured numerous interviews of bank employees, the results of which it provided to the government. Because there was a "close nexus" between the government and the company interviews, Judge McMahon found that the Fifth Amendment rights of employees of Deutsche Bank were triggered since Paul Weiss had conducted the interviews effectively as an arm of the government. *Id.* at *11, 14-15.

The facts in the matter *sub judice* are far more compelling than those presented in *Connolly*. Here, the OAG isn't a mere non-governmental party. It is the state's principal law enforcement agency and is actively, admittedly, and publicly, stating that it is criminally prosecuting the Trump Organization (TTO) and is investigating the Respondents/Movants with DANY. The obligations and responsibilities in a criminal investigation are not subject to fanciful claims of severability. Letitia James said that her office indicted TTO and Mr. Weisselberg and continues to investigate with a grand jury with DANY. She and her office are bound by the same Criminal Procedure Law protections that DANY is, just like SDNY's legal obligations carried over to the private, non-governmental business, Deutsche Bank.[9]

---

[9] The degree of coordination and information sharing between the OAG and DANY in the grand jury investigation is clearly relevant to the issues presented, and a hearing is warranted.

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 19 of 39

**E. The OAG's Filings Deliberately Ignore Attorney General James' Statements, which are Binding on the OAG in this Litigation**

Lastly, the OAG refuses to address Letitia James's numerous improper statements, but they cannot be ignored. In fact, as we show herein, they are admissible and binding on the OAG.

In Movants' MOL, the Moving Parties brought to the Court's attention numerous statements Attorney General James made to the public, including her appearance on the television show, *The View*, as well as the spectacle of Ms. James and then-DA Cyrus Vance entering the Courtroom together on the day of the criminal case arraignment (July 1, 2021), and sitting together during the proceedings in an obvious display of co-equals in the prosecution of the case.[10] In the course of 160 pages of responsive filings (*see* the OAG's Notice of Cross-Motion (ECF 357); OAG's MOL Response (ECF 359); Supplemental Verified Petition (ECF 630) (Jan. 18-19, 2022), the OAG utterly fails to address, refute, or even comment upon these statements and actions.[11]

---

[10] As if Letitia James's own statements were not enough, Michael Cohen, interviewed extensively by the OAG and DANY, stated that Ms. James is "working in concert as well with the District Attorney. I've seen the boxes, they have more than ten million documents." *See* Transcript of an excerpt from Michael Cohen's appearance on *CNN Newsroom with Alisyn Camerota and Victor Blackwell* (CNN television broadcast Jan. 19, 2022) annexed to the Second Futerfas Aff. as **Exhibit 2A**.

[11] On the other hand, the OAG chose to include (and publicize) irrelevant past discovery disputes it had with The Trump Organization ("TTO") that were previously resolved by the parties in the ordinary course following meet and confer calls. *See* OAG Supplemental Verified Petition dated January 19, 2022 at pp.91-95, para.'s 321-336. As this Court is aware, the production issues for TTO are covered by a Stipulation, and TTO's production is on-going. *See* Docket No. 314. As per its obligations under the Stipulation, TTO has continued to "work diligently" to comply with its production responsibilities. *See* Stipulation at para 2. Indeed, since the Stipulation was entered into, TTO has been producing thousands of documents each week (in excess of 750,000 by the OAG's own admission), all while keeping the OAG updated on its progress with weekly progress reports. With respect to the OAG's subpoena duces tecum served on Donald J. Trump, counsel for Mr. Trump, Ronald P. Fischetti, and the OAG agreed to stay the subpoena pending the filing of the motion to quash and its resolution by this Court.

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 20 of 39

The OAG's reticence is understandable. Ms. James' public statements express ownership of the criminal investigation; assume and imply wrongdoing on behalf of the moving parties; concern an active investigation; expose extraordinary animus on the part of Ms. James; and potentially poison the jury pool.[12] Her statements thus utterly refute the rather absurd notion raised in the OAG's responsive papers that this case presents a garden variety parallel investigation permitted under the law.

As Attorney General, Letitia James' statements are imputed to, and are binding upon, the OAG. Her statements have the force and effect of statements by the OAG. *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 465 (2010) ("the acts of agents [i.e. the Attorney General], and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals [i.e. the OAG][.]"); *see also Loschiavo v. Port Authority*, 58 N.Y.2d 1040, 1041, 462 N.Y.S.2d 440 (1983)(statement admissible against employer where "the making of the statement is an activity within the scope of his authority") (citations omitted); *Fernandez v. State of New York*, 2002 WL 31955397, at *3, n. 3 (Ct. Cl. 2002) (superintendent had authority to speak for correctional facility, and statements made during labor management meeting were clearly within scope of his duties).

Indeed, the statements of a party can be used as direct evidence of the matters asserted. *See United States v. GAF Corp.*, 928 F.2d 1253, 1262 (2d Cir. 1991) (holding admissible the government's prior statements as inconsistent with the theory of the case it presented to the jury); *United States v. McKeon*, 738 F.2d 26, 33 (2d Cir. 1984) (holding that a prior statement made by

---

[12] They are wholly inappropriate coming from the Attorney General of the State of New York, the highest law enforcement position in the State. Indeed, by making these statements, Ms. James has potentially violated her ethical responsibilities as an attorney barred in New York. *See* POINT THREE *infra*.

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 21 of 39

defendant's attorney during opening statement was properly admitted against the defendant in a subsequent trial.) "In a civil action, the admissions by a party of any fact material to the issues are always competent evidence against the party, wherever, whenever or to whomever made." *Reed v. McCord*, 160 N.Y. 330, 334, 54 N.E. 737 (1899); *People v. Chico*, 90 N.Y.2d 585, 665 N.Y.S.2d 5 (1997).

The public statements and press releases of Letitia James are, consequently, binding upon the OAG in this litigation. *See, e.g. United States v. Bases*, supra at *4(announcement by CFTC and DOJ of criminal charges, *inter alia*, "illustrate extensive cooperation, joint participation, and sharing of resources between the CFTC and DOJ related to the investigation").

*          *          *

### The Conclusion that the OAG is Violating Movants' Rights by Circumventing CPL 190.40 is Inescapable

There is little question that the framers of New York's Constitution and the drafters of CPL 190.40 did not envision, much less intend, that the protections built into these statutes could be easily and deliberately sidestepped by law enforcement conducting a criminal investigation. But that is precisely what the OAG is plainly and admittedly doing in this case. The OAG is conducting a criminal investigation via a grand jury – so says the Attorney General. The criminal investigation is investigating the very same matters sought by the subpoenas at issue. The OAG intends to use the "evidence obtained" in the OAG's criminal investigation – which is a grand jury investigation. The conclusion is inescapable that the OAG is violating CPL 190.40 and Movants' rights under the New York Constitution.

20

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 22 of 39

## POINT TWO

## IN THE ALTERNATIVE, THE COURT SHOULD GRANT THE MOTION TO STAY

### A.      *This Court Clearly has the Discretion to Grant a Stay*

The Moving Parties clearly set forth the law on the subject of staying an action (Movants'
MOL at 17-20). The OAG attempts to convert the issue into whether an invocation of the privilege
against self-incrimination <u>compels a court</u> in the routine case to stay a civil action where the
defendant is being investigated in a related criminal action. At other places, the OAG appears to
suggest that these cases stand for the proposition that a Court <u>does not have</u> the discretion to stay
a civil action. *See* OAG's MOL Response at 26. Both of these premises are incorrect.

This Court has full discretion to grant a Stay. CPLR 2201 provides that "the court in which
an action is pending may grant a stay of proceedings in a proper case, upon such terms as may be
just."  The OAG cites to *Campbell v. New York City Transit Auth.,* 32 A.D.3d 350, 351 (1st Dept
2006), which stands for that very propostion. Indeed, the *Campbell* court stated the unremarkable
propositions that "[t]he law is clear that a court is <u>not required</u> to stay a civil action until a pending
related criminal prosecution," and that "the pendency of a criminal proceeding does not give rise
to an absolute right….to a stay of a related civil proceeding…" *id. (emphasis added)*, which is just
what Movants stated in their Motion to Quash. *See* Movants' MOL at 17-18; *see also Fortress
Credit Opportunities I LP v. Netschi,* 59 A.D.3d 250 (1st Dept 2009) ("The motion court
<u>appropriately exercised its discretion</u> in denying the motion for a stay of the action and a stay of
discovery pending federal criminal investigation of defendant.")(emphasis added); *Access Capital
v. DeCicco*, 302 A.D.2d 48, 49-50 (1st Dept 2002)(recognizing stay is discretionary).

This Court does have the discretion to stay the action, especially under the unprecedented
circumstances presented in this case.

**B.** *Discretionary Factors Weigh in Favor of a Stay*

The OAG argues that none of the Moving Parties have been indicted, and the OAG will be prejudiced by a stay. *See* OAG's MOL Response at 32-34. First, if anyone is prejudiced it is Movants, whom the OAG is endeavoring to prejudice by circumventing the grand jury process. Indeed, the fallacy of the OAG's argument is so obvious – if the OAG wants the testimony, they merely need to comply with CPL 190.40 and bring Movants before the Grand Jury. The fact that they are resistant to this obvious solution belies their true intent, which is to circumvent the grand jury process.

The OAG also makes the obvious point that "Protecting the citizenry against fraud is undoubtedly a legitimate state interest." OAG's MOL Response (ECF 359) at 33 citing *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 43 (1980). Sure, but avoiding the grand jury and receiving the invocation of the fifth amendment hardly advances their investigation. If the OAG truly seeks testimony, they can call these witnesses before the very grand jury they are utilizing. In any event, staying this unique case pending the criminal investigation does not prevent the OAG from enforcing the laws.

For these reasons, if the Court decides not to quash the subpoenas, it should stay their enforcement pending the criminal investigation.

## **POINT THREE – RESPONDING TO THE MOTION TO COMPEL**

## **THE COURT SHOULD DENY THE OAG'S MOTION TO COMPEL BECAUSE THE ATTORNEY GENERAL IMPERMISSIBLY SELECTED THE MOVING PARTIES FOR INVESTIGATION DUE TO THEIR POLITICAL VIEWS AND RELATIONSHIPS TO FORMER PRESIDENT TRUMP**

Letitia James' extraordinary public statements—condemning Donald Trump's political views and promising to "take on" Mr. Trump and his family, associates, and companies—is powerful evidence that the OAG impermissibly targeted Donald Trump's associates and companies for investigation and prosecution based solely on political animus. Such selective prosecution violates the Equal Protection Clauses of the Federal and New York States Constitutions and requires that the subpoenas be quashed. At a minimum, Movants have made a sufficient showing of animus and disparate treatment to require the OAG to provide discovery on this selective prosecution claim and for the Court to then schedule an evidentiary hearing.

### A. **The Equal Protection Clauses in the Federal and New York State Constitutions Forbid Selective Prosecution Based on Disfavored Speech or Political Views**

The Equal Protection Clauses in the United States Constitution (14th Amendment) and the New York State Constitution (Article I, § 11) "forbi[d] a public authority from applying or enforcing an admittedly valid law 'with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances.'" *303 W. 42nd St. Corp. v Klein*, 46 N.Y.2d 686, 693 (1979) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373–374 (1886)); *see also People v. Goodman*, 31 N.Y.2d 262, 268 (1972) (holding that the "intentional or

23

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 25 of 39

purposeful discrimination in the administration of an otherwise nondiscriminatory law violates equal protection").[13]

To succeed on a motion to dismiss based on selective prosecution "both the 'unequal hand' and the 'evil eye' requirements must be proven – to wit, there must be not only a showing that the law was not applied to others similarly situated but also that the selective application of the law was deliberately based upon an impermissible standard such as race, religion or some other arbitrary classification." *303 W. 42nd St. Corp.*, 46 N.Y.2d at 693 (1979). One such "impermissible" and "arbitrary classification" is targeting a person for prosecution based on his political views or speech. *See id.* ("At this stage, though, taken as a whole, the nature and quantum of petitioner's proposed proofs were more than adequate to justify a judicial hearing, all the more so because the alleged discrimination involved the exercise of 1st Amendment rights"); *Sonne v. Bd. of Trustees of Vil. of Suffern*, 67 A.D.3d 192, 203-204 (2d Dep't 2009) ("The person must be singled out for an impermissible motive not related to legitimate governmental objectives, which could include personal or political gain, or retaliation for the exercise of constitutional rights" such as "free speech under the First Amendment[.]"). The Court of Appeals has cautioned that ordinarily "a strong inference of illicit motive will be all that can be expected because admission of intentional discrimination is likely to be rare; law enforcement officials are unlikely to avow that their intent was to practice constitutionally proscribed discrimination." *Id.* Proof of intent, therefore, can be shown by a "showing of a grossly disproportionate incidence of nonenforcement

---

[13] This rule applies to corporations, as well as to individuals. *See, e.g., 303 W. 42nd St. Corp.* at 690 (remanding for a hearing on the selective prosecution claim raised by the "[p]etitioner corporation"); *Bower Assoc. v. Town of Pleasant Val.*, 2 N.Y.3d 617, 630 –632 (2004) (addressing a selective prosecution claim raised by Home Depot, U.S.A., Inc.).

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 26 of 39

against others similarly situated in all relevant respects save for that which furnishes the basis of

the claimed discrimination." *Id.*

> **1.** **Letitia James Repeatedly Said That She Despises Former President Trump's Politics and That She Intended to Investigate Every Aspect of His Life, as well as Sue Him, His Family, His Associates, and His Businesses, and Would Bring Civil and Criminal Charges to Punish Him for His Political Views**

Starting from the time she announced her candidacy for Attorney General in May 2018 –

well before she could have seen any evidence or known any facts – Ms. James made clear that she

despised Donald Trump's politics and policies and made "taking on Donald Trump" the focal point

of her campaign. In doing so, she made countless statements indicating that her opposition to

President Trump was meant to serve as a condemnation of his policies and views and a public

display of loyalty to her own political party. She promised that if she became Attorney General

she would go after him personally by investigating and prosecuting him. For example, in a

campaign video, Ms. James tied her political opposition to President Trump directly to her promise

to investigate and prosecute both him and his companies. Ms. James stated:

> I'm running for attorney general, because I will never be afraid to challenge this illegitimate president when our fundamental rights are at stake....
>
> I believe that this president is incompetent. I believe that this president is ill-equipped to serve in the highest office of this Land. And I believe that he is an embarrassment to all that we stand for. He should be charged with obstructing justice. I believe that the President of these United States can be indicted for criminal offenses and we would join with law enforcement and other attorneys general across this nation in removing this President from office.
>
> In addition to that, the office of attorney general will continue to follow the money because we believe he's engaged in a pattern and practice of money laundering. Laundering the money from foreign governments here in New York State, and

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 27 of 39

particularly related to his real estate holdings. It's important that everyone understand, the days of Donald Trump are coming to an end.[14]

Letitia James Video, September 28, 2018, available at

https://www.youtube.com/watch?v=D1yj0NKSsuU.

When Ms. James made this speech, she had no evidence that Donald Trump was engaged in any criminal activity. Nonetheless, she promised to investigate and prosecute him for money laundering, a baseless allegation as to which there is, to this day, no evidence. Throughout her campaign, Ms. James continued to promise to investigate President Trump and prosecute him, publicly: (i) accusing Mr. Trump of having engaged in "public corruption;"[15] (ii) stating that she had her "eyes on Trump Tower;"[16] (iii) stating that then-President Trump should be "worried" about her,[17] and "scared" about her upcoming term;[18] (iv) stating that Mr. Trump's "days of defrauding Americans are coming to an end;"[19] (v) stating that, if elected, she would "take on

---

[14] Letitia James Video, September 28, 2018 , available at https://www.youtube.com/watch?v=D1yj0NKSsuU, at :17–:25; 1:50–2:36.

[15] Letitia James's 2018 campaign website, *Fighting Corruption No Matter Where It Lies*, TISH JAMES 2018 CAMPAIGN annexed to the First Futerfas Aff. as **Exhibit F**.

[16] Letitia James (@TishJames), TWITTER (Aug. 6, 2018, 3:47 PM), annexed to the First Futerfas Aff. as **Exhibit G**.

[17] Letitia James (@TishJames), TWITTER (Aug. 13, 2018, 11:37 AM), annexed to the First Futerfas Aff. as **Exhibit L**.

[18] Letitia James (@TishJames), TWITTER (Aug. 22, 2018, 9:09 AM), annexed to the First Futerfas Aff. as **Exhibit H**.

[19] Letitia James (@TishJames), TWITTER (October 3, 2018, 1:44 PM), annexed to the First Futerfas Aff. as **Exhibit I**.

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 28 of 39

Donald Trump,"[20] and immediately investigate him and his "cronies;"[21] (vi) stating that she was "getting ready to ask [Trump] some questions-under oath;"[22] and (vii) "call[ing] upon any agency with jurisdiction – from the IRS to the NY AG – to follow the facts wherever they may lead, and stressing that [n]o stone should be left unturned;"[23] (viii) stating that she "want[ed] to begin to engage in an investigation into the Trump Administration with respect to [Trump's] finances in the State of New York;"[24] and (ix) stating that planned to "focus on Donald Trump and his abuses . . . we need to follow his money . . . we need to find out where he's laundered money."[25] And though it appears to have since been removed, Ms. James' campaign website at one time even contained a section entitled "*Investigate Trump's New York Business*" in which she promised to undertake "a review of Trump-related real estate transactions, especially those in which the Trump family suddenly started paying cash for properties after years of operating their businesses

---

[20] Letitia James (@TishJames), TWITTER (July 1, 2018, 2:56 PM), annexed to the First Futerfas Aff. as **Exhibit J**.

[21] Letitia James (@TishJames), TWITTER (Aug. 21, 2018 1:01 PM) ("Just wait until I'm in the Attorney General's office.", annexed to the First Futerfas Aff. as **Exhibit K**.

[22] Letitia James (@TishJames), TWITTER (Aug. 13, 2018, 11:37 AM), annexed to the First Futerfas Aff. as **Exhibit L**.

[23] Letitia James (@TishJames), TWITTER (October 3, 2018, 1:44 PM), annexed to the First Futerfas Aff. as **Exhibit I**.

[24] Letitia James On Her Run for Attorney General, Boosting Our Communities and Speaking Truth to Power, The Breakfast Club Power 105.1 FM, October 24, 2018), available at https://www.youtube.com/watch?v=dhH_nLfPUVU, from 5:21 to 5:28.

[25] *New York Attorney General on Plan to Thwart Trump Pardons*, The Beat with Ari Melber on MSNBC, April 23, 2019), available at https://www.youtube.com/watch?v=6onOx85SRbc, from 0:27 to 0:32.

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 29 of 39

exclusively by borrowing money."[26] Finally, in response to a question of what should motivate people to vote, she responded: "Donald Trump – that should motivate you to vote" and promised that "we're gonna definitely sue him. We're gonna be a real pain in the ass."[27]

It bears repeating that these allegations and threats of investigation were made when Ms. James had no personal knowledge about "Trump-related real estate transactions," or any information or insight into Donald Trump's business other than what she presumably had seen in the media. Her statements, therefore, can only be understood to be based on personal animus to then-President Trump, not those of an elected law enforcement officer following the evidence where it may lead.

Nor did this targeting of President Trump cease once Ms. James was elected. Rather, during her election night victory speech, she stated that she would "be shining a bright light into every dark corner of his real estate dealings, and every dealing … ."[28] In November 2018, one month before taking office, she told NBC News that she would "use every area of the law to investigate President Trump and his business transactions and that of his family as well."[29]

---

[26] PDF downloaded from Letitia James' 2018 campaign website, annexed to the First Futerfas Aff. as **Exhibit M**.

[27] This video, originally posted on Instagram, is now available on YouTube at https://www.youtube.com/watch?v=V5-MLgPRejM&feature=youtu.be.

[28] Kristine Phillips, *New York's next attorney general targeted slumlords. Now she's going after Trump,* THE WASHINGTON POST, Dec.19, 2018, annexed to the Second Futerfas Aff. as **Exhibit 2D**. *Accord* Athena Jones, *New York AG Vows to Target Trump*, CNN (video), available at https://www.cnn.com/videos/politics/2019/01/03/letitia-james-donald-trump-jones-dnt-lead-vpx.cnn.

[29] Allan Smith, *Incoming New York attorney general plans wide-ranging investigations of Trump and family*, NBC NEWS, Dec. 12, 2018, annexed to the Second Futerfas Aff. as **Exhibit 2E.**

Case 1:21-cv-01352-BKS-CFH    Document 25-3    Filed 02/23/22    Page 30 of 39

In November 2020, Attorney General James made an appearance on the comedic news program *Full Frontal with Samantha Bee*. To understand that this investigation is premised entirely on the desire to "get" President Trump and his family, one only has to watch this video.

> Samantha Narration: Between the Attorney General's civil investigations of Trump, and the Manhattan DA's criminal investigation, things could get really legal. I don't want to get too excited, but a girl can dream, can't she?

> Samantha: I know you can't tell me anything too specific about any of the lawsuits, but can I just sit here and use my imagination to picture the outcomes that I desire.

> (both laugh)

> AG: When he leaves office as a private citizen, he will no longer have presidential immunity, so stay tuned.

Transcript from Excerpt of Letitia James' Appearance on *Full Frontal with Samantha Bee* (TBS television broadcast Nov. 19, 2020) annexed to the Second Futerfas Aff. as **Exhibit 2B**.

These intemperate and improper comments continue to this day. Indeed, just last month, Ms. James went on the television program *The View* to explain why she withdrew from the race for Governor and made clear that one of the main reasons was her desire to continue to investigate and prosecute Donald Trump and his companies. Then, in response to a statement by one of the show hosts, Joy Behar, that "I believe in putting Trump in jail," AG James laughed, adding . . . "Joy, you know I love you, right? I do, I do, I do. So, you know I can't admit or deny. [AG James laughing]. I cannot admit and/or deny those allegations in the preface of your question." *See* transcript of an excerpt from Letitia James' appearance on *The View* (ABC television Broadcast Dec. 14, 2021) annexed to the First Futerfas Aff. as **Exhibit D**. Notwithstanding her protestations, however, Ms. James went on to discuss the facts of the case and her Office's joint investigation of Donald Trump and the Trump Organization more generally, all while laughing as if a criminal

prosecution, or a civil investigation of all of Trump's companies by the Attorney General's Office, was a joking matter.

A complete timeline of Ms. James's improper and inappropriate statements regarding Donald J. Trump and his companies is annexed to the Second Affirmation of Alan S. Futerfas as Exhibit **2G**. A video compilation of Ms. James making some of these improper statements is annexed to the Second Affirmation of Alan S. Futerfas as Exhibit **2H.** Finally, Exhibit **2I** annexed to the Second Affirmation of Alan S. Futerfas contains two demonstrative spreadsheets cataloging Ms. James's improper statements about Donald J. Trump and video clips of her making those statements.

Courts have consistently found statements like these to be evidence of an illicit motive sufficient to warrant the relief of the dismissal of criminal charges. *See, e.g., 303 W. 42nd St. Corp.*, 46 N.Y.2d at 696 (finding evidence of "illegitimate motive" where government officials "were unabashedly trumpeting: '[despite] all the constitutional limitations, we stop at nothing when we try to put one of these places out of business.'") (brackets in the original); *People v. Abram*, 178 Misc. 2d 120, 125 (City Ct. 1998) (dismissing the charges because the "court finds in this case the District Attorney 'avowed' his intent to practice 'constitutionally proscribed discrimination' based on an announced policy of his Office he outlined to the local newspaper.").

Further, many of Ms. James's statements are in blatant violation of the presumption of innocence, a hallmark of prosecutorial ethics which requires a prosecutor to "refrain from speaking in public about pending and impending cases except in very limited circumstances." *See* N.Y.R.P.C. 3.6 ("A lawyer who is participating in or has participated in a criminal or civil matter shall not make an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of

materially prejudicing an adjudicative proceeding in the matter."); *see also* ABA M.R.P.C. Rule 3.8 ("[A] [p]rosecutor shall…refrain from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused"). Despite her well-founded obligation to refrain from commenting on an ongoing investigation, Ms. James has seemingly jumped at every opportunity to disseminate public statements about her investigation of Movants. Even worse, her comments imply—or even downright proclaim—that Movants are guilty of wrongdoing.[30] Therefore, it cannot be reasonably disputed that Ms. James's repeated public pronouncements concerning Movants are highly prejudicial and have tainted the public's perception of Movants and their business.

### 2. Shortly After She Became Attorney General, Letitia James Began a Massive Investigation into President Trump, His Businesses, Family, and Associates

Less than three months after being sworn in as Attorney General, Letitia James launched an investigation into virtually all aspects of the business dealings of Donald Trump and the Trump Organization.[31] While Ms. James has repeatedly claimed that her investigation was predicated on Michael Cohen's February 2019 testimony to Congress, it is clear from her campaign promises that Ms. James was looking for <u>any</u> excuse to investigate Donald Trump and his companies and merely seized on Mr. Cohen's testimony as a dubious justification for commencing her

---

[30] New York courts have consistently rebuked remarks which "bundle together unproven allegations regarding [a] [d]efendant with broader commentary on corruption and a lack of transparency in certain aspects of . . . politics," noting that these types of statements are inherently prejudicial because "it would not be unreasonable for members of the media or the public to interpret" them "as a commentary on the character or guilt of the individual or entity under investigation." *United States v. Silver*, 103 F. Supp. 3d 370, 378-79 (S.D.N.Y. 2015).

[31] *See* Redacted Affidavit of Matthew Colangelo, dated August 21, 2020 (ECF 10), filed in support of a Motion to Compel, dated Aug. 24, 2020, annexed to the First Futerfas Aff. as **Exhibit P**. The OAG filed an unredacted copy underseal as ECF 14.

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 33 of 39

investigation. It stretches all credibility to believe that the OAG put any legitimate stock into the

testimony of Mr. Cohen, a man who has seemingly made his recent living off of publicly maligning

Donald Trump and who has already been convicted of perjuring himself in connection with the

very same act—testifying before Congress—that the OAG claims to have relied upon.[32]

Even other law enforcement agencies have acknowledged, in no uncertain terms, that Mr.

Cohen is an untrustworthy source. For instance, around the same time the OAG supposedly

commenced its investigations based upon Mr. Cohen's testimony, the United States Attorney's

Office for the Southern District of New York (SDNY), interviewed Cohen, who sought leniency,

and had very "substantial concerns about Cohen's credibility as a witness." Indeed, the SDNY

found that "Cohen lied to the SCO (The Special Counsel) at [a] meeting, repeating many of the

prior false statements he had made to the Congress." They also pointed to "material false

statements" that he had made to both the SDNY and FBI. The SDNY also acknowledged that after

Cohen's testimony before Congress, "members of one committee made a criminal referral for

perjury, citing apparent contradictions between Cohen's testimony and his guilty pleas and certain

filings in the SDNY case." Finally, the SDNY conveyed that "throughout the period of his

purported cooperation, Cohen and his surrogates made a litany of public comments about his

SDNY case, many of which minimized his acceptance of responsibility for conduct to which he

had pled guilty and were inconsistent with his pleas or other undisputed facts." Government

Opposition to Cohen's Application Pursuant to Rule 35 dated December 19, 2019, 18 Cr. 602

---

[32] In particular, on November 29, 2018, Cohen was convicted of making false statements to Congress in violation of 18 USC § 1001(a)(2) as well as seven additional federal felonies which "each involved deception." Sentencing Tr. at 31:10-15, *United States v. Cohen*, No. 18 Cr. 602 (WHP) (S.D.N.Y. Dec. 12, 2018). In the words of presiding district court judge William H. Pauley III, Cohen was guilty of a "veritable smorgasbord of fraudulent conduct." *Id.*

Case 1:21-cv-01352-BKS-CFH Document 25-3 Filed 02/23/22 Page 34 of 39

(WHP)(ECF 58) at pages 1, 3-6 and n. 4. As described by the SDNY, this behavior is entirely

consistent with the "pattern of deception that permeate[s]" Cohen's life.[33]

Given the political motivation of this case, it is not surprising that this investigation was

treated very differently than other investigations conducted by OAG. The OAG has devoted

massive amounts of resources to this investigation, subpoenaing millions of pages of documents

from both the Trump Organization and third parties, as well as taking dozens of lengthy

depositions. The OAG has also ensured that significant aspects of its investigation receive media

attention. Thus, as soon as the first subpoenas were served, that information was immediately

leaked to the press (apparently on the very same day), with the New York Times reporting that the

OAG had served subpoenas on various financial institutions, including Deutsche Bank and other

banks, and was investigating "the financing of four major Trump Organization projects..."[34] And

when there was a discovery dispute between OAG and the Trump Organization, OAG issued a

press release, setting out the details of their investigation, a highly unusual thing for a government

agency to do.

Letitia James's statements – which constitute powerful evidence of selective prosecution –

continue unabated. As recently as January 9, 2022, Attorney General James sent an email blast

soliciting her supporters to "stand with [her] in this fight [against President Trump.]" *See* January

9, 2022 James Campaign Email with the Subject "One Year Ago Today[,]" annexed to the Second

Futerfas Aff. as **Exhibit 2C** In this extraordinary, unprecedented and frankly appalling email, Ms.

---

[33] USAO Sentencing Memorandum at 1-2, *United States v. Cohen*, No. 18 Cr. 602 (WHP) (S.D.N.Y. Dec. 7, 2018).

[34] William K. Rashbaum and Danny Hakim, *New York Attorney General Opens Investigation of Trump Projects*, NEW YORK TIMES, March 11, 2019, available at www.nytimes.com/2019/03/11/nyregion/deutsche-bank-trump.html. Annexed to the annexed to the Second Futerfas Aff. as **Exhibit 2F**.

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 35 of 39

James, the current Attorney General of the State of New York, asks recipients whether they "Approv[ed] of Donald Trump as president" and claims that "it now appears that the [January 6, 2021 riot] may be traced back to one person: Trump himself." *Id.* This email was sent less than a week after Moving Parties filed Movant's MOL, which referenced Ms. James' prior statements. There can be no stronger basis for a claim of selective prosecution than the evidence presented herein. It is truly unprecedented in the history of this state.

### 3. Whether the OAG's Investigation is Viable or Not is Irrelevant to a Claim of Selective Prosecution

The OAG may argue that its investigation is justified notwithstanding the Attorney General's admitted political motivations for investigating Donald Trump, his companies, and associates. This argument, if made, must be rejected.

Once an action is found to be the result of viewpoint discrimination, it is unconstitutional *per se*, regardless of whether it may have been reasonable for other reasons. *See, e.g., Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 297 (3d Cir. 2011) (quoting *Ridley v. Mass. Bay Transp. Autho.*, 390 F.3d 65, 86 (1st Cir. 2004)) (Because "[t]he government rarely flatly admits it is engaging in viewpoint discrimination," such a claim is not defeated by "the recitation of a nondiscriminatory rationale."). In other words, in a viewpoint discrimination case, whether the government action is justified or unjustified in its own right "is beside the point." *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 396–97 (1993); *Accord Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S. 788, 812 (1985) ("While we accept the validity and reasonableness of the justifications offered by petitioner … those justifications cannot save an exclusion that is in fact based on the desire to suppress a particular point of view."). In short, governmental action that is viewpoint discriminatory is *prima facie* unconstitutional. *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 633 (2d

Cir. 2005) (holding a "viewpoint discriminatory restriction on school-sponsored speech is, prima facie, unconstitutional, even if reasonably related to legitimate pedagogical interests").

As such, once it is established that Letitia James had unconstitutional motives for investigating the Trump entities and family, any action, including the issuance of subpoenas, must be estopped or dismissed, irrespective of any evidence or leads the OAG may have had.

### 4.  This Court Should Order a Hearing on the Issue of Selective Prosecution and Should Order the OAG to Produce Discovery on this Issue

Where a party asserting a selective prosecution claim demonstrates a "reasonable probability" of success on the merits, "an evidentiary hearing before a judicial tribunal is mandated." *303 W. 42nd St. Corp.*, 46 N.Y.2d at 690. *See, e.g., People v. Bergen Beach Yacht Club*, 160 Misc. 2d 939, 944 (N.Y. Crim. Ct. 1994) (granting a hearing on a selective prosecution claim). In considering whether a defendant has carried his burden and is therefore entitled to a hearing on his selective prosecution claim, the Court should recognize that the "difficulties in obtaining detailed knowledge of unprosecuted violators in order to meet the burden of demonstrating similarity are likely to be great" and therefore, in proving uneven enforcement, "[l]atitude should be allowed in this complex area of proof.") *Id.* This flexibility in proof is necessary because "the importance of the right to be free from impermissible selective enforcement must be of more than theoretical value, [and so] the burden of demonstrating a violation, albeit heavy, must not be so heavy as to preclude any realistic opportunity for success." *Id.*

In New York, "the claim of unequal protection is treated not as an affirmative defense to criminal prosecution or the imposition of a regulatory sanction but rather as a motion to dismiss or quash the official action." *303 W. 42nd St. Corp.*, 46 N.Y.2d at 693. "And, in its consideration of the merits of such a claim … a court must conduct a hearing if, on the papers before it, a strong showing of selective enforcement, invidiously motivated, appears." *Id.* Where, following

a hearing, a prosecution is found to be "invidiously motivated," the indictment must be dismissed as a matter of law. *Id.*

Accordingly, we respectfully request that the Court order a hearing as to whether the investigation in this case, including the issuance of subpoenas, should be quashed because of selective prosecution, allow the Movants discovery on this issue, and that, at the conclusion of the hearing, quash the subpoenas.

In addition, the Court should allow for discovery into this claim, including all OAG communications and memos regarding or referencing political calculations related to Trump-related investigations or charges. *Cf. United States v. Oaks,* 508 F.2d 1403, 1405 (9th Cir. 1974) ("At that hearing, the trial court may, in the exercise of its discretion, require disclosure of relevant privileged information."). In light of the unprecedented actions taken by Ms. James, including the endless tirade of public threats and promises, Movants are entitled to fully examine the clear political animus that propel the OAG's investigation.

We respectfully submit that given the extensive and extraordinary evidence detailed above, the OAG selectively initiated its Trump investigation and issued the subpoenas, "based on impermissible considerations such as … to inhibit or punish the exercise," *Bower Assoc. v. Town of Pleasant Val.*, 2 N.Y.3d 617, 631 (2004), of President Trump's Free Speech and political association rights under both the Federal and State Constitutions. Accordingly, the Court should quash the subpoenas. In the alternative, the Court should schedule a hearing on this claim.

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 38 of 39

## CONCLUSION

For all of the foregoing reasons, the Court should:

(a)    Grant the Moving Parties' motion to quash the subpoenas or, in the alternative, stay

this action pending the criminal case;

(b)    Grant the requested hearings;

(c)    Deny the OAG's motion to compel;

(d)    Grant a hearing regarding whether the OAG's investigation was the result of

selective prosecution; and

(e)    Grant any further relief the Court deems just and proper.

Dated: New York, New York
       February 1, 2022

_____
Alan S. Futerfas
Law Offices of Alan S. Futerfas
565 Fifth Avenue, 7th Fl
New York, NY 10017

*Attorneys for Respondents/Moving Parties*
*Donald J. Trump, Jr., and Ivanka Trump*

Ronald P. Fischetti
Fischetti & Malgieri
565 Fifth Avenue, 7th Fl
New York, New York 10017

Michael T. van der Veen
Van der Veen, Hartshorn and Levin
1219 Spruce Street
Philadelphia, PA 19107

Alina Habba
Habba Madaio & Associates LLO
112 West 34th Street
New York, New York 10120

37

Case 1:21-cv-01352-BKS-CFH   Document 25-3   Filed 02/23/22   Page 39 of 39

*Attorneys for Respondent/Moving Party*
*Donald J. Trump*